UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

      -v.-

MAALIK ALIM JONES,

                    Defendant.

16 Cr. 19 (PGG)

**THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION
TO THE DEFENDANT'S MOTION TO SUPPRESS STATEMENTS**

JOON H. KIM
Acting United States Attorney
Southern District of New York
*Attorney for the United States
of America*

Andrew J. DeFilippis
Shawn G. Crowley
      Assistant United States Attorneys
      *Of Counsel*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

MAALIK ALIM JONES,

                    Defendant.

16 Cr. 19 (PGG)

## PRELIMINARY STATEMENT

On May 19, 2017, Maalik Alim Jones ("Jones" or "the defendant") filed a motion to suppress all statements that he made to U.S. and Somali authorities following his apprehension in Somalia in December 2015.  The statements by Jones that the Government seeks to offer at trial include: (1) statements to members of the Somali National Army ("SNA") following his apprehension by the SNA in Baraawe, Somalia, and (2) *Mirandized* statements subsequently made to agents of the Federal Bureau of Investigation ("FBI") in Mogadishu, Somalia while he was still in Somali government custody.  As explained in further detail below, the Government respectfully submits that the defendant's motion should be denied, but that that a limited and narrowly tailored factual hearing is warranted to resolve two discrete issues of material fact.  First, because the Government seeks to offer at trial certain statements made by the defendant to members of the SNA in the days immediately following his arrest, *see infra* Discussion Part I, a limited factual hearing is warranted to determine whether those statements were voluntary under the

circumstances of his questioning by the SNA.[1]  Second, a limited factual hearing is also necessary to determine whether the defendant's subsequent statements to the FBI were voluntary.  *See infra* Discussion Part II.  With regard to those statements to the FBI, only the conduct of U.S. (as opposed to Somali) government personnel is relevant to the Court's determination, and the Court therefore should limit the proposed factual hearing and witness testimony accordingly.  The Government expects that testimony at any factual hearing will establish that the defendant's statements made to both U.S. and Somali authorities were voluntary and are therefore admissible at trial.

## BACKGROUND

### I.  The Alleged Offense Conduct

In July 2011, Jones, a United States citizen who resided in the Baltimore, Maryland area, traveled via commercial aircraft from New York to Kenya, with stopovers in Morocco and the United Arab Emirates.  After arriving in Kenya, Jones traveled by land from Kenya to Somalia where he trained, worked, and fought with al Shabaab.[2]  Compl. ¶ 24.  Among other things, Jones

---

[1] The FBI has informed the Government that obtaining necessary approvals for the travel and entry to the United States of Somali government witnesses will take at least approximately three months. The FBI has initiated this process.  Accordingly, the Government respectfully requests that the Court either (1) conduct a bifurcated hearing on the issues described above, first hearing testimony of U.S. officials and later hearing testimony of Somali officials (once their travel to the United States can be arranged), or (2) conduct a single hearing to occur no earlier than September 2017.

[2] Al Shabaab is a foreign terrorist organization aligned with al Qaeda.  Compl. ¶ 11.  Among other things, al Shabaab has used violent means to destabilize the government of Somalia, to commit violence against the Somali population, to force the withdrawal of foreign troops in Somalia, and to conduct cross-border attacks in Kenya.  *Id.*  As a result of al Shabaab's recruitment efforts, men from other countries – including the United States and the United Kingdom – have traveled to Somalia to engage in violent jihad.  *See id.*

received military training at an al Shabaab training camp.  *Id.*  As part of his training with al Shabaab, Jones learned to operate an AK-47 assault rifle and a PK machine gun, as well as rocket-propelled grenades.  *Id.*  Jones also became a member of al Shabaab's specialized fighting force, Jaysh Ayman, and participated in combat on behalf of al Shabaab against soldiers of the Kenyan government at a battle in Afmadow, Somalia.[3]  *Id.*

In June 2014, a contingent of Jaysh Ayman al Shabaab fighters traveled to Mpeketoni, Kenya, a village near the Somali-Kenya border, and massacred more than 84 residents of the village, going house-to-house shooting men as their families were forced to watch.

On June 14, 2015, a contingent of al Shabaab's Jaysh Ayman fighters ambushed a Kenyan Defense Force Base in Lamu County, Kenya, using various weapons, including AK-47 rifles and rocket-propelled grenades.  Compl. ¶ 11.  Two Kenyan Defense Force soldiers and all of the al Shabaab members who participated in the attack were killed.  *Id.*

Thereafter, Kenyan authorities recovered electronic media from the body of a deceased al Shabaab fighter who had been killed in the attack.  *See* Compl. ¶ 19.  Kenyan authorities subsequently provided the electronic media to the FBI.  The FBI's review of the media revealed several videos in which Jones is depicted with other prominent al Shabaab fighters, including members of the Jaysh Ayman unit who were killed in the June 2015 Lamu County attack.  For example, in one of the videos, Jones is depicted sitting behind an al Shabaab commander ("CC-1"), as CC-1 gave a sermon to a crowd of male fighters and exhorted the fighters to carry out

---

[3] Jaysh Ayman is responsible for carrying out commando-style attacks and cross-border raids in which fighters, among other things, travel across the land border between Somalia and Kenya to target individuals and carry out terrorist attacks against military and civilian targets.  Compl. ¶ 13.

attacks on Kenyans.  *See* Compl. ¶ 21.  In another of the videos, Jones possessed an AK-47 assault

rifle and is seen with CC-1 and several fighters who participated in the aforementioned June 2014

attack in Mpeketoni, Kenya as well as the June 2015 attack on a Kenyan Defense Force base.  *See*

*id.*  In a third video, Jones is depicted with other al Shabaab fighters receiving combat instructions

and training.

## II.   The Defendant's Statements to Somali and U.S. Authorities

### A.   The Defendant's Capture in Somalia and Statements to the SNA

On December 7, 2015, the defendant was apprehended in Baraawe, Somalia by a battalion

of SNA soldiers.   The soldiers were on patrol when they came upon Jones attempting to procure

a boat in the Baraawe harbor.[4]  The soldiers took Jones into custody and brought him to the SNA

headquarters in Baraawe.

The Government expects that evidence adduced at a hearing would show that, shortly after

Jones arrived at SNA headquarters, he was questioned over the course of approximately two days

by SNA personnel, including by an English-speaking officer ("Officer-1") who was present for

each of the interviews conducted with Jones.[5]  Officer-1 was also the highest-ranking Somali

---

[4] Baraawe is a city in Somalia and is a common point of departure for individuals traveling via
boat to Yemen or to other locations in Somalia.

[5] The defendant asserts in his May 19, 2017 motion that his "statements to Somali officials that
the government may seek to offer at trial" have not been provided to him.  Def. Mem. 2.  The
substance of those statements, which the Government recently had become aware of at the time of
the defendant's motion, were provided to defense counsel on May 20, 2017.  The defendant made
these statements to Somali officials following his capture and prior to his transport to Mogadishu.
Accordingly, the defendant's claims concerning his treatment by the SNA—the veracity of which
the Government vigorously disputes—relate to these statements.

located at the SNA headquarters and charged with custody of Jones.  The Government expects that Officer-1 would testify that Jones told him, in sum and substance, that he had lived in Somalia for five or six years, during which time he was a member of a fighting group within al Shabaab.  Jones further stated that prior to his arrest, he had left al Shabaab due to a clash within the group.  Jones explained that he was transiting through Barawe where he and his co-conspirators planned to board a boat and travel to northern Somalia where they would join Daesh, or ISIS, in Somalia.  Jones told Officer-1 that al Shabaab had been hunting down Jones and other individuals who had defected from the group to join ISIS in Somalia.  The Government expects that Officer-1 will testify further that he had received orders from other Somali Government officials to ensure that Jones be treated well and kept safe.  Officer-1 will further testify that he was present for all questioning of Jones.  Contrary to Jones's affidavit, Officer-1 will testify that no one threatened, coerced, or physically harmed or abused Jones during his time in SNA custody.

### B.   The Defendant's Transfer to Mogadishu and Questioning by FBI Agents

On December 9, 2015—two days after his apprehension by the SNA—Jones was flown by helicopter from Baraawe to Mogadishu, Somalia, where Jones remained in the custody of the Somali government.  On the next morning, *i.e.*, December 10, 2015, Jones was interviewed by two FBI agents (the "Agents") at the Mogadishu airport.  No Somali authorities were present for the interview.  The Government expects that evidence adduced at a hearing will establish that the Agents began the interview by asking Jones, in sum and substance, who he was and whether he was being treated well.[6]  Jones provided his name and confirmed that he had been treated well,

---

[6] The Government expects the Agents will testify that Jones was unrestrained when he was brought into the interview room and remained unrestrained throughout the interview.

was comfortable, and had been given food and drink.[7]  The Agents then asked Jones whether he was aware of any potential threats or imminent attacks by al Shabaab.[8]  Jones replied that he was not aware of any threats or attacks, and explained that he had left al Shabaab because he felt misled by the group.

One of the Agents then read Jones an "Advice of Rights" form, which included the standard *Miranda* warnings.  *See* Ex. A (Advice of Rights Form).  The Advice of Rights form also stated, in part:

> We are not interested in any statements you may have made before.  We don[']t care what you said to anyone in the past.  We are starting anew.  You do not need to speak with us today just because you have spoken with others in the past.

*Id.*  Jones confirmed that he understood the form and then read it to himself.  *Id.*  Jones then paused and asked if waiving his rights at that time applied just to the meeting with the Agents and whether he could decide to invoke his rights later.  The Agents explained that Jones could invoke his *Miranda* rights at any time and that waiving his rights at that time did not mean he was waiving his rights forever.  They further explained that, should Jones wish to speak with an attorney at any time, he was free to do so.  Jones confirmed that he wished to speak with the Agents and initialed and signed the form.  *Id.*  In particular, Jones wrote his initials ("M.J.") next to each of the following statements:

- "I am willing to make a statement and answer questions."

---

[7] Agents also took photographs of Jones at this time to show that he was in good physical condition and had not been mistreated in any way.

[8] This brief questioning was conducted pursuant to *New York* v. *Quarles*, 467 U.S. 649 (1984) (setting forth public safety exception to *Miranda* requirements)

- "I do not want a lawyer at this time."

- "I understand my rights and my decision is a knowing and voluntary one."

- "No promises or threats have been made to me and no pressure or coercion of any kind has been used against me."

After waiving his *Miranda* rights, Jones told the Agents that in July 2011, he left Baltimore, Maryland with the intent to join al Shabaab. Compl. ¶ 23. He further stated that he traveled to New York City where he flew from John F. Kennedy International Airport to Morocco. *Id.* He added that approximately one week later, he traveled to Kenya, and thereafter to Somalia by taxi. *Id.* Jones stated that once in Somalia, he traveled to territory controlled by al Shabaab, and attended a training camp where he received religious instruction and training in how to shoot firearms (including AK-47s and PK machine guns) and operate rocket-propelled grenades. *Id.*

Jones further explained, in substance and in part, that upon completion of his training, he was assigned to the Jaysh Ayman fighting force. Compl. ¶ 23. Thereafter, he participated in an attack on Kenyan forces in Afmadow, where, according to Jones, he was injured by a missile. *Id.* Jones stated that after receiving medical treatment for his injuries, he returned to his Jaysh Ayman unit and subsequently attempted to leave al Shabaab and travel to Yemen. *Id.* Jones further stated that after spending time with al Shabaab, he came to believe that the group was causing harm to the Somali people. He added that he intended to travel to Yemen—a war-torn country wracked by civil war—to live in peace, and that when he decided to leave al Shabaab, al Shabaab was hunting him. Jones also identified himself in several screenshots of the above-referenced

videos, and identified other al Shabaab members.[9]  *Id.*

Jones subsequently was arrested by the FBI in Somalia and ultimately transported to the Southern District of New York, where he arrived on December 18, 2015 and was presented on the Complaint.

## DISCUSSION

### I.  The Defendant's Statements to the Somali National Army Were Voluntary

The defendant argues that the statements he made to Somali officials while in SNA custody in Baraawe (from approximately December 7 to 9, 2015) should be suppressed.  He states in his affidavit that the officials "interrogated [him] at least once a day," treated him roughly, and "placed [him] in fear for his life."  Def. Aff. ¶ 6.  As a result, the defendant argues, the statements he made were not voluntary.  Def. Mem. 2.  And even if his statements were voluntarily made, the defendant contends, they should be suppressed because the defendant was not advised of his *Miranda* rights before he made them.  *Id.* 2, 5-6.

The Government acknowledges that a suppression hearing is warranted to resolve factual issues concerning the circumstances of the defendant's statements to the SNA and expects that testimony at any such hearing would establish that Jones's statements were voluntary and are therefore admissible at trial.  Moreover, the Government expects that the evidence will show that the defendant was arrested, detained, and interviewed by the SNA based solely on the decision of Somali authorities and not at the request or direction of the FBI or anyone else in the United States

---

[9] This memorandum provides only a partial summary of the defendant's statements.

government.  As a result, the defendant was not entitled to *Miranda* warnings at the time he was interviewed by Somali authorities.

### A.  Applicable Law

#### 1.  <u>Voluntariness</u>

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ."  U.S. Const. Amend. V.  "It guarantees 'the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty. . .  for such silence,'" and it applies "regardless of the origin – *i.e.*, domestic or foreign – of a statement . . . ."  *Weaver* v. *Brenner*, 40 F.3d 527, 534 (2d Cir. 1994) (quoting *Malloy* v. *Hogan*, 378 U.S. 1, 8, 84 (1964)).  Thus, a statement that is "compelled" – whether taken overseas or domestically – is inadmissible at trial in a court of the United States.  *In re Terrorist Bombings of U.S. Embassies in East Africa (Fifth Amendment Challenges)*, 552 F.3d 177, 199 (2d Cir. 2008).  It follows that inculpatory statements obtained overseas by foreign officials must have been voluntarily made in order to be admissible at trial.  *See id.* The law is well-settled, however, that such statements, when taken by foreign officials, are admissible even if they are not *Mirandized*.  *See United States* v. *Yousef*, 327 F.3d 56, 145 (2d Cir. 2003); *In re Terrorist Bombings of U.S. Embassies in East Africa (Fifth Amendment Challenges*, 552 F.3d at 200.

In determining whether a statement is voluntary, courts look to the "totality of the circumstances" which include: "(1) the accused's characteristics, (2) the conditions of the interrogation and (3) the conduct of the police."  *In re Terrorist Bombings of U.S. Embassies in East Africa (Fifth Amendment Challenges)*, 552 F.3d at 213 (internal citations omitted).  The inquiry examines "'whether a defendant's will was overborne' by the circumstances surrounding

9

the giving of a confession." *Dickerson* v. *United States*, 530 U.S. 428, 434 (2000) (quoting *Schneckloth* v. *Bustamente*, 412 U.S. 218, 226 (1973)).   The defendant's language ability, education and demeanor, as well as the conditions of his confinement, the duration of the interrogation sessions and the conduct of the officers, among other factors, are relevant to this inquiry.   *See, e.g.*, *In re Terrorist Bombings of U.S. Embassies in East Africa (Fifth Amendment Challenges)*, 552 F.3d at 213-214.   The test "depends on examining all of the circumstances surrounding the interrogation to see if police overreaching overcame a suspect's will and led to an involuntary confession, one not freely given."   *Weaver*, 40 F.3d at 536 (citation omitted); *see also, e.g.*, *Colorado* v. *Spring*, 479 U.S. 564, 574 (1987) (waiver is voluntary "[a]bsent evidence that [defendant's] will [was] overborne and his capacity for self-determination critically impaired because of coercive police conduct.") (citations and quotation marks omitted).

2.   Statements to Foreign Law Enforcement Officials

Custodial statements taken by American law enforcement officers in the absence of *Miranda* warnings may not be admitted into evidence at trial, but statements taken by foreign law enforcement officers may be admitted in the absence of such warnings.   *See, e.g., United States* v. *Abu Ali,* 528 F.3d 210, 227 (4th Cir. 2008).   This framework reflects the objectives of *Miranda*. While the warnings prescribed in that case "are not themselves rights to be protected by the Constitution," *New York* v. *Quarles*, 467 U.S. 649, 654 (1984), they are designed to maximize the trustworthiness of custodial statements, and the exclusionary sanction is designed to deter American law enforcement officers from failing to give the warnings.   *See, e.g., Oregon* v. *Elstad*, 470 U.S. 298, 308 (1985).

"[T]he law is settled that statements taken by foreign police in the absence of *Miranda* warnings are admissible if voluntary." *Yousef*, 327 F.3d at 145.   Courts' refusal to apply an exclusionary sanction reflects the limited deterrent benefit from excluding trustworthy evidence obtained by foreign sovereigns, "because the United States cannot dictate the protections provided to criminal suspects by foreign nations," *United States* v. *Abu Ali*, 528 F.3d 210, 227 (4th Cir. 2008), and "the exclusionary rule has little or no effect upon the conduct of foreign police," *United States* v. *Chavarria*, 443 F.2d 904, 905 (9th Cir. 1971).  *See also Hudson* v. *Michigan*, 547 U.S. 586 (2006) (noting that because the "exclusionary rule generates 'substantial social costs'" the rule is properly applied only "where its remedial objectives are thought most efficaciously served" and "its deterrence benefits outweigh its 'substantial social costs'") (citations omitted)).

There are two exceptions to this general rule.  "One exception is the 'joint venture' doctrine, under which statements elicited during overseas interrogation by foreign police in the absence of *Miranda* warnings must be suppressed whenever United States law enforcement agents actively participate in questioning conducted by foreign authorities." *Yousef*, 327 F.3d at 145.  The other exception to the general admissibility of voluntary statements taken by foreign officials are statements obtained in circumstances that "shock the judicial conscience." *Id.* at 146.

The Second Circuit has not defined the precise contours of the joint venture doctrine where, as here, U.S. officials were not involved in, or present for, the questioning conducted by foreign actors.  It has made clear, however, that if the Government can show that the United States and foreign law enforcement "went no further than providing assistance and sharing information, a joint venture has been disproven.  This is particularly true where U.S. authorities do not themselves conduct the interview in question." *United States* v. *Bary*, 978 F. Supp. 2d 356, 366–67 (S.D.N.Y.

11

2013) (citing *United States* v. *Abu Ali*, 528 F.3d 210, 228 (4th Cir. 2008)); *see also United States* v. *Maturo*, 982 F.2d 57, 61 (2d Cir. 1992) (investigation of crime requires cooperation between foreign and United States law enforcement officials, but there is no reason to think that "such cooperation would constitute the foreign officials as agents of the United States").   Indeed, a joint venture is found only in "circumstances under which the relationship between American and foreign authorities . . . amount to a joint willful attempt to evade the strictures of *Miranda*," *United States* v. *Bagaric*, 706 F.2d 42, 69 (2d Cir. 1983), *abrogated on other grounds by Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249 (1994), or a situation in which "United States police officers simply used foreign police officials as instruments" in conducting the investigation and interviews, *United States* v. *Welch,* 455 F.2d 211, 213 (2d Cir. 1972).   Accordingly, courts have deemed admissible un-*Mirandized* statements to foreign officials even where U.S. authorities are involved in the questioning itself, so long as American officers do not themselves conduct the questioning or otherwise control the interview.  *See, e.g., Welch*, 455 F.2d at 213 (holding that no joint venture existed where FBI agents were present for un-*Mirandized* questioning by Bahamian police, because the American presence did not establish that the United States had "simply used foreign police officials as instruments); *Abu Ali*, 528 F.3d at 229-30 (holding that un-Mirandized statements to Saudi authorities were admissible despite American involvement because Saudis retained ultimate control over the interview).

The second exception to the admissibility of voluntary statements to foreign officials— those obtained under circumstances that "shock the conscience"—has been defined to include "reprehensible" conduct, *United States* v. *Cotroni*, 527 F.2d 708, 712 n. 10 (2d Cir. 1975), or

"shocking conduct" such as, for example, the rubbing of pepper in the eyes of a suspect, *United States* v. *Nagelberg*, 434 F.2d 585, 587 n.1 (2d Cir. 1970).

### B. Argument

The Government expects that evidence adduced at a hearing will clearly establish that the defendant's statements to the SNA following his capture in Baraawe were voluntary.  In particular, the Government expects to offer testimony from one or more SNA officers establishing that Jones was provided adequate food and shelter; was not abused, threatened, or mistreated; and was not questioned in a coercive manner.  The evidence will further establish that because the SNA was not acting in concert with, or at the direction of, U.S. law enforcement authorities when Jones was arrested and questioned in Baraawe, *Miranda* warnings were not required.   In particular, government witnesses will testify that while the U.S. Department of Defense was notified of the defendant's apprehension soon after it occurred, there were no pending U.S. charges against Jones at that time, and no U.S. government personnel requested or participated in the Somali authorities' arrest or questioning of Jones.   *Cf. Yousef*, 327 F.3d at 146 (holding there was no need for evidentiary hearing concerning 'joint venture' allegations even where defendant asserted that U.S. authorities had "asked the Jordanians to help in [the defendant's] apprehension"); *United States* v. *Molina-Chacon*, 627 F. Supp. 1253, 1262-63 (E.D.N.Y. 1986) ("The fact that it was the United States that initiated [the defendant's] arrest by requesting the assistance of Bermuda in apprehending him is irrelevant.").   Accordingly, all of Jones's statements made to the SNA in the days following his apprehension did not require the administration of *Miranda* warnings and are admissible.

## II.   The Defendant's Statements to the FBI Were Voluntary

The defendant next argues that the statements he made to the FBI on December 10, 2015 while in Somali custody after being flown to Mogadishu should also be suppressed.  Def. Mem. 6-7.  The defendant does not allege any physical abuse or mistreatment while in Somali custody in Mogadishu, or during his FBI interview.  Rather, the defendant asserts that while he was in Mogadishu, Somali officials made various representations to him, including that certain governments were planning to kidnap him; that the "Americans were coming for him and that if he didn't help the Americans, the Somali government was powerless to protect [him];" and that if Jones agreed to join a "defector program" run by the Somali government, he would serve only a six-month sentence in a house in which he could live with his family.  *Id*. 3.  Jones argues that these statements placed him in fear for his life.  Jones Aff. ¶ 15.

Jones further contends that Somali authorities eventually told him that he would be meeting "with some Americans from the consulate," whereupon he was brought to a room and met with American law enforcement agents.  Def. Mem 3.  According to Jones, one of the Americans he met told him that the Somalis could sell Jones to the Kenyans or Djiboutians and that Jones would be killed if he did not cooperate with the Americans.  *Id*. 4.  Finally, Jones asserts that he signed the *Miranda* form that was provided to him because he "thought he would receive amnesty if he did and be killed if he didn't."  *Id.*

The Government respectfully submits that a hearing is warranted to resolve factual issues surrounding Jones's questioning by U.S. authorities on or around December 10, 2015.  Such a hearing should be limited, however, to testimony concerning Jones's interactions with U.S. authorities because Jones does not allege—nor could he—that any Somali officials participated in

his questioning by U.S. law enforcement agents.  Nor do his allegations concerning his prior treatment by Somali authorities bear on the voluntariness of his subsequent statements to the FBI, which Jones made after waiving his *Miranda* rights outside the presence of Somali authorities.

### A.   Applicable Law

To prove that a defendant exercised a valid waiver of his *Miranda* rights, "the government must show (1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right." *United States* v. *Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (citing *United States* v. *Baldacchino*, 762 F.2d 170, 178–79 (1st Cir. 1985)).  Generally, promises of leniency will not render a confession involuntary.  *See United States* v. *Bye*, 919 F.2d 6, 8 (2d Cir. 1990) (promises of leniency do not per se render a confession involuntary).  *See also Hawkins* v. *Lynaugh*, 844 F.2d 1132, 1139 (5th Cir.) (*dictum*), *cert. denied*, 488 U.S. 900 (1988); *United States* v. *Harris,* 914 F.2d 927, 933 (7th Cir. 1990).  Rather, the Court's determination should be based on the "totality of the circumstances." *Jaswal*, 47 F.3d 539 at 543.

### B.   Argument

The Court should grant a hearing on the limited issue of whether the conduct of U.S. authorities during Jones's December 10, 2015 interview rendered his statements voluntary.  The Court's consideration of this issue need not address matters concerning Jones's alleged treatment by Somali authorities in the days prior to his FBI interview.  In particular, the defendant's allegations that he was (1) threatened and physically mistreated while in the custody of the SNA in Baraawe, and (2) subjected to a series of promises and threats thereafter while in Somali custody in Mogadishu, are—in addition to being false—immaterial to the voluntariness *vel non* of his

15

subsequent statements to U.S. authorities.  *United States* v. *Yousef*, 925 F. Supp. 1063 (S.D.N.Y. 1996), *aff'd* 327 F. 3d 56 (2d Cir. 2003), is instructive.  There, the defendant moved to suppress statements he had made to U.S. law enforcement agents during a flight to the United States from the Philippines, where he previously had been in the custody of Philippine authorities.  *Id.* at 1067. The defendant argued that the statements given to U.S. law enforcement agents were "the result of the continued effects of alleged mistreatment suffered while in the custody of Philippines law enforcement officials."  *Id.* at 1077.  In a striking similarity to the instant claims, the defendant in *Yousef* argued that "the allegedly coercive nature of his custody in the Philippines was somehow imputed onto the United States law enforcement agents, and his waiver of his rights was not voluntarily given."  *Id.*  He further alleged that "three months of threats, torture, denial of proper sustenance, and fear at the hands of [foreign] interrogators and the knowledge that he had already confessed, influenced the defendant in such a manner so that he could not have made a conscious and deliberate choice when asked to waive his rights after leaving the Philippines."  *Id.*

The *Yousef* Court rejected these claims.  It concluded that, even if one credited the defendant's conclusions regarding his mental state, "[the defendant's] psychological state at the time the statement was given, without a showing of official coercion," did not "dispose of the question of voluntariness."  *Id.* (citing *Colorado* v. *Connelly*, 479 U.S. 157, 164 (1986)).  Finding that "the Philippine authorities who held [the defendant] in custody were not acting as agents of the United States," the Court held that it "must consider only whether the circumstances of [the defendant's] *interview by the FBI agents* aboard the plane were of such a coercive nature that [his] will was overborne by the conduct of the agents and [whether] his waiver was therefore involuntary."  *Id.* (emphasis added).  The Court further held that "if there is an absence of unduly

16

coercive conduct on the part of the law enforcement officials *involved in administering Miranda warnings* and obtaining a waiver of the rights contained therein, [the Court] cannot find that the interrogation was so tainted as to require suppression of the custodial statement." *Id.* (emphasis added).

This Court should adhere to the principle articulated in *Yousef*. In particular, it should limit the scope of any factual hearing on this issue to testimony concerning the conduct of U.S. (not Somali) authorities during Jones's December 10, 2015 questioning by the FBI. This approach accords with the well-settled principles that the purpose of the *Miranda* rule "is to prevent and deter United States law enforcement personnel from taking involuntary statements that are the result of unduly coercive custodial circumstances," and that "[t]his rationale cannot be applied to foreign countries since the law enforcement agencies would not be affected by the application of the exclusionary rule by a United States Court." *Id.* at 1076. *See also Welch*, 455 F.2d at 212 (recognizing that *Miranda* requirements have little if any deterrent effect upon foreign police). Thus, here, as in *Yousef*, it is the conduct of U.S. authorities alone that should inform the Court's decision as to whether the defendant's statements were voluntary.

Moreover, even assuming *arguendo* that Jones's self-serving allegations of prior mistreatment by Somali authorities were true and potentially relevant to his claims, those allegations would be insufficient to render his statements to the FBI involuntary. It is well settled that a "confession [elicited] under circumstances which preclude its use" does not "perpetually disable [] the confessor from making a usable one after those conditions have been removed." *United States* v. *Bayer*, 331 U.S. 532, 541 (1947). Even in a case "in which police forced a full confession from the accused through unconscionable methods of interrogation, the Court assumed

that the coercive effect of the confession would, with time, be dissipated." *Oregon*, v. *Elstad*, 470 U.S. 298, 311-12 (1984). Indeed, the Supreme Court has set forth several factors that should guide an inquiry into whether a confession obtained after a coerced statement is admissible, including "the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators." *Id.* at 310. Whether *Miranda* warnings were given prior to the second set of statements is also relevant. *Westover* v. *United States*, 384 U.S. at 496-97 (decided together with *Miranda* v. *Arizona*, 384 U.S. 436, 484 (1966)). *See also Robinson* v. *Percy*, 738 F.2d 214, 221 (7th Cir. 1984). The purpose of these factors is to ensure "a break in the stream of events . . . sufficient to insulate the statement from the effect of all that went before." *Clewis* v. *State of Texas*, 386 U.S. 707, 710 (1967).

Applying these standards, even if Jones's prior statements to Somali officials were coerced or influenced by mistreatment—which they were not—his subsequent interview with the FBI was not tainted by these purported events. Jones's only allegation of physical mistreatment is his claim that SNA officials in Baraawe pushed him, drew guns on him, and threatened to kill him on one occasion. Def. Mem. 2. But, even by the defendant's own account, those events purportedly occurred at least two days prior to his interrogation by the FBI, and the defendant does not dispute that in the intervening time, there was both a "change in place" of the interrogations (from Baraawe to Mogadishu) and a "change in the identity of the interrogators" (from the SNA to the FBI). *Elstad*, 470 U.S. at 311-12. In addition, Jones does not dispute that he received complete *Miranda* warnings from the FBI agents during which he acknowledged in writing that "[n]o promises or threats have been made to me and no pressure or coercion of any kind has been used against me." Moreover, the combination of purported threats and promises that Jones claims Somali officials

18

made to him do not amount to severely coercive conduct that would taint even his subsequent FBI interview.  Indeed, these purported threats constitute, at most, allegations that Somali officials informed Jones of certain things that they believed other governments would seek to do to him.  Such speculative predictions do not rise to the level of threats that would render his subsequent, *Mirandized* statements to U.S. officials inadmissible.  *Cf. United States* v. *Hocking*, 860 F.2d 769, 775 (7th Cir. 1988) (predictions made by FBI agents that the defendant would be prosecuted, imprisoned, and his property seized were not "the type of highly coercive, debilitating threats" warranting suppression).  Moreover, Jones's allegations that Somali officials offered him potential inducements to cooperate—including participation in a purported defection program—are insufficient to establish that his will was overborne by Somali authorities, much less by the FBI.  *See United States* v. *Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995) ("statements to the effect that it would be to a suspect's benefit to cooperate are not improperly coercive); *Jaswal*, 47 F.3d at 539 (promises of leniency do not *per se* render confession involuntary).  In short, even accepting the truth of Jones's self-serving allegations concerning his treatment by Somali authorities, those allegations are insufficient to bolster his claims because there was a sufficient "break in the stream of events . . . sufficient to insulate the [subsequent] statement from the effect of all that went before."  *Clewis*, 386 U.S. at 710.  Accordingly, any hearing conducted to examine the voluntariness of Jones's statements to the FBI should not involve testimony from Somali officials on this issue.

Finally, the Government expects that testimony to be offered by U.S. law enforcement agents at any hearing will establish that Jones's statements to the FBI were voluntary.  Among other things, such testimony will reveal that Jones's assertion that an American official threatened

him—by telling him that he would be "sold and killed" if he did not cooperate—is false.  Def. Mem. 4.  Moreover, the Government expects the testimony of U.S. law enforcement personnel to establish that Jones demonstrated complete and unambiguous understanding of the *Miranda* warnings he received at the airport in Mogadishu, and thereafter made a free and voluntary decision to waive his rights and speak with U.S. authorities.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully requests that the Court should conduct a limited factual hearing concerning (1) the circumstances surrounding Jones's statements to the SNA in the days immediately following his arrest, and (2) Jones's interactions with U.S. authorities prior to and during his statements to the FBI on December 10, 2015.


Dated: New York, New York
      June 9, 2017

Respectfully submitted,

JOON H. KIM
Acting United States Attorney
Southern District of New York

By:         /s/
         Andrew J. DeFilippis
         Shawn G. Crowley
         Assistant United States Attorneys
         (212) 637-2231/1034

Cc:    Sean Maher, Esq.
       (Via ECF)