UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

MAALIK ALIM JONES,

Defendant.

S1 16 Cr. 19 (PGG)

## THE GOVERNMENT'S SENTENCING MEMORANDUM

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York
*Attorney for the United States*
*of America*

Andrew J. DeFilippis
Shawn G. Crowley
        Assistant United States Attorneys
        *Of Counsel*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

MAALIK ALIM JONES,

                              Defendant.

16 Cr. 19 (PGG)

## I. PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in advance of the sentencing of Maalik Alim Jones, which is scheduled for May 29, 2018.  As explained herein, Jones is an American citizen who left his Maryland home in 2011, traveled to Somalia, and joined the terrorist organization al Shabaab.  For more than four years, Jones received training from, fought with, and assisted al Shabaab's specialized fighting force, Jaysh Ayman.  During that time, Jaysh Ayman perpetrated countless attacks against members of the Kenyan military and innocent civilians, including an attack on a shopping mall in Nairobi, Kenya, that killed more than 67 people and injured five Americans; an attack in June 2014 that killed more than 50 men, women, and children in a village in Mpekatoni, Kenya; and an attack on a Kenyan military base in June 2015.  In December 2015, after four years with al Shabaab, Jones left the group and attempted to travel to Yemen to join yet another terrorist organization, the Islamic State of Iraq and al-Sham ("ISIS").  He was arrested by Somali officials while in transit.

For the reasons set forth below, a Guidelines sentence of 50 years' imprisonment is sufficient, but not greater than necessary, to adequately reflect the seriousness and depravity of the

defendant's conduct, provide justice to the victims of Jaysh Ayman's brutality, and deter Jones, and others who might consider following his deadly path, from engaging in similar acts of terror.

## II. FACTUAL BACKGROUND

### A.   The Defendant's Support of al Shabaab

Maalik Jones abandoned his family and betrayed his country when he traveled to Somalia to join and fight with al Shabaab, a violent terrorist group aligned with al Qaeda that has killed countless innocents and called for attacks against the United States.  Specifically, in July 2011, Jones, a United States citizen, traveled via commercial airplane from New York to Kenya, and then by land to Somalia.  Probation Department Final Presentence Investigative Report ("PSR") ¶ 27.  As described in further detail below, Jones trained with al Shabaab, became a member of its violent and specialized fighting force, Jaysh Ayman, and fought with and provided assistance to al Shabaab.  *Id*.

#### 1.  Background on Al Shabaab

Al Shabaab is a jihadist terrorist group based in Somalia that has pledged allegiance to al Qaeda.  In February 2008, the United States Department of State designated al Shabaab a Foreign Terrorist Organization ("FTO").  PSR ¶ 31.  Among other things, al Shabaab has used violent means, including the ruthless slaughter of innocent civilians, to destabilize the government of Somalia, to quell the Somali population, and to force the withdrawal of foreign troops in Somalia. *Id.*  As a result of al Shabaab's recruitment efforts, men from other countries—including the United States and the United Kingdom—have traveled to Somalia to engage in violent jihad.  *See id.* ¶¶ 28, 29.  Since al Shabaab's designation as an FTO, it has made several public statements demonstrating its intent to harm the United States and its citizens and interests.  For example, in

or about April 2009, al Shabaab claimed responsibility for mortar attacks targeting a United States Congressman who had been visiting Somalia. *Id.* Similarly, after an al Shabaab member was killed in or about May 2008, al Shabaab leaders declared that the mujahedeen would "hunt the U.S. government" and that governments supporting the United States and Ethiopia should keep their citizens out of Somalia. *Id.* ¶ 31. In or about February 2012, the then-emir of al Shabaab publicly swore allegiance to Ayman al-Zawahiri, the emir of al Qaeda, stating that al Shabaab "will hereby merge into al Qa'ida." *Id.* ¶ 34.

Al Shabaab maintains a unit known as Jaysh Ayman, which functions as a specialized fighting force within the terrorist group. PSR ¶ 35. Jaysh Ayman is responsible for carrying out commando attacks and cross-border raids in which fighters, among other things, cross the border into Kenya to target individuals and carry out terrorist attacks outside Somalia. *Id.*

### 2. The Defendant's Decision to Join al Shabaab

In July 2011, Jones left his wife and children at their residence in the Baltimore, Maryland area and flew from New York to Kenya. According to interviews with Jones's wife and other family members conducted by law enforcement after Jones's arrest, Jones had attended a mosque in the Baltimore area and had become increasingly religious and radicalized in the period before his departure, including by watching radical Islamic videos. PSR ¶¶ 37-38.

After arriving in Kenya, Jones traveled by land to Somalia. Once in Somalia, he trained, worked, and fought with al Shabaab. PSR ¶ 45. Among other things, Jones received military training at an al Shabaab training camp, during which he learned to operate an AK-47 assault rifle, a PK machine gun, and rocket-propelled grenades. *Id.* ¶ 46. Following his training, Jones became a member of Jaysh Ayman. Among other things, Jones fought alongside other Western al Shabaab

recruits in a battle against Kenyan soldiers in Afmadow, Somalia. *Id.* ¶¶ 46-47.

### 3. Al Shabaab's Attacks on Innocent Civilians

Al Shabaab, and Jaysh Ayman in particular, has been especially brutal in its willingness to target civilians, and the group has committed numerous attacks against innocent people during the time period in which Jones was a member.  For example, on September 21, 2013, other members of al Shabaab entered the Westgate Mall in Nairobi, Kenya and held those inside hostage for over 48 hours.  PSR ¶ 32.  The masked gunmen killed 67 innocent civilians and injured 175 others, including five Americans.  *Id.*  And on April 2, 2015, al Shabaab members—not including Jones— stormed the Garissa University College in Garissa, Kenya, killing 148 people and injuring 79 others.  Those gunmen held over 700 students hostage until members of the Kenyan Defense Force ended the siege and killed the attackers.  Al Shabaab claimed responsibility for both of these massacres.  *See id.*

The attacks on the Westgate mall and Garissa University were not the only times al Shabaab targeted innocent civilians.  On June 15, 2014, Jaysh Ayman carried out an attack on the village of Mpektaoni, Keyna.  PSR ¶ 36.  During the attack, Jaysh Ayman fighters hijacked a van, raided a police station, and killed approximately 53 men, women, and children by shooting them and slitting their throats.  *Id.*  The attackers burned hotels, restaurants, and government offices. Two days later, on June 17, 2014, members of the unit set fire to houses in the vicinity of Mpekatoni.  *Id.*  The attackers pulled victims from their homes and killed at least 15 people during the overnight attacks.  *Id.*  An al Shabaab propaganda video that claimed responsibility for and featured images of the Mpekatoni attacks was subsequently recovered from a Jaysh Ayman fighter. *See infra* Part 2.A.4.  The video shows the attackers, including an individual with his face covered

4

who appears to be Jones, preparing for the attack and walking toward the village of Mpekatoni.  It later depicts the fighters laying their victims in the streets and slitting their throats.

Attached as Exhibit A are transcripts of interviews of some victims of the June 2014 Mpeketoni attack.[1]  Their accounts demonstrate the extreme and wanton violence in which Jaysh Ayman engaged.  For example, David Mbukiza, a victim of the attack who was shot in the leg explained:

> I recall very well that day, June 14, 2014 on a Sunday.  We were watching a soccer match at the video shop.  It was during the second half at halftime when we went outside to take a break while the match was going on.  When we got outside there were gunshots and a house on fire.  Everyone started running for his safety.  My neighbor Anthony Kahindi who has a motorbike told me that we should go home quickly because it was unsafe.  We got on the motorbike and at a distance of 200 meters, we came across a Nissan vehicle stopped on the road.  . . . . The [people in the Nissan] pursued us for about 500 meters and that is when they hit my leg . . . . When they hit my leg, the motorbike lost control because the whole back tire was hit, and then they began shooting at the individual who was driving the motorbike on the right shoulder.  He was unable to control the motorbike and we fell down. . . . I slept there until the following day at 8:00 am.  Lo and behold as I slept there the blood was flowing to the road.  When the neighbors came to see what was happening there, they followed the blood flow and found me sleeping in the bushes.

Ex. A at 1-2.  Mbukiza explained that his injuries left him unable to work, and he could no longer afford private school for his child.  *Id.*  Esther Mungai, whose husband was burned to death in the Mpeketoni attack, described Jaysh Ayman's advance on her village:

> I lived there in Mpeketoni town. . . . I heard the gunshots go off really loudly.  I now waited for it because I had never heard a gunshot sound like that one.  I waited, and waited, and waited.  As I was waiting—I live by the road. . . there was a guest house close to where I [was] renting a house.  Now I saw guns firing at that guest house.  It looked like stars shooting out—ah!—I went back to the house.  When I got in the house I locked the door and looked through the window since the moon was bright.  On looking, I saw a group of about thirty people approaching carrying

---

[1]  FBI agents showed several of these victims a photograph depicting Jones.  They did not recognize him as one of the attackers.

guns and they were covered up [gesturing to her face]. Their clothing resembled that of the people in the forest. I saw one had a flag—he was holding it up like this [holds right hand up] leading. When they got closer—there was a car by the roadside, and about three other cars—they set it on fire. They put something in the car that released fire. As it released the fire they laughed—they were laughing out loud.

They came closer. There is a guest house that is close by me now. There were about—about six tractors and about two lories. One was close by me—at the place I was renting. They came very close. They now came as—as close as here outside. I was just peeking at them—they set it on fire. They spoke a language that sounded like Somali—and they laughed a lot. Once they had burned those vehicles, they then went to the road. Now there, about ten steps forward was the firing of gunshots—twa-twa-twa-twa—they were moving along—as they moved along they fired shots. When they found a guest house they fired at it. They went around the road—they went on—they got to a house that was-that was called Monica Guest House. Now that is where they killed 12 people. They were laid down—and shot at while lying there.

*Id.* at 4-5 (second and third brackets in original). Lucy Wanjuku, who was also widowed in the attack, recounted that the loss of her husband has devastated her family. She explained, "As a result of the attack that took place in Mpeketoni on June 15, 2014, I was left a widow. I had a husband and two children. My husband was everything. I was a house wife—he was the breadwinner—everything; he is the one who provided everything; the children's tuition, food and clothing for the children." *Id.* at 19.

### 4. The Lamu, Kenya Attack, and Recovery of Electronic Media

Many of the attacks carried out by the Jaysh Ayman unit during the period of Jones's membership in al Shabaab targeted the Kenyan government and defense forces. For example, on June 14, 2015, a contingent of Jaysh Ayman fighters, though not Jones, ambushed a Kenyan Defense Force base in Lamu County, Kenya, using various weapons, including AK-47 rifles and rocket-propelled grenades. PSR ¶ 33. Two Kenyan Defense Force soldiers and all of the al Shabaab fighters who participated in the attack were killed. *Id.*

6

Attached as Exhibits B, C, and D are interviews of Kenyan officers who were present for al Shabaab's June 2015 Lamu attack. Their accounts demonstrate the brutality of the tactics used by al Shabaab, and the effects its brutality had on the Kenyan soldiers and their families. For example, a Kenyan Army Captain who was injured in the attack explained:

> This . . . was one of the most . . . traumatizing days that I've experienced. One, apart from me being injured, there is the issue of my soldiers, [who were] fully traumatized, others, they lost their life. . . . [I]t's very sad to know some were very young, newly married, they had spouses who were looking upon them, others— they had very young kids. The kids will no longer have a father. They will forever remember they lost their father and through means that were never justified.
>
> * * *
>
> This—this not a thing that will fade away [from] my life. I know the families of my soldiers—who lost their life—who were injured. I and the rest of the Company, the soldiers we were with, our lives will never be the same again. . . . It was unwarranted. We were in line of duty doing what we are supposed to do, and I think such people need extensive counselling and be guided. Terrorism helps no one.

Ex. B at 1, 2.

Following the battle, Kenyan authorities recovered electronic media from the body of a deceased al Shabaab fighter who had been killed in the attack, and provided the media to the FBI. *See* PSR ¶ 39. The FBI's review of the media revealed at least five videos in which Jones is depicted with other prominent al Shabaab fighters, including members of Jaysh Ayman who were killed in the June 2015 Lamu attack. For example, in one of the videos, Jones is seen sitting behind Luqman Osman Issa, an al Shabaab commander, as Issa gave a sermon to a crowd of male fighters and exhorted the fighters to carry out attacks on Kenyans.[2] *See* PSR ¶ 40. In another video, Jones

---

[2] A cooperating defendant in this District (the "CW") who was a former al Shabaab commander, viewed several screenshots of the aforementioned videos. Upon reviewing the screenshots, the

is seen with other al Shabaab fighters receiving combat instructions and training.  In one of the images, Jones is holding an AK-47 assault rifle, while Issa and other Jaysh Ayman fighters who participated in the Lamu attack chant about attacking Kenya, the West, and Washington, D.C.  *See, e.g.*, PSR ¶ 42.

Hours after the attack in Lamu, Jones called the mother of one his fellow Jaysh Ayman fighters, a British citizen named Thomas Evans who was killed in the attack, to inform her of Evans' death.  The video and phone call make clear that, even if Jones did not himself participate in the attack, he was certainly aware of it before and after.

### 5.  The Defendant's Arrest

On December 7, 2015, a battalion of Somali National Army ("SNA") soldiers apprehended Jones in Baraawe, Somalia.  PSR ¶ 43.  The soldiers were on patrol when they came upon Jones attempting to procure a boat in the Baraawe harbor.[3]  *Id.*  The soldiers took Jones into custody and brought him to the SNA headquarters in Baraawe.  SNA personnel questioned Jones over the course of approximately two days.  An English-speaking SNA officer ("Officer-1") was present for each of those interviews.  Jones told Officer-1, in sum and substance, that he had lived in Somalia for five or six years, during which time he had been a member of a fighting group within al Shabaab.  Jones further stated that prior to his arrest, he had left al Shabaab due to a clash within the group.  Jones explained that he was transiting through Baraawe, where he and his co-

---

CW identified Issa in the videos as an individual who fought under the CW's command in numerous battles for al Shabaab.  *See* PSR ¶ 40.

[3] Baraawe is a common point of departure for individuals traveling by boat to Yemen or other Somali ports.

conspirators had planned to board a boat and travel to northern Somalia where they would join Daesh, or ISIS, in Somalia. Jones told Officer-1 that al Shabaab had been hunting Jones and other individuals who had defected from the group to join ISIS in Somalia.

Following Jones's arrest, Somali authorities permitted the FBI to interview Jones outside the presence of Somali authorities. After being advised of his *Miranda* rights, Jones admitted that in July 2011, he had left Baltimore intending to join al Shabaab. PSR ¶¶ 44-45. He further stated that he had traveled to New York City and flown from there to Morocco. *Id.* ¶ 45. He added that approximately one week later, he had traveled to Kenya, and then to Somalia by taxi. *Id.* Jones stated that once in Somalia, he had traveled to territory controlled by al Shabaab and attended a training camp where he had received religious instruction and training in how to shoot firearms, including AK-47s, and PK machine guns, and rocket-propelled grenades. *Id.* ¶ 46.

According to Jones, upon completion of his training, he was assigned to the Jaysh Ayman fighting force. PSR ¶ 46. Thereafter, he participated in the aforementioned battle against Kenyan forces in Afmadow, where, according to Jones, he was injured by a missile. *Id.* ¶ 47. Jones stated that after receiving medical treatment for his injuries, he had returned to his Jaysh Ayman unit and provided medical aid and other assistance to its fighters. After several years, he attempted to travel to Yemen. *Id.* Jones claimed that he had left al Shabaab because he felt misled by the terrorist group. Jones further stated that after spending time with al Shabaab, he came to believe that the group was causing harm to Somalis. He added that he had intended to travel to Yemen—a war-torn country wracked by civil war—to live in peace, and that when he decided to leave al Shabaab, they were hunting him. Jones also identified himself in several screenshots of the above-referenced videos. *Id.* ¶¶ 48, 49.

The FBI subsequently arrested Jones in Somalia and transported him to this District, where he arrived on December 18, 2015.

**B.   The Defendant's Guilty Plea**

On September 8, 2017, the defendant pled guilty pursuant to a plea agreement to all three counts of a Superseding Information (the "Information").  Count One charged the defendant with participating in a conspiracy, from at least in or about July 2011 up to and including in or about May 2015, to provide material support and resources to al Shabaab, in violation of Title 18, United States Code, Section 2339B.  Count Two charged the defendant with participating in a conspiracy, from at least in or about July 2011 up to and including in or about May 2015, to receive military-type training from, and on behalf of, al Shabaab, a foreign terrorist organization, in violation of Title 18, United States Code, Sections 371 and 2339D.  Count Three charged the defendant with, from at least in or about July 2011 up to and including in or about May 2015, knowingly carrying and using an AK-47 assault rifle, rocket-propelled grenades, and other weapons in furtherance of crimes of violence, specifically the crimes alleged in Counts One and Two of the Information, in violation of Title 18, United States Code, Section 924(c)(1)(A) and (c)(1)(B)(ii).

**C.   The Presentence Investigation Report and United States Sentencing Guidelines**

The Government agrees with the calculation of the United States Sentencing Guidelines ("U.S.S.G." of the "Guidelines") set forth in the PSR.  Specifically, because Counts One and Two are felonies that involved a federal crime of terrorism, pursuant to U.S.S.G. § 3A1.4(b), the defendant's Criminal History Category is VI.

Based upon the Criminal History Category of VI, the defendant's stipulated Guidelines range for Counts One and Two is 360 months' to life imprisonment.  However, the statutorily authorized maximum terms of imprisonment for Counts One and Two are 180 months and 60

months, respectively.  Therefore, pursuant to U.S.S.G. § 5G1.2(d), because the sentences the Court can impose on those Counts is less than the total punishment prescribed by the Guidelines, the Court should order that they run consecutively.  Accordingly, the recommended Guidelines sentence for Counts One and Two is 240 months' imprisonment.  *Cf. also* U.S.S.G. § 5G1.1(a) (noting, when sentencing on single counts of conviction, that "the statutorily authorized maximum sentence shall be the guideline sentence" where the statutory maximum "is less than the minimum of the applicable guidelines range").

Pursuant to U.S.S.G. § 5G1.2(a), the sentence for Count Three is to be imposed independently of, and consecutive to, the sentences imposed on Counts One and Two. Accordingly, the stipulated Guidelines sentence for Counts One, Two, and Three is 50 years' (*i.e.*, 600 months) imprisonment, with a mandatory minimum term of 360 months' imprisonment (the "Stipulated Guidelines Sentence").  In addition, after determining the defendant's ability to pay, the Court may impose a fine pursuant to U.S.S.G. § 5E1.2.  At Guidelines level 37, the applicable fine range is $40,000 to $400,000.

## III. DISCUSSION

### A.   Applicable Law

The United States Sentencing Guidelines still provide strong guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005).  Although *Booker* held that the Guidelines are no longer mandatory, it held also that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing.  543 U.S. at 264.  As the Supreme Court explained, "a district court should begin all sentencing proceedings by correctly calculating the applicable

11

Guidelines range," and that "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007). After calculating the Guidelines, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3); the Guidelines range itself, *id.* § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7). *See Gall*, 552 U.S. at 49-50 & n.6. In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

- to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

- to afford adequate deterrence to criminal conduct;

- to protect the public from further crimes of the defendant; and

- to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within the Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50, n.6. Their relevance

throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46.  To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance."  *Id.* at 50.

### B.   The Nature and Seriousness of Jones's Crimes and the Need for Just Punishment Necessitate a Guidelines Sentence

For this defendant—who abandoned his life and family in Baltimore in order to join and fight with a terrorist group that murders innocents and opposes the United States—the nature and seriousness of the offense could hardly be more serious and, consistent with the Probation Department's recommendation, strongly counsel in favor of a Guidelines sentence.  Contrary to the defense's assertion, Jones was not a misguided youth who naively embraced a radical or violent ideology.  He did not merely join and swear allegiance to al Shabaab.  Nor did he engage in isolated or relatively minor acts of support.  Rather, over the course of more than four years, he fully committed himself to al Shabaab, traveling halfway around the world to join and train with one of its most specialized and violent units.  And, by his own admission, the defendant took up arms and engaged in battle in furtherance of the organization's murderous goals.

The defense submission and the defendant's letter both attempt to minimize the seriousness of this conduct.  Jones claims that he traveled to Somalia and joined al Shabaab because he believed he could help "innocent people . . . fight their oppressors."  Jones Ltr. at 1.  He contends that, once

in Somalia, he "learned how wrong [his] misguided views and perspectives were" and left al Shabaab because he "didn't agree with their ways anymore." *Id.* But Jones does not explain why his desire to help Somalis required him to join al Shabaab's most brutal battalion, or why it took him more than four years and countless battles to come to the realization that Shabaab's tactics were "harsh . . . and did a lot of wrong to their own people." *Id.* The defense submission ignores the fact that Jones's involvement in al Shabaab was not short-lived or fleeting; instead, it lasted for years, during which time the group carried out at least four brutal, deadly attacks, killing hundreds of people. Nor was Jones merely an innocent bystander to the group's atrocities. He trained with Jaysh Ayman, learned how to use AK-47s and other deadly weapons, and then deployed them on the battlefield.

Jones's attempt to portray himself as an unwitting, and ultimately resistant, member of Jaysh Ayman, is belied also by his interactions with his family while he was in Somalia. He now claims that, once he arrived in Somalia and witnessed al Shabaab's brutal tactics, he "didn't want any part in what they were doing" (Def. Ltr. at 1), but he told his family a different story when he spoke with them by phone from Somalia. In an interview with the FBI following Jones's arrest, Jones's younger brother Tauhid told agents that he had spoken with Jones several times while Jones was in Somalia. Jones reported to Tauhid that he was happy in Somalia, and requested that Tauhid and Jones's children come live with him. And Jones's sister, Baiyinah, reported to FBI agents that she had spoken with Jones periodically during his time in Somalia, and Jones had never told her he was unhappy or wanted to leave.

Notably, the defense submission focuses principally on the defendant's upbringing and family circumstances when arguing for a substantial downward variance from the Guidelines

14

sentence. The defense points to several unfortunate incidents from the defendant's past, apparently arguing that Jones's troubled childhood explains, and in some senses justifies, his decision to leave his home to join a terrorist organization.

The Government certainly does not dispute that the defendant faced difficult circumstances as a child, and the Government considered those circumstances when determining the appropriate plea offer in this case. But the defendant's troubled past does not explain or justify his decision to travel to Somalia to take up arms on behalf of a terrorist group, to remain a member of that group for four years, and to leave it only to join an organization known to be at least as brutal in its indiscriminate killings. Indeed, and as the defense submission and letters make clear, all of Jones's siblings faced the same unfortunate circumstances he did, and none of them abandoned their homes and families in Baltimore, traveled to Somalia, and fought on behalf of al Shabaab. They are, instead, all law-abiding citizens of the United States. One of Jones's brothers, for example, is an officer with the Maryland State Police. The defendant and his brother share the same background. Yet, as adults, one brother devoted his life to protecting and upholding the laws of his country; the other left his family, betrayed his country, and devoted himself to a group dedicated to killing. The adversities Jones faced as a child are certainly sympathetic, but they do not mitigate the horrific, deliberate nature of the conduct he chose to undertake as an adult. *See* PSR at 25 (noting the absence of factors sufficient to warrant a downward variance given Jones's "decision to join a terrorist organization and participate in terroristic acts of violence").

The defendant's choices and actions paint a clear picture: Maalik Jones, an American citizen, knowingly abandoned his life as a father, husband, and resident of Baltimore and chose instead to train and fight as a battle-hardened terrorist. Few crimes could be more serious.

15

### C.   A Guidelines Sentence Will Serve the Purpose of Deterrence and Promote Respect for the Law

A Guidelines sentence is also necessary in this case in order to "afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B), and "promote respect for the law," *id.* § 3553(a)(2)(A).  Indeed, the need for general deterrence here is especially paramount.  For groups such as al Shabaab, recruits like Jones are the lifeblood of their operations.  Such organizations aggressively seek to attract young recruits—typically young men in their 20s and 30s—so that they can train and employ those men to carry out vicious attacks around the globe.  In order to fill their ranks, groups like al Shabaab frequently produce and disseminate videos, pamphlets, and other propaganda materials that seek to spread and gain adherents of their violent ideology.  In this climate, only the most severe penalties serve as an adequate counterweight to the messaging efforts of terrorist groups.  Although those who are inclined to consider joining terrorist groups are sometimes difficult to deter for a variety of complicated reasons, it is nevertheless crucial to send a message that the consequences of joining such groups will be decades in an American prison cell.  In sum, it is essential for our country's national security that other young men be deterred from engaging in similar conduct.  A Guidelines sentence is more likely to deter future generations of young people exposed to hateful, extremist teaching from engaging in acts of terrorism.

As for individual deterrence, a Guidelines sentence of 50 years' imprisonment, as recommended by the Probation Office, is necessary to deter Jones from returning to his criminal conduct.  Terrorism is a crime with high recidivism rates and rehabilitation is notoriously difficult for those convicted of it.  *See United States* v. *Meskini*, 319 F.3d 88, 91-92 (2d Cir. 2003) (noting the link between "the difficulty of deterring and rehabilitating" terrorists and the conclusion that "terrorists and their supporters should be incapacitated for a longer period of time").  As Judge

John M. Walker has stated, "[i]n no area can the need for adequate deterrence be greater than in terrorism cases, with their potential for devastating loss of innocent life." *United States* v. *Stewart*, 590 F.3d 93, 181 (2d Cir. 2009) (Walker, J., concurring).

In this case, there is an overwhelming need for both individual and general deterrence. Jones's full commitment to jihad over the span of at least four years speaks to the gravity of his conduct and the depth of his dedication to terrorism.  And while Jones claims in his letter that he regrets joining al Shabaab and is remorseful, his conduct throughout the time period of the charged offenses and the circumstances of his departure from al Shabaab suggest that his remorse is at best newly acquired, and at worst a calculated attempt to appear a changed man in order to obtain leniency at sentencing.  His claim that he was fleeing al Shabaab in Somalia to live a peaceful life in Yemen is simply not credible, and is belied by his own statements to Somali officials at the time of his arrest.  It also ignores entirely the fact that, at the time of Jones's arrest, Yemen was a hotbed of ISIS and al Qaeda in the Arabian Peninsula terrorist activity, and there are well-publicized incidents of al Shaabab members fleeing to join ISIS in Yemen during this same time period.  *See, e.g.*, Gaffey, Conor, "ISIS or al-Qaeda?  Somalia's al-Shabaab Divided Over Allegiance," NEWSWEEK, Nov. 25, 2015, *available at* www.newsweek.com/isis-or-al-qaeda-somalias-al-shabab-divided-over-allegiance-397772.

For all these reasons, society's interest in effective deterrence calls for a Guidelines sentence of 50 years' imprisonment.

### D.  A Guidelines Sentence Is Appropriate to Protect the Public from Further Crimes of Jones

Similarly, a Guidelines sentence in this case is necessary "to protect the public from further crimes of the defendant."  *See* 18 U.S.C. § 3553(a)(2)(C).  As noted above, Jones not only swore

allegiance to al Shabaab, but he took affirmative steps to carry out its agenda in ways ranging from the receipt of training in the use of semi-automatic weapons and rocket-propelled grenades to his engagement in battle against the Kenyan army.  Al Shabaab is a violent terrorist organization that has pledged itself to attacking U.S. citizens and U.S. interests.  Indeed, the defendant is still only 33 years old, and remains of an age where he could engage in similar acts upon his release.  As a result, a term of incarceration in accordance with the recommended Guidelines sentencing range is necessary to protect the public from the defendant as well as those whom he would seek to recruit to further al Shabaab's murderous goals.  Accordingly, a Guidelines sentence of 50 years' imprisonment will protect the public from additional crimes by this defendant.

### E.   A Guidelines Sentence Will Avoid Creating Unwarranted Nationwide Disparities

Finally, a Guidelines sentence will avoid creating unwarranted nationwide sentencing disparities because it will fairly punish the defendant for his serious crimes.  As an initial matter, the uncontested Guidelines sentencing range here is 50 years.  As the Court of Appeals has explained, "the guidelines cannot be called just another factor in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors." *Rattoballi*, 452 F.3d at 131 (internal citations and quotation marks omitted); *cf. United States* v. *Fernandez*, 443 F.3d 19, 28 (2d Cir. 2006) (stating that "the Guidelines range should serve as 'a benchmark or a point of reference or departure' for the review of sentences" (quoting *United States* v. *Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005))), *abrogated on other grounds by Rita*, 551 U.S. 338.  "[T]o secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall*, 552 U.S. at 50.  It is precisely because the Guidelines function as a national "benchmark"

18

that a Guidelines sentence here will advance "the need to avoid unwarranted sentence disparities." 18 U.S.C. § 3553(a)(6).

As to nationwide disparities, while a sentence approaching or in excess of 50 years is never routine, sentences of 50 years or more are regularly imposed in federal courts in cases where the defendant knowingly and willfully associates himself with foreign terrorist organizations that have dedicated themselves to murdering U.S. citizens and attacking U.S. interests.  Indeed, courts both within and outside this District have imposed sentences of life imprisonment on such defendants even when their own actions did not lead directly to the deaths of any U.S. citizens.  *See, e.g.*, *United States* v. *Mustafa*, 04 Cr. 356 (KBF) (S.D.N.Y.) (life sentence for London-based preacher arising out of convictions relating to hostage-taking in Yemen—which resulted in deaths of non-U.S. tourists during a rescue operation—and material support to al Qaeda); *United States* v. *Kassir*, S2 04 Cr. 356 (JFK) (S.D.N.Y.) (sentencing the defendant to multiple terms of life in prison for attempting to establish a jihad training camp and for distributing bomb-making manuals); *United States* v. *Abu Ghayth*, 98 Cr. 1023 (LAK) (S.D.N.Y. 2015) (life sentence for al Qaeda spokesman convicted of material support and conspiracy to kill Americans); *United States* v. *Jabarah*, 02 Cr. 1560 (BSJ) (S.D.N.Y.) (life imprisonment upon a guilty plea to conspiring to bomb U.S. Embassies in Singapore and the Philippines); *United States* v. *Abu Baker, et al*., 04 Cr. 00240 (JAS) (N.D.Tx.) (sentencing two defendants to 65 years' imprisonment for convictions that included 18 U.S.C. § 2339B); *see also United States* v. *Abdulmutallab*, 10 Cr. 2005 (NGE) (E.D. Mich. 2012) (sentencing AQAP member to multiple life sentences, after guilty pleas, for attempted bombing of U.S.-bound flight on December 25, 2009); *United States* v. *Shahzad*, 10 Cr. 541 (MGC) (S.D.N.Y. 2010) (life imprisonment after guilty pleas for attempted bombing in Times

Square, New York); *United States* v. *Reid*, 02-10013-WGY (D. Mass. 2003) (three life sentences upon a guilty plea to attempting to destroy with explosives an in-flight commercial aircraft).

Here, Jones's culpability is significantly greater than defendants in prior "traveler" cases who have conspired or attempted—unsuccessfully—to travel to conflict zones or to join forces with terrorist groups. For example, in *United States* v. *Pugh*, 15 Cr. 116 (NGG) (E.D.N.Y. 2017), a former member of the United States military was apprehended in Turkey en route to join ISIS in Syria. Pugh was arrested before he had an opportunity to follow through with his apparent goals of meeting with ISIS members; receiving military training; and engaging in combat or other terrorist acts. Nevertheless, Pugh received a sentence of 35 years' imprisonment. By contrast, Jones successfully completed all of those goals by training, fighting in battle, and supporting a brutal terrorist organization that massacred innocents during the very time period in which he was a member. Accordingly, in order to fairly reflect the enhanced culpability of his conduct, Jones should receive significantly more time in prison that defendants such as Pugh.

Moreover, with respect the material support and military-type training counts, it is important to note that sentencing courts routinely sentence defendants charged with similar crimes to the statutory maximum or more. *See, e.g.*, *United States* v. *Aswat*, S2 04 Cr. 356 (KBF) (S.D.N.Y.) (stacking 18 U.S.C. § 2339B and 18 U.S.C. § 371 in order to sentence defendant to statutory maximum 20 years' imprisonment); *United States* v. *Sherifi*, 09 Cr. 00216 (FL) (E.D.N.C.) (sentencing defendant to statutory maximum 15 years' imprisonment on material support count, followed by consecutive mandatory minimum five-year and 25-year sentences, as part of a total 45-year sentence); *United States* v. *Shah, et al.*, 05 Cr. 673 (LAP) (S.D.N.Y.) (Shah, statutory-maximum 15 years; Sabir, 25 years; Brent, statutory-maximum 15 years); *United States*

v. *Hashmi*, 06 Cr. 442 (LAP) (S.D.N.Y.) (statutory maximum 15-year sentence for violation of 18 U.S.C. § 2339B); *United States* v. *Hassan*,09 Cr. 216 (FL) (E.D.N.C.) (statutory maximum 15 years' imprisonment for violation of 18 U.S.C. § 2339A); *United States* v. *Bujol*, 10 Cr. 0368 (DH) (S.D. Tex.) (sentencing defendant to a total of 240 months' imprisonment by stacking statutory maximum penalties for 18 U.S.C. § 2339B and 18 U.S.C. § 1028A).

## IV. CONCLUSION

For these reasons, the Government respectfully submits that a Guidelines sentence of 50 years is sufficient, but not greater than necessary to achieve the objectives of sentencing.


Dated: New York, New York
       May 22, 2018


                                        Respectfully submitted,

                                        GEOFFREY S. BERMAN
                                        United States Attorney
                                        Southern District of New York

                              By:    ___/s/_____
                                        Andrew J. DeFilippis
                                        Shawn G. Crowley
                                        Assistant United States Attorneys


Cc:    Defense Counsel
       (Via ECF)