I5TKJONS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          16 CR 19 (PGG)

MAALIK ALIM JONES,

                 Defendant.

------------------------------x

                                    New York, N.Y.
                                    May 29, 2018
                                    3:20 p.m.

Before:

                    HON. PAUL G. GARDEPHE,

                                    District Judge

                         APPEARANCES

GEOFFREY S. BERMAN,
     United States Attorney for the
     Southern District of New York
ANDREW DeFILIPPIS
SHAWN CROWLEY
     Assistant United States Attorneys

SEAN MICHAEL MAHER
     Attorney for Defendant

ALSO PRESENT:  MARY BOESE, FBI

I5TKJONS

1           (Case called)

2           THE DEPUTY CLERK:  Is the government ready?

3           MR. DeFILIPPIS:  Yes.

4           Good afternoon, your Honor.  Andrew DeFilippis and

5      Shawn Crowley, for the government.  With us at counsel table is

6      Special Agent Mary Boese, of the FBI.

7           THE DEPUTY CLERK:  Is the defendant ready?

8           MR. MAHER:  Yes.

9           Good afternoon, your Honor.  Sean Maher, for

10     Mr. Jones, who is seated here right next to me.

11          THE COURT:  All right.  This is on my calendar for

12     purposes of sentencing.  I have a couple of questions I want to

13     ask at the outset.

14          Having reviewed the materials, there is evidence in

15     the record that Mr. Jones engaged Kenyan forces in combat, but

16     I want to understand whether there's any evidence that he

17     personally participated in other acts of violence.  So, what's

18     the government's position on that?

19          So, there was a battle that he participated in against

20     Kenyan forces.  My understanding is that he was wounded in the

21     course of that battle.  But are there other acts of violence

22     that the government has evidence Mr. Jones was personally

23     involved in?

24          MR. DeFILIPPIS:  Yes, your Honor.  And let me just

25     take it one incident and act at a time.

1          Of course, before engaging in battle with Kenyan

2     forces, the defendant does not dispute -- in fact, admitted --

3     he was fully trained by al-Shabaab, the Jaysh Ayman unit, in

4     the use of, among other weapons, AK-47s and rocket-propelled

5     grenades, but he did report to agents upon his arrest that he

6     participated in that battle in Afmadow, Somalia, against Kenyan

7     forces.  The Kenyan forces are a common target of al-Shabaab

8     because one of their very purposes, and one of the purposes of

9     the Jaysh Ayman unit, is to destabilize the Kenyan government,

10    and as we've seen, also to massacre Kenyan civilians.

11          So, that is the one battle to which he admitted.  The

12    other attacks mentioned in our sentencing submission, your

13    Honor, include the June 2014 Mpeketoni attacks.  One was

14    committed on June 15, 2014, and involved a raid of a police

15    station, and shootings, and slittings of throats.  The second

16    was on June 17th.  That was where members of the Jaysh Ayman

17    unit set fire to houses, pulled innocent civilians out of their

18    houses, and killed them.  It was in connection with that second

19    attack where the FBI identified a photograph of perpetrators of

20    the attack preparing to commit the attack, and an individual

21    whom FBI believes is Jones is pictured with those individuals.

22          So, while there is no contemporaneous evidence of him

23    carrying out the attack, there is evidence of him with other

24    attackers in their preparation phase for the attack.  So,

25    that's the nature of the evidence tying him to those events,

I5TKJONS

1        your Honor.

2              THE COURT:  Now, that's the one where the individual

3        in question had a mask on of some sort, right?

4              MR. DeFILIPPIS:  That's right, your Honor.  The

5        individual is wearing a mask, but I would note it's not a full

6        mask, the sort of nose and eye area is revealed.  And in the

7        FBI's assessment in looking at that, based on their review of

8        dozens, hundreds of photos, both of Jones and of other members

9        of the Jaysh Ayman unit, their assessment was that he was

10       pictured there among the fighters, which would make sense based

11       on everything else we know about his membership in the unit,

12       and the timing of his membership, and his acts in furtherance

13       of the unit.

14              Now, the other attack in which there is video of Jones

15       is the June 14th, 2015 Lamu attack.  That was an attack on a

16       Kenyan defense base in which two Kenyan soldiers were killed.

17       Again, we do not have contemporaneous evidence of him

18       participating in that attack.  However, in a video that was

19       filmed in preparation for it, we have the defendant pictured.

20       In this video, he's clearly pictured, there's no mask.  He's

21       with others, they're holding weapons.  And Luqman Issa, who's

22       now deceased, was a leader within the group, he can be seen in

23       preparation for that attack listening to speeches and engaging

24       in other activities.

25              THE COURT:  Now, I take it when Mr. Jones was

1    interviewed by the FBI, he didn't make any admissions of

2    participating in other attacks other than the battle I

3    mentioned against the Kenyan forces.  Is that correct?

4              MR. DeFILIPPIS:  He did not, your Honor.  Certainly,

5    as to the Mpeketoni attack, one could imagine why it was an

6    attack against civilians, quite brutal.  It seems something one

7    would probably be hesitant to admit.  And I would note as to

8    the Lamu attack, he did play a critical role after the attack

9    in calling the mother of a deceased fighter notifying her,

10   which may seem in some sense innocuous, but for terrorist

11   groups like al-Shabaab, it's actually a very important function

12   that the families of firefighters and so-called martyrs be

13   notified.  It's what sort of gives them the comfort that when

14   they go and fight to die, that their families will be notified.

15   So it's not a trivial act that he did that.

16             THE COURT:  Well, it also shows that he was

17   knowledgeable of the attack.

18             MR. DeFILIPPIS:  Correct, your Honor, and shows while

19   we don't have contemporaneous evidence of his actual carrying

20   out the attack, he's certainly there both before and after with

21   the very people who conducted it.

22             THE COURT:  All right.  Anything defense counsel wants

23   to say on that issue before I turn to something else?

24             MR. MAHER:  Yes.

25             We contest much of what the government just said as

I5TKJONS

1    far as Mr. Jones' involvement.  Mr. Jones has conceded that he

2    was a member of al-Shabaab.  He has not ever said that he was

3    involved in any attacks in Kenya, none.  The government has no

4    evidence that Mr. Jones personally was involved in any military

5    attacks in Kenya, that I'm aware of, none.  They showed

6    pictures.  He's not been identified.

7            The government has a video that purportedly shows

8    Mr. Jones, as the Court just heard the government surmise, in

9    preparation, but not battle footage, battlefield footage of

10   Mr. Jones involved in those attacks.

11           So, I objected to that information in the PSR, I

12   believe.  I still object to that.  And that's not part of the

13   criminal culpability of Mr. Jones.

14           Mr. Jones did not make the phone call that was just

15   referenced.  I have not, I believe, ever been provided any Rule

16   16 recording of that call or any information about that call.

17           THE COURT:  But that's in the presentence report, I

18   recall, isn't it, that he called Evans' mother?  I know I've

19   read that.  I suppose it could have been in the government's

20   submission.  I thought it was in the presentence report as

21   well.  Maybe I'm incorrect.

22           MR. MAHER:  I believe it was in the government's

23   submission, your Honor.

24           THE COURT:  All right.  So, you're contesting that he

25   called, I think it was, Thomas Evans' mother?

I5TKJONS

1              MR. MAHER:  Yes.

2              THE COURT:  What's the government's offer of proof on

3    that point?

4              MR. DeFILIPPIS:  Well, your Honor, we have several

5    forms of proof to establish that call.  The first is that toll

6    records and records of phone calls, obtained both from

7    telephone companies and then from Evans' mother herself,

8    reflect that the same number who called Jones' family during

9    this time period, when Jones was calling home, made a phone

10   call to Ms. Evans during that time period.  And Ms. Evans, when

11   interviewed, said that the person was, as she recalled, an

12   American friend or an American co-fighter of Mr. Evans.  So,

13   again, the fact that it's the same number calling Jones'

14   family, calling Evans, and then the fact that it is an American

15   friend doing the notification, that's the proof that the

16   government has that, in fact, he called her after the attack.

17             THE COURT:  Now, have those toll records been provided

18   to defense counsel?

19             MR. DeFILIPPIS:  Yes, your Honor.

20             MR. MAHER:  There's nothing about those records that

21   indicate any connection whatsoever to Maalik Jones, the man

22   here for sentencing today, your Honor.

23             THE COURT:  So, help me understand how the records tie

24   up to Mr. Jones.

25             MR. DeFILIPPIS:  Your Honor, it is the same telephone

I5TKJONS

1   number that Jones used to call his family, it's the originating

2   number of the call to Ms. Evans in the aftermath of her son's

3   attack.  I would note, also, when Jones was interviewed by the

4   FBI, while not referencing that phone call, identified Evans as

5   one of his fellow al-Shabaab fighters with whom he associated

6   in Somalia.

7          THE COURT:  What about that, Mr. Maher?  If the same

8   phone that Mr. Jones used to call home is the phone that called

9   Mr. Evans' mother, that would seem rather probative.

10          MR. MAHER:  I disagree.  Again, it's how the

11   government has characterized it, that Mr. Jones used it,

12   implying that he had control over this phone.  We don't know

13   how many calls this phone has made, whose possession it was in,

14   whether it was something used by many different people under

15   the control of someone way up the food chain in this

16   organization that was then passed around.  We don't know the

17   circumstances that Mr. Jones' voice, if ever, was used on that

18   specific phone, much less that Mr. Jones had anything to do

19   with that phone being used to call other people in the United

20   States anywhere in that time frame.  It's conjecture, at best.

21          THE COURT:  So, let me understand from the government:

22   Did someone from the FBI speak with Thomas Evans' mother?

23          MR. DeFILIPPIS:  They did, your Honor.  They traveled

24   to the U.K. for that purpose.

25          THE COURT:  And what did she say exactly about the

I5TKJONS

1    call that she had received?

2              MR. DeFILIPPIS:  Your Honor, she said that when her

3    son was in Somalia, but before his death, she was told that in

4    the event her son were killed, she would receive a call from

5    his American friend.  Upon his death, she did receive a call.

6    She identified through her phone the number that the call

7    originated from.  That, again, is the same number that Jones

8    used to call his family, as corroborated by his family and the

9    toll records.  And then she said that when he died, she, in

10   fact, received the call from his American friend informing her

11   of his death.

12             THE COURT:  Mr. Maher, anything else you want to say?

13   Let me say, the significance of it, to me -- and I am going to

14   ask you, Mr. Maher, in a minute -- do you deny that your client

15   was knowledgeable about the attack on Lamu?  Is that an issue?

16   Because that's the evidentiary significance, really, from my

17   perspective, is it shows that he was knowledgeable of the

18   attack.  I don't really regard it of consequence that he called

19   the mother, but it does show knowledge of the attack.

20             MR. MAHER:  We are not contesting that he had

21   knowledge that al-Shabaab was involved in that attack.  We're

22   contesting his specific participation as the government is

23   reciting.

24             THE COURT:  Well, the government doesn't allege that

25   he was involved in the attack.  The government doesn't allege

I5TKJONS

1    that.

2              MR. MAHER:  I was talking earlier about that laundry

3    list of things as far as being in Kenya and being involved in

4    raids in Kenya.

5              THE COURT:  I understand that.  But if we could just

6    stay focused on the phone call.

7              So, as I said, I don't regard it of consequence, from

8    a sentencing perspective, whether he called the mother or not.

9    It is potentially of sentencing significance that he was

10   knowledgeable of the attack, and you told me that you don't

11   challenge that he knew about the attack.  Am I correct?

12             MR. MAHER:  You're correct.

13             THE COURT:  Okay.  Then I will not rely for purposes

14   of sentencing that Mr. Jones called the mother of Thomas Evans.

15   Setting that aside, I will consider, for purposes of

16   sentencing, that Mr. Jones knew about the attack on Kenyan

17   forces in Lamu.

18             MR. MAHER:  And just for even more clarity, our

19   position is that Mr. Jones knew about it after the fact, not in

20   preparation for that specific attack.  He was not in the know

21   of that.

22             THE COURT:  I understand.

23             MR. MAHER:  Thank you.

24             THE COURT:  The second question I had is -- and this

25   is directed at the government -- I want to make sure that I

I5TKJONS

1   understand the evidence, if there is any, that he was going to

2   join ISIS in Yemen.  Even the government's evidence seems to be

3   conflicting on that.  There is something in the record

4   indicating that when he was -- when Mr. Jones was interviewed

5   by Somali officials, he said something about joining ISIS in

6   Somalia, and then the government alleges that when he was

7   interviewed by the FBI, he said he was going to Yemen, but I

8   don't think he said he was going to Yemen to join ISIS.  I

9   think he said that he was going to Yemen because he was

10  defecting from al-Shabaab, and he wanted to live in peace in

11  Yemen.

12          You want to help me understand if there's any other

13  evidence that bears on that issue?

14          MR. DeFILIPPIS:  Sure, your Honor.  I think with

15  regard to the two locations, the difference between joining

16  ISIS in Somalia and going to Yemen to join ISIS, at this

17  time -- and there have been public reports of this, one of

18  which we cited in our submission -- there was a faction of

19  supposedly dissatisfied al-Shabaab members who had been

20  recruited by or decided to defect to ISIS.  This faction was at

21  the time in Somalia, and Mr. Jones, we believe, was a part of

22  that faction that had fallen out, for lack of a better word,

23  with al-Shabaab and was intending to go elsewhere to join ISIS.

24          When he was first captured by the Somalis, that is

25  when he was interviewed by Somali forces, and because the FBI

I5TKJONS

1    later interviewed the individuals who interviewed Mr. Jones,

2    stated to them that he had left al-Shabaab in order to join

3    ISIS and was in the process of doing so.

4          When he was later interviewed by the FBI, he stopped

5    short of saying he was joining ISIS.  He said that he was going

6    to Yemen in order to live a peaceful life.  And, again, the

7    kind of facial implausibility of that statement, we think,

8    again, as with the Mpeketoni attack, it's not hard to imagine

9    why he would, when speaking to American law enforcement, stop

10   short of admitting what exactly he was going to do.

11         THE COURT:  All right.  Mr. Maher, anything you want

12   to say on that point before I move on?

13         MR. MAHER:  Yes.  Mr. Jones specifically and adamantly

14   denies that he fled from al-Shabaab with the intent to join

15   ISIS.  The government's position is shifting literally all over

16   the map of South Asia and East Africa based on an unreliable

17   first statement to the Somali authorities.  Mr. Jones, as the

18   PSR states in paragraph 51, when he was found, he was barefoot

19   and appeared malnourished.  Mr. Jones' letter to the Court also

20   indicates clearly that he did not intend to join ISIS.  That's

21   Exhibit A to our original sentencing memorandum.

22         Mr. Jones was trying to get away from al-Shabaab and

23   trying not to be killed.  He wanted nothing more to do with

24   them.  He did not leave in order to join ISIS.  He left to

25   live, and to be in peace, and to get away.  That's what it was

I5TKJONS

about.  And the government has no corroborated information of

any value that I've heard so far to prove that.  I've not heard

today of any witness who corroborates that.  I've not heard of

any single intelligence that corroborates that; any type of

intel that corroborates that, nothing.  It is, again,

conjecture and feeding into a narrative that is very convenient

for the government, I would suggest.

THE COURT:  All right.  Well, I'm going to make

findings on these points a little bit later, but I wanted to

understand what each party's position was on them.

In preparation for sentencing, I have read the

presentence report, which is dated November 30, 2017.  I've

read the submission from defense counsel, dated May 15th, along

with all of the exhibits attached to that submission.  And I

have read the government's May 22nd, 2018 sentencing

submission.

Mr. Maher, have you read the presentence report and

its recommendation and discussed it with Mr. Jones?

MR. MAHER:  Yes, I have.

THE COURT:  Mr. Jones, have you read the presentence

report's recommendation and discussed it with Mr. Maher?

THE DEFENDANT:  Yes.

THE COURT:  Mr. Maher, we've talked about a couple of

aspects of the factual portions of the presentence report, but

do you want to, for the record, make formal objections to any

I5TKJONS

1    portion of the factual section in the presentence report?

2           MR. MAHER:  At this point, your Honor, we're not

3    making any formal objections to require any hearing.  Again, I

4    just want to emphasize that the key paragraph here concerning

5    the ISIS issue that the Court just raised is, I believe,

6    contained in this paragraph 51.  And this paragraph was

7    modified after my objection to the probation office.

8           The second sentence states, "It was believed."  Okay?

9    So, factually, maybe an FBI agent or someone believed this.  I

10   don't know if I can factually dispute that, but I want to be

11   clear that I did not want language in here that Mr. Jones was

12   doing this.  And so if the understanding from the Court is that

13   this paragraph is consistent with the idea that the defense's

14   position is that Mr. Jones was not leaving to go to ISIS, the

15   government has some basis -- we can't say how strong -- for

16   them to have some type of belief, I think that's reflected in

17   this paragraph.  That's the last issue I would say that I have

18   with this report.

19          THE COURT:  Okay.  Mr. DeFilippis, does the government

20   have any objections to the factual portions of the presentence

21   report?

22          MR. DeFILIPPIS:  We do not, your Honor.

23          THE COURT:  Then, as I mentioned, I am going to make

24   findings on these issues, both the issue about Mr. Jones'

25   involvement in other acts of violence other than the battle

I5TKJONS

1    with Kenyan forces, and I am going to address later this issue

2    about whether he was going to Yemen to join ISIS.  But for

3    present purposes, I am going to adopt the findings of fact set

4    forth in the presentence report.

5            Although I'm not required to impose sentence in

6    accordance with the sentencing guidelines, I am to consider

7    what the guidelines recommend.  Mr. Jones pled guilty to three

8    counts.  Count One is conspiracy to provide material support

9    and resources to a foreign terrorist organization, in this

10   case, al-Shabaab.  That count has a statutory maximum sentence

11   of 15 years' imprisonment.  He also pled guilty to Count Two,

12   which is conspiracy to receive military training from

13   al-Shabaab.  The statutory maximum for that charge is five

14   years.  Count Three is possessing, carrying, and using

15   firearms, here, an AK-47 firearm, during and in relation to

16   crimes of violence.  That charge carries a 30-year mandatory

17   sentence, which must be imposed consecutively to any sentence

18   imposed on Counts One and Two.

19           The base offense level for Count One is 26.  Because

20   the offense involved the provision of firearms, or other

21   material support, or resources with the intent, knowledge, or

22   reason to believe that they were to be used to commit or assist

23   in the commission of a violent act, two levels were added.

24   Because the offense is a felony that involved the federal crime

25   of terrorism, 12 levels were added.

I5TKJONS

1          Mr. Jones' offense level is reduced by three levels

2    for acceptance of responsibility.  The total offense level,

3    after these calculations are made, for Count One is 37.

4          The same calculations apply to Count Two.

5          Because Counts One and Two involve the same victim in

6    two or more acts or transactions connected by a common criminal

7    objective or plan, they're grouped together.  The offense level

8    for this group, Counts One and Two, is 37.

9          As to Criminal History Category, Mr. Jones has a

10   conviction for assault in the second degree for which he

11   received a sentence of probation.  Ordinarily he would receive

12   one criminal history point for that conviction.  However,

13   because Counts One and Two involve the federal crime of

14   terrorism, he falls automatically in Criminal History Category

15   Number VI.

16         Offense level 37 at Criminal History Category VI

17   results in a guidelines range of 360 months to life

18   imprisonment.  However, as I mentioned at the outset, there are

19   lower statutory maximum sentences here.  As I indicated, Count

20   One carries a maximum sentence of 15 years, and Count Two

21   carries a maximum sentence of five years.  Accordingly, the

22   maximum statutory sentence on Counts One and Two together, if

23   the sentences were to run consecutively, is 20 years.

24   Accordingly, the guideline sentence for Counts One and Two is

25   the statutory maximum sentence of 240 months' imprisonment.

I5TKJONS

1          As I also noted earlier, Count Three carries a

2    mandatory consecutive sentence of 360 months' imprisonment.

3    Accordingly, the guideline sentence here is 240 months on

4    Counts One and Two; 360 months on Count Three.

5          Mr. Maher, do you have any objection to the accuracy

6    of those calculations as I've stated them?

7          MR. MAHER:  No.

8          THE COURT:  Mr. DeFilippis, does the government have

9    any objections to the accuracy of the guidelines calculations

10   as I have stated them?

11         MR. DeFILIPPIS:  No, your Honor.

12         THE COURT:  Based on my independent evaluation of the

13   sentencing guidelines, I find that the offense level for Counts

14   One and Two is 37, that the Criminal History Category is VI,

15   and that the guidelines range for Counts One and Two is 240

16   months' imprisonment, and that the overall guidelines sentence

17   is 600 months' imprisonment, including the mandatory minimum

18   sentence of 360 months on Count Three, which must be imposed to

19   run consecutively to the sentence imposed on Counts One and

20   Two.

21         Mr. Maher, I'll hear from you as to an appropriate

22   sentence.

23         MR. MAHER:  Thank you.

24         Your Honor, I believe that the fundamental question

25   before your Honor is whether a sentence of 30 years in prison

1  is a sentence that is sufficient, but not greater than

2  necessary, to meet the goals of sentencing in this individual

3  case before you and this individual human being, Maalik Jones,

4  who sits before your Honor.  And I respectfully request, your

5  Honor, to not go a day above 30 years.

6       I believe -- I don't think this will be contested --

7  that it's almost impossible for any of us in this room to know

8  where our country, if you could think existentially, is going

9  to be 30 years from now or where Mr. Maalik Jones, at least

10  existentially, is going to be 30 years from now - his mind, his

11  state, his psychology, his health.  But one thing that is

12  fairly certain is that a sentence of 50 years in prison for

13  this 33-year-old man would likely result in a situation where

14  he dies of at least some cause while in the custody of the

15  Bureau of Prisons.

16       There is no magic indicator that I'm aware of that we

17  can say with a specific person what is this individual's chance

18  of recidivising again.  I think that we know from the

19  literature there are some broad categories that we can look to

20  that are helpful.  One of them is age.  I think it's also

21  uncontested from the research that the older one is first

22  brought into the criminal justice system, the greater

23  likelihood they won't recidivise.  Mr. Jones has no appreciable

24  criminal record.  He has that one point for an assault when he

25  was 23 years old.  That is it.

I5TKJONS

1      Any sentence your Honor imposes with Mr. Jones will

2  mean that when he is released, he will be at least in his, at

3  best, I'd say, late fifties probably in age to possibly way

4  later in life, which, again, I think is a benchmark indicating

5  a very low risk of recidivism.

6      I think another important aspect to look at is what

7  has been Mr. Jones' behavior and attitude since his arrest.

8  I'm going to touch on his life before his arrest, as I did in

9  my letter.  I'm going to talk about that a little bit.  Not

10  much, but I want to bring that up.  But the government's

11  response to our submission was basically, well, yes, there were

12  terrible things in his childhood, but he committed these acts.

13  And, yes, he has, and he's admitted that.  But let's look at

14  what Mr. Jones has done since he's been arrested and what can

15  we reasonably foresee being the trajectory of Mr. Jones' life

16  from this point on.

17      Mr. Jones, since being brought to New York City, was

18  kept for almost two years in solitary confinement in lock-down

19  on Ten South, which is most likely the most horrific and

20  soul-crushing legal environment that our judicial system

21  countenances at this point in this country.  Mr. Jones was

22  placed under special administrative measures by the Attorney

23  General -- not immediately, it took a while, a number of

24  months -- but those were placed on Mr. Jones, which cut him off

25  literally from basically the entire outside world, and it put

I5TKJONS

severe restrictions in my ability to relay information from
Mr. Jones to anyone.

How did Mr. Jones react to that?  Mr. Jones, by all
accounts, has been an exemplary detainee.  He has no writeups
that I'm aware of.  His behavior has been nothing less than
model.  He is respectful to all.  And most importantly -- and I
don't know the exact statistics on this -- Mr. Jones, around
November/October of last year, was actually the SAMs were not
renewed, and the BOP made the internal decision to allow
Mr. Jones to move into general population.  He has been in
general population for, give or take, six months now.  Again,
no writeups, no allegations that Mr. Jones is doing anything to
try to organize detainees in any way against the structures of
authority within the jail system, the Bureau of Prisons, that
he is in any way abusing religious faith in any way whatsoever.

I can't think of a single more significant indicator
right now than the trajectory that Mr. Jones is on.  Every day,
for over two years now, he has been reflecting on the decisions
he's made in his life and the decisions he's going to continue
to make in his life.  He has the support of his family.
Unfortunately, they could not come up to be here today from
Maryland.  It is a significant hardship for their family to
come up here, but we were able to provide the Court a number of
letters of support, which I know your Honor has read.  That
support, I think, is another indication of the hopeful aspect

I5TKJONS

1    of nonrecidivism for Mr. Jones.

2         I bring up these three categories of his behavior

3    since arrest, his family support, and this last category, I'll

4    call it lack of ideological resistance.  Mr. Jones has written

5    a letter that is publicly filed where Mr. Jones has apologized

6    publicly for his criminal behavior.  He has acknowledged that

7    he was wrong.  He specifically renounces violence, and he

8    specifically renounces violence made in the name of religion in

9    any guise whatsoever.

10        There is no ideological resistance from Mr. Jones at

11   this point showing that he would somehow be a threat to

12   recidivise to commit the specific type of political violence

13   that these charges represent and, thus, usually invoke the

14   terrorism enhancement under the guidelines.

15        So, these three main areas, I think, point out to the

16   Court, with some level of assurance, I hope, that a 30-year

17   sentence is more than sufficient to meet the goals of

18   sentencing, including those of protecting the community and

19   deterrence, as well as the unique characteristics of Mr. Jones.

20        I want to touch on the idea of comparing Mr. Jones'

21   sentence to other cases.  And the government, towards the end

22   of their submission, proposed a number of cases for the Court

23   to look at.  I don't know how helpful that is, to point the

24   cases out that the government has pointed out.  If you look at

25   any of those cases, almost all of them involve specific planned

I5TKJONS

attacks against vital interests of the United States.  And,

importantly, what it misses is a whole range of cases over the

last 20 years that just can't be captured by a handful of

sentences.  There have been a number of studies, particularly

by the Center on National Security at Fordham, that indicate

that the average sentence in so-called jihadist terrorism

crimes were at 15 years and one month.  You can then parse them

out by the type of crime, and you can get to different numbers.

One thing that I think is curious is when the

government proposes sometimes in these cases, these comparison

cases, I don't see, and I didn't see here, any cases involving

what you consider to be terrorism of the domestic sort

involving white supremacists, and there have been a number of

sentences around the country involving white supremacists who

have been found guilty of the most serious crimes you can think

of.  There was the case of USA versus Leroy Charles Wheeler in

1994, a group called the Patriots Council, where two members of

this right-wing group possessed ricin, a deadly toxin, and

plotted to blow up a federal building, killing a sheriff's

deputy and obtaining assault rifles.  They received sentences

of 33 months.

There was another Patriots Council case, USA versus

Dennis Brett Henderson, in which two members of this right-wing

group in Minnesota, charged with conspiring to use ricin

against civilians and law enforcement officials, got 48 months

I5TKJONS

1    and 37 months.

2              There was the case of the Mountaineer Militia, USA

3    versus Floyd Raymond Looker, where three members of a West

4    Virginia paramilitary group possessed C4 plastic explosives,

5    bomb-making materials, guns, 50,000 rounds of ammo, and tried

6    to sell blueprints of government installations to terrorist

7    organizations, and plotted to blow up the FBI's national

8    fingerprint center.  The sentences meted out for the three

9    defendants were, I believe, 216 months, 24 months, and 6

10   months.

11             There is a whole list of cases that we could start

12   picking, but I think that that, to some degree, takes our eye

13   off the ball, which is, what is the appropriate sentence again

14   for this unique case and this unique person, Mr. Jones?  I

15   wrote in the submission to the Court that the living conditions

16   that Mr. Jones grew up in can't be described as anything other

17   than horrific.  I'm not going to recount it all, but I want to

18   highlight a few of the things that are in the PSR and some of

19   the other things that I brought to the Court's attention.

20             Mr. Jones' level of poverty was just appalling.

21             THE COURT:  But, you know, the government's going to

22   say, well, he had nine siblings, and none of them ran off to

23   Somalia to join an Islamic terrorist group.  That's what

24   they're going to say.  Of course, they're right.  In fact, I

25   think one of them actually became a state trooper in Maryland.

 1          MR. MAHER:  He did.

 2          THE COURT:  So obviously someone could grow up under

 3    those horrific conditions and, nonetheless, become a

 4    productive, lawful member of society.  Or to put it another

 5    way:  The horrific conditions that Mr. Jones grew up under in

 6    no other case led to his siblings running off to join an

 7    Islamic terrorist group in Somalia.  Everyone else was able to

 8    get on with their life and become productive members of

 9    society.

10          MR. MAHER:  Sure.

11          THE COURT:  So that's what they're going to say.  So,

12    what's your response?

13          MR. MAHER:  My response is, I'm very happy and glad

14    that those other nine siblings were able to survive the horror

15    they went through, and didn't get led astray, and make horrific

16    decisions that injured other people, and themselves, and their

17    family for decades to come.  I'm very happy that Mr. Jones'

18    brother, who's within two years of his age, that when the two

19    of them were so hungry around ten years of age, that they

20    literally ate the wall of their house at the top of their

21    stairs.  Because they were so hungry, they ate the wall, and

22    his younger brother got diagnosed with lead poisoning, but the

23    family didn't bother to test Mr. Jones for lead poisoning.  So,

24    I am glad that that brother didn't make that decision.  There's

25    a whole host of things that poverty and degradation can do

biologically, neurologically, and I can't sit here right now and say there's a brain scan that I can present the Court or anything to show that this is a direct cause, but in looking at 3553(a) factors and the unique characteristics and history of Mr. Jones, I think that the conditions that Mr. Jones grew up in are significant and should be a part of the Court's calculations here.

I think there is also the aspect of the education system that Mr. Jones went through, the small school. I have provided the school records to your Honor, I would say the very narrow range of subjects in the curriculum. I think there's a whole host of factors that we could poke through and put together, if we had unlimited time perhaps, to say how did this happen and why, and why didn't it happen for this person, but it did for Mr. Jones? But I think we still come back to the question now is: What does any crystal ball tell us about the difference between a 30-year sentence, a 40-year sentence, and a 50-year sentence, and where does the Court hit the point where it's greater than necessary to meet the goals of sentencing?

I believe that if your Honor takes the entire calculus of everything before the Court, that 30 years for this man here, Mr. Maalik Jones, is more than sufficient and in line with all of the principles of justice on every point that's important to this Court.

I5TKJONS

1          Thank you.

2          THE COURT:  Mr. Jones, is there anything you wish to

3    say before the Court imposes sentence?

4          THE DEFENDANT:  Yes, your Honor.

5          I'd just like to say that I want to stand by my

6    statements that I made in the letter that I wrote to you, and

7    that I guess there's no way I can take back what transpired

8    from the time I left my home in 2011 until now.  But I know

9    that I realize that I've hurt a lot of people, mainly my

10   family, and I'd like to say I'm sorry for that.  And I've had a

11   lot of time to reflect, and I realize that sometimes we

12   ourselves can be our own worst enemy, and in my case, it's

13   myself, and I've acted rash in a lot of situations, especially

14   when I left my family.

15         So, I believe I've turned that page in my life, and I

16   don't subscribe to that type of thinking anymore.

17         So, I just want to ask you for a second chance, and I

18   do have a family that are supportive to me, and we want to one

19   day be together again.  So, once again, I'm remorseful for what

20   I have done, and I ask you for another chance.

21         Thank you.

22         THE COURT:  Mr. DeFilippis?

23         MR. DeFILIPPIS:  Thank you, your Honor.

24         Mr. Maher is right, your Honor, in the sentence that

25   the question here is:  What is the appropriate sentence for

1   this unique case?  And this is a unique case, your Honor, in

2   several respects.  It is unique in that this defendant was

3   unique in the brutality of the conduct that he supported.  It's

4   unique in the jump that he took from a resident of Baltimore,

5   from a father, a brother, a son, who all of a sudden went

6   halfway around the world to join a brutally violent terrorist

7   group, to train himself into a battle hardened terrorist, and

8   to support acts of violence, and to support a group that

9   engages in acts of violence that are unspeakable, your Honor.

10         Now, it's also unique, your Honor, in the sense that

11  the defendant didn't just do this on a whim, he didn't just

12  embrace an ideology.  He fully committed himself, his time, his

13  life to al-Shabaab and to its murderous goals, and he didn't

14  just do it for a fleeting time, a short time, he did it for

15  four years.

16         Now, your Honor, we've heard a lot from the defense

17  about the conditions of Mr. Jones' confinement, about what he's

18  done since committing his offense conduct, and we've heard a

19  lot about what happened in his childhood before that, but we

20  haven't heard a lot about what he did for those four years,

21  because, your Honor, the conduct could not be more serious, and

22  it could not be more stark.

23         The Westgate Mall attack that al-Shabaab committed was

24  in September of 2013.  That's two years after Maalik Jones

25  joined al-Shabaab.  It killed 67 people; injured 175.  He

I5TKJONS

1   claims he was disaffected with the group, but he didn't leave

2   the group then.  He stayed with al-Shabaab in its most brutal

3   group, Jaysh Ayman.  The sole purpose of Jaysh Ayman is to

4   conduct cross-border raids into Kenya and to murder Kenyan

5   defense forces and civilians.

6           So, 2013, al-Shabaab committed a horrific attack.

7   Maalik Jones stayed with them.  2015, the Garissa University

8   attack, which killed 148.  He doesn't dispute he was with the

9   group, did not leave, stayed with al-Shabaab.

10          And then, your Honor, his unit, Jaysh Ayman, in 2014

11  and '15, committed three horrific attacks, two in Mpeketoni

12  Kenya, and one in Lamu, Kenya, all of which have some sort of

13  evidence, video or photographic, tying the defendant to the

14  perpetrators of the attacks.

15          And, your Honor, the testimony, the statements given

16  by the victims of those attacks in the government's submission,

17  are gut-wrenching.  You heard about how al-Shabaab raided a

18  police station, slit throats, pulled poor, innocent people out

19  of their homes.  All the while, the defendant was associating

20  himself, supporting, conducting acts of material support of the

21  very unit, the very people who were committing these attacks.

22          And, your Honor, I think, rightly pointed out that the

23  question is not did he wield a gun, did he wield a knife, what

24  particular role did he play, if any, in killing those

25  innocents.  The question is he knew about them.  He knew about

I5TKJONS

what his unit was doing because that was their entire purpose, and, yet, he stayed with them for one year, two years, three years, four years.  It wasn't until late 2015, your Honor, that the defendant was picked up and caught red-handed, tried to claim he was going to live a peaceful life in Yemen.

Your Honor, that has no ring of credibility to it. It's obviously false.  The defendant did not have cold feet. He was captured, and he stayed with the group through all of its brutality.  The acts of material support that he committed could not have supported a more murderous or bloody mission, and he was there for four long years.

Now, your Honor and the defense rightly anticipated that the government does not believe that the circumstances of the defendant's life mitigate his conduct or warrant a sentence of 30 years.  The appropriate sentence here, even when considering the life circumstances of this defendant, his conduct, is the guideline sentence, the sentence recommended by probation, which is 50 years, your Honor.

Now, the defense characterized the government's likely reaction to his reportedly difficult childhood as, yes, he had a difficult child, but he committed these acts.  It's not that simple, your Honor.  The fact of it is, we didn't hear anything from the defense about the defendant's radicalization.  Why did he choose willingly, knowingly, to embrace al-Shabaab's ideology and then support its murderous goals?  The reason we

I5TKJONS

1    didn't hear anything about that process, your Honor, is because

2    there's no logical connection, there's no logical link between

3    the childhood that the defendant reportedly suffered and the

4    heinous act and ideology that he then supported.

5            If the defendant were trying to explain --

6            THE COURT:  Excuse me.  He went to an Islamic school.

7    Are you saying that -- you really don't think his upbringing

8    had anything to do with his decision to join an Islamic

9    terrorist organization?

10           MR. DeFILIPPIS:  Your Honor, certainly --

11           THE COURT:  Or to put it another way:  You think the

12   fact that he went to an Islamic school for 12 years is

13   completely unrelated to his decision to join an Islamic

14   terrorist organization?  That's your theory?

15           MR. DeFILIPPIS:  Your Honor, I think that the --

16           THE COURT:  Because it would seem that they're

17   probably connected in some way.  He probably learned something,

18   either from his father or from somebody else at that school he

19   went to for 12 years, that played some role in his decision to

20   go to Somalia.  I mean, that would seem like a reasonable

21   inference.  But you seem to be saying that the fact that he was

22   12 years in an Islamic school is totally unrelated to his

23   decision to join an Islamic terrorist organization.

24           MR. DeFILIPPIS:  Your Honor, certainly his Muslim

25   upbringing explains why he's Muslim, certainly his attendance

1   at an Islamic school explains why he embraced the religion of

2   Islam, but that does not explain, and certainly we don't know

3   why for sure, why he then made the leap to violence, brutal

4   violence.  There's nothing about going to an Islamic school

5   that should lead one to engage in violence, to support

6   violence, to support a terrorist group, and, yet, Maalik Jones

7   did that.  Now, was there an influence in his life, was there a

8   preacher, was there someone who was radical and supportive of

9   violence who lured him and encouraged him to follow that path?

10  There probably was, your Honor, but that is a path that the

11  defendant willingly and knowingly took.

12          And whether he grew up in a rich household or a poor

13  household offers no mitigating comfort, offers no mitigating

14  support, for the knowing steps he took to support violence.

15  And I think it is very important to distinguish Islamic

16  teaching and violence in this context, your Honor, because the

17  point that your Honor rightly anticipated the government would

18  make about his siblings, there are certainly dozens, hundreds

19  of children who graduate from that school and do not knowingly

20  go down the path of supporting a bloody terrorist group.

21          So that's the government's point, your Honor, is that

22  whatever circumstances, whatever poverty he suffered, does not

23  even begin to explain why he would travel halfway around the

24  world to support a group that ironically murders people who are

25  themselves extremely poor in a small village in Somalia or

I5TKJONS

1    Kenya.  Nothing could explain or justify that, your Honor.  If

2    the defendant's poverty were used to explain a petty theft

3    because he needed money, that's one thing.  If it were used to

4    explain a decision to sell drugs, that's another thing.

5    Certainly he was a Muslim, and no one is disputing that.

6    Certainly there must have been some very bad influence in his

7    life, something that grabbed his attention, but none of the

8    difficulties of his childhood, your Honor, excuse or justify

9    the violent activities that he later engaged in.

10           And, your Honor, the defense spoke for some time about

11   other cases, but didn't mention the case that we think is quite

12   relevant here, which is the Pugh case in the Eastern District.

13   Now, obviously, there's always a danger in looking to other

14   cases, but by comparison, your Honor, that was a case where a

15   traveler, a so-called traveler, who was committed to support

16   ISIS, never made his way to ISIS, never actually received the

17   military training he intended to receive, never supported a

18   group while it was engaging in terrorist attacks, never

19   supported actively in battle, and, yet, he received 35 years in

20   prison.

21           Here, your Honor, we have a far, far more culpable

22   defendant, who actually spent four years in Somalia supporting

23   not only al-Shabaab, but its most brutal and vital unit, Jaysh

24   Ayman.

25           Now, the defense also referenced other cases in which

I5TKJONS

defendants received life sentences for plotting attacks against U.S. installations.  Your Honor, first, we are not seeking a life sentence, but, second, when you read those --

THE COURT:  Well, effectively, you are.  I mean, the man is 33, you're seeking a 50-year sentence.  Effectively, you are seeking a life sentence, aren't you?

MR. DeFILIPPIS:  Your Honor, he may, if a 50-year sentence is imposed, spend the left of his life in prison, but when you compare the acts that he supported to, for example, the act of plotting against a military installation, the horrific violence against innocents in a Kenyan village is no less troubling.  It's no less serious.  It should be punished no less than something like that.

Again, your Honor, we've been very forthcoming about our knowledge of his particular role in these attacks.  We're not alleging that he wielded a gun or a knife, and that he killed any particular person.  But the point that was by immersing himself in this group and this unit for several years, he certainly supported its activities, he was fully knowledgeable of them, as your Honor pointed out.  And even before you consider whether he would recidivate, whether he has become a reformed person, if you look only at what he did, what he supported, what his unit did, what they supported, that alone justifies, your Honor, a guideline sentence of 50 years, as recommended by the probation department, because it is hard

1  to imagine more serious conduct, and it's hard to imagine

2  someone more committed to those activities than someone who

3  stays there for four years after being trained and

4  indoctrinated and who, nevertheless, does not leave, who, by

5  his own family's account, would call home and tell his siblings

6  that he was happy there, that he wanted them to come join him

7  there.  There was no indication, your Honor, before the defense

8  submissions were filed with this Court, that the defendant had

9  any remorse.  And, certainly, that is sometimes the case in

10  criminal cases, your Honor, but all of the evidence prior to

11  the defense's submissions were that he had no regrets, that he

12  was happy with what he was doing over there.  And, your

13  Honor --

14       THE COURT:  Well, that's not really true, is it?  We

15  know that he was defecting from al-Shabaab, so at some point,

16  he decided he didn't want to be part of al-Shabaab anymore.

17  You don't dispute that, do you?

18       MR. DeFILIPPIS:  Your Honor, he defected from

19  al-Shabaab in order to, in the government's view, join an

20  arguably more dangerous and more brutal terrorist group, ISIS.

21  There was a well-publicized rift within al-Shabaab at this time

22  where, as we mentioned, a faction of al-Shabaab firefighters

23  were seeking to join ISIS, and the defendant, rather than

24  getting cold feet, was doubling down on his commitment to

25  Islamic terrorism.

 1          That, your Honor, we think, is the only credible,

 2    plausible, and cogent explanation for what he was doing because

 3    at that time, and even today, certainly no one goes to live a

 4    peaceful life in Yemen with a bunch of former co-al-Shabaab

 5    firefighters.  That's not a logical or plausible explanation

 6    for what he was going to do in Yemen.  He was going to Yemen to

 7    join another arguably even more brutal terrorist group.

 8          And, your Honor, that brings us to the final point

 9    here, which is deterrence.  It is incredibly important that

10    this Court send a message that people who engage in conduct

11    like this, who travel around the globe to support the most

12    brutal organizations on the face of the earth, will face

13    decades in American prison.

14          THE COURT:  Well, he's going to face decades no matter

15    what.  There's a 30-year mandatory minimum here.  So, I guess

16    what I need to hear you address is why you think that a 50-year

17    sentence is necessary for deterrence and why 30 years is not

18    good enough.  That's really the issue because he is going to do

19    decades in jail.  There's a mandatory minimum that applies

20    here, so he's going to do three decades.  The law requires that

21    he receive a sentence of three decades in prison.  So the

22    question is:  For deterrence -- and we're obviously talking

23    about general deterrence because 30 years represents most of

24    this man's natural lifespan -- what I need you to explain is

25    why 50 years is necessary to deter others, why 30 years isn't

I5TKJONS

1    going to do it.

2              MR. DeFILIPPIS:  Your Honor, two answers to that, one

3    more legal and one more factual.  To give this defendant just a

4    30-year sentence would essentially give him the 30-year

5    mandatory minimum on the weapons count and give him nothing on

6    his receipt of military training or on his provision of

7    material support to the terrorist group.  It would essentially

8    punish him only for essentially what was one of his

9    instrumentalities of this conspiracy, his use of a weapon in

10   furtherance.  But, your Honor, the message that that would send

11   would be that the defendant, when he carried an AK-47, he was

12   punished for that, but received nothing for his general support

13   to the terrorist group and nothing for his receipt of military

14   training and his transformation into a trained battle-hardened

15   terrorist.

16             So that, your Honor, is just looking at the counts

17   he's charged with and that he pled to, and thinking what is the

18   appropriate punishment on those counts, I think that itself is

19   compelling enough reason to say that a 30-year sentence would

20   be lenient in that sense.

21             Then factually, your Honor:  Material support, when

22   you look at the thrust of a material support conspiracy, the

23   question is what did the defendant do and what was the effect,

24   direct and indirect, of what he supported.  And, here, it is

25   hard to imagine something more serious, something more

I5TKJONS

1   deserving of punishment, which is the defendant committed his

2   life for four years to the group.  That was his act of material

3   support.  He trained, fought, engaged in combat with them, and

4   then supported a unit that went and massacred innocents.  And

5   that, your Honor, to say 30 years for that, while swearing

6   allegiance to a group that is an enemy of the United States

7   that targets civilians and armies of foreign governments, to

8   say that you would get 30 years' for that, your Honor, the

9   government believes is simply not sufficient to punish the

10  serious, grave conduct that the defendant engaged in on

11  multiple fronts.

12        So, when other young men receive the propaganda of

13  al-Shabaab, a 50-year sentence is not too extreme to say that

14  when the decision is presented to them, they should know that

15  50 years or more is something that they will receive when they

16  betray the United States, abandon their families, and support a

17  group that massacres innocents.

18        Your Honor, a 50-year sentence, we think, is within

19  the realm of what is an appropriate balance, given the gravity

20  of his conduct on several levels.

21        Finally, your Honor, the comparisons to other

22  terrorist groups to white supremacist groups, to domestic

23  groups, those are not apt comparisons first.  Second, we don't

24  have the facts of those cases, but this is an international

25  terrorist group that causes mayhem, seeks to destabilize

1    governments around the world, and has successfully committed

2    murder again and again.  And so looking to cases of more

3    comparable groups of comparable defendants, we think that a

4    50-year guideline sentence is certainly appropriate and

5    adequately reflects the defendant's conduct here.

6            Thank you, your Honor.

7            THE COURT:  In deciding upon an appropriate sentence,

8    I have considered all of the factors listed in Title 18, United

9    States Code, Section 3553(a), including the nature and

10   circumstances of Mr. Jones' offenses, his personal history and

11   characteristics, the need for the sentence imposed to reflect

12   the seriousness of the offenses, the need to promote respect

13   for the law, to provide just punishment, and to afford adequate

14   deterrence, both specific and general.

15           Beginning with the nature and circumstances of the

16   offense:  Mr. Jones was born and raised in Maryland and lived

17   there until 2011.  In July of that year, he left the United

18   States and traveled to Somalia, where he joined the Islamic

19   terrorist organization known as al-Shabaab.  Al-Shabaab has

20   used acts of violence to undermine the Somali government, to

21   terrorize the Somali population, and to force the withdrawal of

22   foreign troops from Somalia.  Al-Shabaab assassinates civilians

23   and journalists and commonly murders innocents, including women

24   and children, in committing its acts of indiscriminate terror.

25           In 2008, the State Department designated al-Shabaab as

I5TKJONS

a foreign terrorist organization.  In response, al-Shabaab announced a campaign of violence against the United States.

In 2012, the leader of al-Shabaab swore allegiance to al Qaeda.

There is a fighting unit of al-Shabaab that's known as Jaysh Ayman, and Jaysh Ayman, as I understand it, carries out commando attacks and raids on military and civilian targets in Kenya.

Now, there's not much in the record about the whys and wherefores of how someone who grew up in Baltimore, Maryland, woke up one day and decided to join al-Shabaab.  As we have discussed, Mr. Jones was the product of a strict Islamic upbringing.  His father was the principal of an Islamic school that he was educated at for 12 years.

As best as we understand it, at some point in time, Mr. Jones began watching recruiting videos, recruitment videos that are put online by Islamic terrorist organizations.  And according to his letter to the Court, at some point he came to believe that innocent people in Somalia were suffering, and that it was his religious obligation to help them fight their oppressors.  So that's the best we have as an explanation for why he did what he did.

After Mr. Jones arrived in Somalia in 2011, he received military training at an al-Shabaab training camp.  He learned how to shoot firearms, including an AK-47, and how to

1    operate rocket-propelled grenade.

2            After completing his military training, Mr. Jones

3    joined the Jaysh Ayman component of al-Shabaab, and he remained

4    a member of that unit until some point in 2015, so for

5    approximately a period of four years.

6            We know that in August of 2013, Mr. Jones fought

7    Kenyan military forces in a battle in a town called Afmadow,

8    A-f-m-a-d-o-w, which I understand to be located in Somalia,

9    near the border with Kenya.

10           Mr. Jones was wounded and taken to a hospital.  After

11   his release from the hospital, he returned to service with the

12   Jaysh Ayman military unit.

13           Beyond that, the record before me reveals little about

14   what Mr. Jones did with Jaysh Ayman, and the government has

15   contended that the video evidence -- I should say, for the

16   record, there's video evidence showing Mr. Jones at meetings of

17   al-Shabaab people, al-Shabaab leaders, holding a firearm,

18   holding an AK-47.  There is a video of a man in a mask that the

19   government contends, and the FBI contends, is Mr. Jones.  My

20   finding on that is, I can't make a finding on whether Mr. Jones

21   was involved in other acts of violence other than the attack on

22   the Kenyan military that I've made reference to.

23           Now, al-Shabaab itself -- there's no dispute about

24   this -- was involved in a number of vicious attacks on

25   civilians, both before and after Mr. Jones joined the

organization.  For example, in July of 2010, about a year

before Mr. Jones traveled to Somalia to join al-Shabaab, that

organization claimed responsibility for suicide bombings in

Kampala, Uganda, that killed 74 civilians, including an

American citizen.

On September 21st, 2015, about two years after

Mr. Jones had joined al-Shabaab, the organization attacked a

shopping mall in Nairobi, Kenya.  72 innocent people were

killed, innocent civilians, and another 175 were wounded,

including American citizens.

On June 15, 2014, the unit of which Mr. Jones was a

part, Jaysh Ayman, attacked the Kenyan village of Mpeketoni.

During that attack, Jaysh Ayman firefighters highjacked a van,

they raided a police station, and they murdered at least 53

people, including women and children.  They also burned hotels,

restaurants, and government offices.  Two days later, they

returned, and they killed 15 more people and burned more houses

in the same village.

While we don't know precisely what actions Mr. Jones

participated in during his four years with al-Shabaab, it is a

fair inference that he was aware of these attacks, and that he

approved of them, because he stayed with the organization for

four years.

As the government noted, there's also evidence that

Mr. Jones spoke with his relatives during the four years that

1   he was with al-Shabaab.  There is evidence that he told his

2   brother that he was happy in Somalia.  And there is no evidence

3   that he ever expressed to his family a desire to leave

4   al-Shabaab.

5         On December 7, 2015, law enforcement authorities in a

6   town called Baraawe, Somalia, apprehended Mr. Jones while he

7   was attempting to board a boat.  It's undisputed that Mr. Jones

8   had decided to defect from al-Shabaab, but the parties dispute

9   what Mr. Jones' plan was.

10        Mr. Jones says that he wanted to go to Yemen, not for

11   purposes of joining ISIS, but to live in peace.  The government

12   says that after Mr. Jones was arrested in Somalia, he told a

13   Somali military officer that he planned to travel to northern

14   Somalia where he would join ISIS, citing the government's

15   sentencing submission, Docket No. 84, pages 9 to 10.

16        In a later interview with the FBI, however, the

17   government says that Mr. Jones stated that he was defecting

18   from al-Shabaab and was trying to travel to Yemen where he

19   planned to live in peace.  Id. at page 10.

20        I make no finding as to whether Mr. Jones intended to

21   join ISIS, but I will say that given that Yemen at the time,

22   and today, is a war-torn country with a strong ISIS presence,

23   it would be an odd place to go if one was looking for a place

24   to live in peace.

25        As to Mr. Jones' personal history and characteristics:

I5TKJONS

1    He is 33 years old.  He was born and raised in Baltimore.  As I

2    indicated, his father was the principal of an Islamic school.

3              As we have heard, Mr. Jones had a horrific childhood.

4    His father had ten children with Mr. Jones' mother, and then he

5    largely abandoned the family in favor of a second family that

6    he started with another woman.

7              Mr. Jones and his nine siblings commonly lacked food

8    and the basic necessities.  Electricity and heat were

9    frequently shut off for months at a time, including during the

10   winter.

11             Mr. Jones' father physically abused him, punched him,

12   bashed his head into walls and desks.  Mr. Jones was also the

13   victim of sexual abuse.

14             Mr. Jones has entered into two arranged marriages,

15   both of which failed.  He has two children with his second

16   wife, but has not had direct contact with that wife of his

17   children since he left the U.S. in 2011.

18             As to substance abuse, Mr. Jones abused alcohol,

19   marijuana, oxycodone, and PCP when he was young, but has not

20   used any of these substances in more than a decade.

21             As for Mr. Jones' education:  He attended and

22   graduated from the Islamic community school I mentioned.  He

23   briefly attended Baltimore Community College, but had to drop

24   out for financial reasons.  He obtained a commercial driver's

25   license in 2004 and earned certificates related to outdoor

1    electrical systems when he worked for a power company.

2            As to employment:  Mr. Jones worked steadily until he

3    left for Somalia in 2011.  He worked as a trucker from 2006 to

4    2011.  From 2004 to 2006, he was employed at a utility company,

5    where he did electrical and wiring work.  From 2002 to 2004, he

6    worked stocking shelves in a Wal-Mart store.  And from 2001 to

7    2002, he worked in a grocery store in Baltimore.

8            As to criminal history:  Mr. Jones has a conviction

9    for second degree assault for which he received a sentence of

10   probation.

11           With respect to Mr. Jones' behavior while in pretrial

12   detention:  He spent about two years in solitary confinement,

13   as we have heard.  About six months ago, he was moved into

14   general population.  He has had no disciplinary infractions

15   during his nearly two and a half years in custody, and he

16   appears to have made a good adjustment to incarceration.

17           To summarize, the guidelines recommend a total

18   sentence of 50 years' imprisonment, and the probation

19   department has recommended to me that I impose a sentence of 50

20   years.  The government seeks a sentence of 50 years.  Defense

21   counsel seeks a 30-year sentence, which is the mandatory

22   minimum applicable here.

23           With all this in mind, I'll now describe the sentence

24   I intend to impose, and then I'll ask the parties if there's

25   anything further they wish to say.

I5TKJONS

```
1          I conclude that Mr. Jones in his current state is a
2    danger to the community, and that a lengthy term of
3    imprisonment is necessary to protect the community.  He
4    voluntarily left the United States to join a terrorist
5    organization, and he stayed with that terrorist organization
6    for four years while it murdered countless innocent people in
7    numerous attacks.  However, Mr. Jones is 33 years old, and a
8    50-year sentence would essentially be a sentence of life
9    imprisonment.
10          I am not convinced that it is necessary that Mr. Jones
11   die in jail in order to protect the community or to deter him
12   or others from joining terrorist organizations, nor am I
13   convinced that an effective sentence of life imprisonment is
14   necessary for just punishment.
15          The evidence before me indicates that he joined
16   al-Shabaab, a terrorist organization, that has committed
17   countless atrocities.  It also indicates that he fought
18   personally Kenyan government troops.  Beyond that, I have
19   little idea what exactly Mr. Jones did with al-Shabaab.
20          There is, for example, no evidence of Mr. Jones
21   engaged in conduct personally that resulted in injury to
22   Americans.  Nor is there any evidence that he engaged in
23   conduct that presented a risk of injury to Americans or that he
24   conspired to do so.  There is no evidence, in my judgment, that
25   Mr. Jones participated in attacks on civilians of any sort,
```

1    certainly not the kind of evidence on which I can base a

2    sentencing determination.  There is no evidence that Mr. Jones

3    occupied a leadership role in al-Shabaab.

4         So were I to impose a sentence of 50 years'

5    imprisonment on Mr. Jones, it raises the question of what

6    sentence would be appropriate for someone who had caused injury

7    to Americans or conspired to do so?  Or someone who had

8    participated in attacks on innocent civilians?  Or someone who

9    had occupied a leadership role in a terrorist organization?

10   Even in terrorism cases, the Court has to consider relative

11   culpability, as well as the parsimony principle, which requires

12   that I impose the least possible sentence that serves all the

13   purposes of the sentencing statute.

14        In imposing a sentence of what must be, by statute, at

15   least 30 years imprisonment, I am aware that no one can predict

16   what type of person Mr. Jones will become 30 years from now, 40

17   years from now, or 50 years from now.

18        Under the circumstances, I conclude that a variance

19   from the guidelines range of 50 years' imprisonment is

20   appropriate, and that a total sentence of 35 years'

21   imprisonment is sufficient to serve all of the purposes of

22   sentencing.

23        As to supervised release:  It is my intention to

24   impose a total term of five years on the following conditions:

25   Mr. Jones will not commit another federal, state, or local

crime; he will not illegally possess a controlled substance; he

will cooperate in the collection of DNA as directed by the

probation officer; he will refrain from any unlawful use of a

controlled substance, and he will submit to a drug test within

15 days of release from custody and at least two periodic drug

tests thereafter, as determined by the probation officer.

I intend to impose the first 13 standard conditions of

supervised release, along with the following special

conditions:  Mr. Jones will submit his person, residence, place

of business, vehicle, and any property, including computers and

electronic devices, data storage devices, any other media under

his control to a search on the basis that the probation officer

has a reasonable suspicion that contraband or evidence of a

violation of the conditions of his supervised release may be

found.  Any search must be conducted at a reasonable time and

in a reasonable manner.  Failure to submit to a search may be

grounds for revocation of supervised release.  Mr. Jones will

inform any other residents that the premises may be subject to

search pursuant to this condition.

Mr. Jones will participate in the computer Internet

monitoring program administered by the U.S. Probation Office.

He will provide the probation office advance notice of any

computer automated service or connected device that will be

used during the term of his supervision that can access the

Internet.  The probation office is authorized to install any

1  application, as necessary, to survey all activity on computers

2  or connected devices owned or operated by the defendant.

3  Mr. Jones may be required to pay the cost of monitoring

4  services.  The rate and payment schedule will be subject to

5  periodic adjustments by the U.S. Probation Office.

6        The probation office is to be notified via electronic

7  transmission of impermissible or suspicious activity or

8  communications occurring on any computer or connected device

9  used by the defendant consistent with its computer monitoring

10  policy.  As triggered by impermissible or suspicious activity,

11  the defendant will consent to and cooperate with unannounced

12  examinations of any computer equipment owned or operated by

13  him.

14        This examination will include, but is not limited to,

15  retrieval and copying of all data from the computers, connected

16  devices, storage media, and any internal or external

17  peripherals and may involve removal of such equipment for the

18  purpose of conducting a more thorough inspection.

19        Mr. Jones will participate in an outpatient mental

20  health treatment program approved by the U.S. Probation Office.

21        Given Mr. Jones' financial condition, I do not intend

22  to impose a fine.

23        I am required to impose a $300 special assessment.

24        Mr. Maher, anything further you wish to say?

25        MR. MAHER:  I'd ask your Honor to consider a

I5TKJONS

recommendation for designation.

THE COURT:  And what do you request?

MR. MAHER:  I request, in light of family that
Mr. Jones has in Georgia, there is a dual facility in Coleman,
Florida, that has both a USP and an FCI in Coleman, Florida, we
would request.  Thank you.

THE COURT:  Mr. Jones, anything further you wish to
say?

THE DEFENDANT:  No, your Honor.

THE COURT:  Mr. DeFilippis, anything else for the
government?

MR. DeFILIPPIS:  No, your Honor.

THE COURT:  Are there any other counts?

MR. DeFILIPPIS:  Yes, your Honor.  We move to dismiss
all open counts.

THE COURT:  All right.  That motion is granted.

Mr. Jones, for the reasons I just stated, it is the
judgment of this Court that you be sentenced as follows:  Three
years' imprisonment on Count One, two years' imprisonment on
Count Two, and 30 years' imprisonment on Count Three, with all
terms to run consecutively, for a total sentence of 35 years'
imprisonment.

You are also sentenced to three years of supervised
release on Counts One and Two and five years of supervised
release on Count Three, with all supervised release terms to

I5TKJONS

1   run concurrently.  Your term of supervised release will be

2   subject to the mandatory standard and special conditions of

3   supervised release I just mentioned.  You are also ordered to

4   pay a special assessment in the amount of $300.

5           As I indicated, the government's motion to dismiss

6   open counts is granted.

7           I do recommend to the Bureau of Prisons that Mr. Jones

8   be designated to the facility in Coleman, Florida.

9           Mr. Jones, I am required to advise you of your appeal

10  rights.  You can appeal your conviction if you believe that

11  your guilty plea was unlawful or involuntary or if there was

12  some other fundamental defect in the proceedings that was not

13  waived by your guilty plea.

14          You also have a statutory right to appeal your

15  sentence under certain circumstances.  With few exceptions, any

16  notice of appeal must be filed within 14 days of judgment being

17  entered in your case.  Judgment will likely be entered

18  tomorrow.  Mr. Maher will discuss with you whether or not you

19  wish to file a notice of appeal.  If you're not able to pay the

20  costs of an appeal, you may apply for leave to appeal

21  in forma pauperis.  If you request, the Clerk of Court will

22  prepare and file a notice of appeal on your behalf.

23          Is there anything else?

24          MR. DeFILIPPIS:  No, your Honor.

25          MR. MAHER:  No, your Honor.  * * *