LAW OFFICES OF
# DRATEL & LEWIS

29 BROADWAY
Suite 1412
NEW YORK, NEW YORK  10006

TELEPHONE (212) 732  0707
FACSIMILE (212) 571  3792
E MAIL: jdratel@dratellewis.com

JOSHUA L. DRATEL
LINDSAY A. LEWIS

FATOUMATA MAGASSA
*Paralegal*

October 17, 2022

**FILED UNDER SEAL**

The Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

    Re:  *United States v. Maalik Jones*,
       16 Cr. 19 (PGG)

Dear Judge Gardephe:

  This letter is respectfully submitted on behalf of defendant Maalik Jones, whom Peter E. Brill, Esq. and I represent, and constitutes Mr. Jones's sentencing submission.  For the reasons set forth below, it is respectfully submitted that a sentence substantially below the statutory maximum of 25 years' imprisonment, and even of time served, which (accounting for "good time") would be the functional equivalent of approximately a 96-month sentence, would be "sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in" §3553(a)(2), and constitute a reasonable and appropriate sentence for Mr. Jones.

  This letter is respectfully submitted under seal because it includes extremely sensitive and private personal background information about Mr. Jones, as well as excerpts from the report by a forensic psychologist.  A redacted version will be filed on the public docket by early next week at the latest.

  This submission will not cover information and subjects already addressed in the context of Mr. Jones's initial May 29, 2018, sentencing.  Rather, it will provide information regarding issues and questions that were not fully resolved or answered at that initial sentencing, expand upon and more precisely articulate certain issues for which additional information is available,

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 2 of 60

and include new and subsequent information relevant to Mr. Jones's re-sentencing.

In so doing, this submission will confront directly the threshold issue for re-sentencing: Why, when the Court initially sentenced Mr. Jones in 2018 to a 35-year prison sentence, should his sentence be less than the 25-year statutory maximum, particulary when that 35-year term was more than the 30-year mandatory minimum the Court was required to impose?

The answers can be summarized as follows (and are detailed below):

(A)     Mr. Jones has completed an additional 4½ years of exemplary behavior in custody, thereby manifesting his commitment to a law-abiding future and obviating the need for his sentence to include any component of deterrence;

(B)     additional and subsequent information regarding Mr. Jones's background and character, including his maturation and improved self-awareness as reflected in his letter to the Court and the report from forensic psychologist Dr. Andrew Rasmussen;

(C)     Mr. Jones has endured a harrowing 35 months at the Metropolitan Detention Center ("MDC")   including contracting COVID-19   while awaiting the resolution of his case following remand, a factor that Courts have regularly factored into sentencing both before the COVID-19 pandemic and certainly since;

(D)     the deterioration of the U.S. Bureau of Prisons ("BoP") system has created an unsafe and inhumane environment to which Mr. Jones will be returned if sentenced to additional incarceration;

(E)     the difference between Mr. Jones's exposure at re-sentencing and other sentences imposed either for material support for terrorism and/or other serious (even violent) offenses (based on statistical information provided by the United States Sentencing Commission ["Sentencing Commission"] and other sources), or for violent conduct that directly threatens U.S. national security, presents an unwarranted disparity that is contrary to the directive in 18 U.S.C. §3553(a)(6), and can be reconciled only by a sentence dramatically shorter than the statutory maximum.  Compounding the disparity, Mr. Jones's sentence will be extended beyond that of an ordinary defendant because, due to the nature of his offense(s), he is ineligible for both BoP's substance abuse programs, including its Residential Drug and Alcohol Program ("RDAP"), and credits that are otherwise available to many inmates pursuant to the 2018 First Step Act ("FSA"), P.L. 115-391, 18 U.S.C. §3624(b);

(F)     Mr. Jones's automatic placement in Criminal History Category VI (although he

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 3 of 60

would otherwise be in Category I as a result of the Guidelines' terrorism enhancement in §3A1.4(b) grossly overstates his criminal history;  and

(G)     the Court's ultimate discretion to impose a reasonable sentence "sufficient, but not greater than necessary" to achieve the objectives of sentencing enumerated in 18 U.S.C. §3553(a)(2)(A)-(D), unaffected by any "anchoring bias" that the prior 30-year mandatory minimum sentence may have exerted upon the initial sentence.

As the Supreme Court confirmed earlier this year, information and developments subsequent to sentencing are certainly relevant to any re-sentencing.  *See Concepcion v. United States*, ___ U.S. ___, 142 S.Ct. 2389 (June 27, 2022).  *See also Pepper v. United States*, 562 U.S. 476, 495-96 (2011) (statute    18 U.S.C. §3742(g)(2)    precluding consideration, at re-sentencing, of post-sentence rehabilitation was invalid because it had the effect of making the Guidelines mandatory in "an entire set of cases").  Here, it is respectfully submitted that the developments and new information in this case should have a material effect on Mr. Jones's re-sentencing.

Mr. Jones also respectfully requests that the Court recommend that BoP designate him to a facility as close as possible to his children and other family in Baltimore, Maryland, to facilitate visitation.

I.     *The Plea Agreement, the Revised Pre-Sentence Report, and the Prior Sentencing*

The length of Mr. Jones's previous 35-year sentence was driven principally by the 30-year mandatory minimum consecutive sentence required for Count Three of the Superseding Information to which he pleaded guilty, which charged a violation of 18 U.S.C. §924(c)(1)(A) & (c)(1)(B)(ii).  However, upon remand, Mr. Jones pleaded guilty to both counts of a subsequent Superseding Information (ECF # 190), a violation of 18 U.S.C. §2339B (conspiracy to provide material support to a Foreign Terrorist Organization ["FTO"]) (Count One), and a violation of 18 U.S.C. §2339D (conspiracy to receive military-type training from an FTO) (Count Two).

Neither statute requires any minimum term of imprisonment.  Instead, the two charges expose Mr. Jones to a maximum prison sentence of 25 years.  Count One carries a 15-year statutory maximum,[1] and Count Two's penalty provision is oddly constructed:  the defendant "shall be fined under this title *or* imprisoned for ten years, or both."  §2339D(a) (emphasis added).

---

[1]  Mr. Jones's offense conduct occurred prior to 2015, when the maximum penalty for §2339B was increased to 20 years.

LAW OFFICES OF

**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 4 of 60

The revised Pre-Sentence Report ("PSR") recommends the maximum term of imprisonment    25 years    in part because Mr. Jones's applicable advisory Sentencing Guidelines range    amplified by the terrorism enhancement in §3A1.4    is the statutory maximum (in place of the calculated Guidelines range of 360 months to life). However, it is respectfully submitted that the PSR's recommendation is far too harsh because it ignores the factors set forth below, all of which are covered within §3553(a) and/or 18 U.S.C. §3661. The PSR, sand the Probation Department's recommendation, *see* PSR Addendum, at 26, also include certain allegations that Mr. Jones denies, that were raised during the initial sentencing hearing, and which the Court expressly did not endorse at that proceeding.

For example, while the PSR, at ¶ 33, continues to allege that Mr. Jones telephoned the mother of Thomas Evans, an *al Shabaab* soldier killed in combat, at the initial sentencing the Court stated it "will not rely for purposes of sentencing that Mr. Jones called the mother of Thomas Evans." Sentencing Transcript, May 29, 2018 (ECF #88) ("*Sentencing Tr.*"), at 10. *See also id*., at 6-10 (discussion).

Also, at ¶¶ 16-20, 26 & 34, the PSR attributes to Mr. Jones activity that is not part of his offense conduct. As the Court noted at the initial sentencing, "My finding on that is, I can't make a finding on whether Mr. Jones was involved in other acts of violence other than the attack on the Kenyan military that I've made reference to." *Sentencing Tr.*, at 40. *See also id*., at 45-46.

In addition, regarding the allegation in ¶ 35 that Mr. Jones told Somali authorities he was traveling to Yemen to join the Islamic State affiliate there, at the initial sentencing the Court decided it would

> make no finding as to whether Mr. Jones intended to join ISIS, but I will say that given that Yemen at the time, and today, is a war-torn country with a strong ISIS presence, it would be an odd place to go if one was looking for a place to live in peace.

*Sentencing Tr.*, at 42.

Those decisions by the Court should constitute the "law of the case." *See Moore v. James H. Matthews & Co.*, 682 F.2d 830, 833 (9th Cir. 1982) ("law of the case" rule ordinarily precludes a court from re-examining an issue previously decided by the same court, or a higher appellate court, in the same case). Mr. Jones thus respectfully requests that the Court amend/correct the PSR to harmonize it with the findings (or lack thereof) that it made at the initial sentencing.

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 5 of 60

**II.**     ***Application of the §3553(a) Factors to Mr. Jones Makes a Sentence Substantially Below the Statutory Maximum Entirely Reasonable and Appropriate for Him***

As discussed below, in applying to Mr. Jones both §3553(a)'s mandate that a sentence be "sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in" §3553(a)(2), as well as the other sentencing factors set forth in §3553(a)(1)-(7), it is respectfully submitted that a sentence substantially below the 25-year statutory maximum, and even of time served   the functional equivalent, accounting for accrued "good time" credit, of approximately a 96-month sentence   would be reasonable, appropriate, and conform with §3553(a)(2)'s parsimony mandate.

In considering those prescribed sentencing factors and identified purposes of sentencing, several other aspects of Mr. Jones's circumstances are relevant.  Either independently or in combination, it is respectfully submitted that they amply justify a sentence significantly below the mandatory maximum term.

**A.**     ***Mr. Jones Has Demonstrated as Best He Can That He Is Firmly Committed to His Rehabilitation and Has Genuine Remorse for His Offense Conduct***

**1.**     ***Mr. Jones's Record While Incarcerated Manifests His Rehabilitation***

At the initial sentencing, the Court noted that Mr. Jones "appears to have made a good adjustment to incarceration."  *Sentencing Tr.*, at 44.  Mr. Jones's counsel added that he could not "think of a single more significant indicator right now than the trajectory that Mr. Jones is on[,]" *i.e.*, his excellent record through 29 months of custody at Metropolitan Correctional Center ("MCC").  *Id*., at 20.

Mr. Jones has now been incarcerated for approximately 83 months, nearly 54 of them since his May 2018 sentencing.  During this post-sentencing phase, that stellar adjustment has continued, Mr. Jones has incurred only two minor disciplinary infractions (in 2018 and 2020).  *See* PSR, at ¶ 8.

Educationally, Mr. Jones has also affirmatively demonstrated his desire to reform by taking essentially every course available to him despite limitations imposed by COVID-19.  Mr. Jones has received six certificates for classes in a wide array of subjects, many of which have been preparing him for release.  A copy of Mr. Jones's BoP Certificates is attached hereto as Exhibit 4.

For instance, Mr. Jones completed courses in "Inside Out Dad Program," and "Stand! Choosing To Be Self-Reliant," both of which will assist him in successfully accomplishing the

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 6 of 60

transition to becoming a productive member of society.  *Id.*

███████████████████████████████████████████████████████████████

### 2.    *Mr. Jones's Remorse Is Deep and Genuine*

Mr. Jones has also had abundant time to reflect, and has expressed his genuine contrition not only through his spotless institutional record, but also in his letter to the Court, in which he "express[es] the remorse and regret that I have for the actions that I allowed myself to engage in. There is no true excuse for what I did, however, I have been able to take this time in prison to educate myself on the errors in thinking and understanding which led to me being here."  Letter from Maalik Jones (a copy of which is attached hereto as Exhibit 1).

In his letter, Mr. Jones explains that

> [t]he most important thing that has happened to me is seeing the reality of prison life and realizing that nothing in the world is worth ending up here.  I am approaching the age of forty and I look at many things differently.

*Id.*

Mr. Jones elaborates that "I have understood my flaws and have undergone a reconstruction of what is most important in life[,]" and that "many of the things that I did and was drawn to for various reasons, I could not imagine engaging in the same or even similar experience and more importantly, realized the crucial mistake of my actions and thinking process."  *Id.*  Consequently, "[w]hat is important to me now is getting my life and family back together and moving in the right direction."  *Id.*

Mr. Jones's family confirms that he has accepted responsibility for his actions.  For example, Mr. Jones's eldest brother, Mujaihid Jones, notes in his letter to the Court that Mr. Jones "realizes the error in his judgment which lead to these actions and that if he could go back and change anything, it would be correcting his poor decisions.  I believe he has matured and learned a great since being incarcerated."  Letter from Mujaihid Jones (a copy of which is attached hereto as Exhibit 6).

███████████████████████████████████████████████████████████████

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 7 of 60



In fact, MDC officials approached Mr. Jones for guidance and help in forestalling violence when a nationwide lockdown was instituted in January 2022 due to fatal gang violence at a BoP facility in Beaumont, Texas. *See* **post**, at 38.

---

[2] Dr. Rasmussen is a Professor in the Department of Psychology,  (and Associate Chair for Master's Programs) at Fordham Univeristy.   His C.V. is attached as Exhibit 3.

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 8 of 60



### 3.    *Neither Specific Nor General Deterrence Is Necessary In This Case*

As a result, it is respectfully submitted that neither specific nor general deterrence should be a factor in Mr. Jones's re-sentencing. The progress of Mr. Jones's rehabilitation, and his fervent commitment to it, obviate the need for any portion of the sentence to be allocated to specific deterrence.

Regarding general deterrence, as the Court recognized in response to the government's entirely speculative but typical argument that Mr. Jones's sentence   as opposed to the *hundreds* of other sentencings in material support cases during the past two decades (discussed more comprehensively **post**, at 44-46)    should "send a message," *see Sentencing Tr.*, at 32, "what I need to hear you address is why you think that a 50-year sentence is necessary for deterrence and why 30 years is not good enough." *Id*., at 32.

Given the data regarding sentences for "material support" convictions, the same is true here with respect to *any* sentence the Court imposes, especially since this is a re-sentencing that is essentially entirely *sui generis*. Moreover, academic literature and clinical research concur that no greater degree of deterrence would be attained by a sentence at or even close to the statutory maximum compared with a sentence well below that term (or even time served, which here

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 9 of 60

would amount to a substantial sentence of 96 months).[3]

Research has consistently established that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."  Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006).  Studies have reached that conclusion consistently for years, even decades: the efficacy of general deterrence through longer sentences is not supported by any data.

In fact, "[t]hree National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence."  *Id.  See also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007), available at bit.ly/3fXaHEd("certainty of punishment is empirically known to be a far better deterrent than its severity");  *United States v. Lawrence*, 254 F. Supp.3d 441 (E.D.N.Y. 2017).[4]

---

[3]  In addition, defendants older than 41 years of age present a dramatically reduced danger of recidivism from those in their 20's.  United States Sentencing Commission, *Recidivism of Federal Offenders: A Comprehensive Overview Report-At-A-Glance*, at 2, available at https://bit.ly/3hRwnPN ("*Recidivism of Federal Offenders*").  *See also United States v. Nellum*, 2005 WL 300073, at *3 (N.D. Ind. 2005);  United States Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders*, December 2017, at 3, available at bit.ly/391akz6;  Daniel Glaser, *Effectiveness of A Prison and Parole System*, 36-37 (1964);  P.B. Hoffman & J.L. Beck, "Burnout   age at release from prison and recidivism," 12 J.Crim.Just. 617 (1984).

[4]  *See also* Dr. Oliver Roeder, Lauren-Brooke Eisen & Julia Bowling, *What Caused the Crime Decline?,* Brennan Center for Justice, February 12, 2015, available at available at bit.ly/3ttVheD;  Michael J. Lynch, *Beating a dead horse: Is there any basic empirical evidence for the deterrent effect of punishment?*, 31 Crime, Law & Social Change 347 (1999), available at bit.ly/3CTMmIg;  Andrew von Hirsch et al., Criminal *Deterrence and Sentence Severity: An Analysis of Recent Research*, (1999), summary available at bit.ly/3tyU3Pn;  Brian Jacobs, "The Cost Of Affording Deterrence," *Forbes*, November 16, 2021, available bit.ly/3zAFqi4 ("[t]wo pieces of scholarship published last month, however, argue that the traditional theory of deterrence has no empirical basis, point toward alternatives to achieving deterrence without lengthy prison terms, and provide an occasion for rethinking traditional deterrence theory as it applies to federal sentencing"), *citing* Benjamin van Rooij and Adam Fine, *The Behavioral Code: The Hidden Ways the Law Makes Us Better . . . Or Worse* (Beacon Press: 2021); Anne Sofie Tegner Anker, Jennifer L.Doleac, and Rasmus Landersø, "The Effects of DNA Databases on the Deterrence and Detection of Offenders," *American Economic Journal: Applied Economics*, 2021, 13(4): 194-225, available at https://doi.org/10.1257/app.20190207.

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 10 of 60

### B.     *Mr. Jones's Difficult and Traumatic Personal Background and History Provide a Compelling Basis for a Reduced Sentence*

#### 1.     *Mr. Jones's Traumatic Childhood*

As the Court observed at the initial sentencing, "Mr. Jones had a horrific childhood." *Sentencing Tr.*, at 43. The catalogue of that long and traumatic episode is recited in vivid and visceral detail in the PSR, at ¶¶ 65-67, in Dr. Rasmussen's Report, at 2-7, and in the letters from Mr. Jones's siblings. As a result, it will not be repeated herein.

Nevertheless, as the Court pointed out,

> [b]ut, you know, the government's going to say, well, he had nine siblings, and none of them ran off to Somalia to join an Islamic terrorist group. That's what they're going to say. Of course, they're right. In fact, I think one of them actually became a state trooper in Maryland.

*Sentencing Tr.*, at 23.

Thus, the Court reasoned,

> [s]o obviously someone could grow up under those horrific conditions and, nonetheless, become a productive, lawful member of society. Or to put it another way: The horrific conditions that Mr. Jones grew up under in no other case led to his siblings running off to join an Islamic terrorist group in Somalia. Everyone else was able to get on with their life and become productive members of society.

*Id.*



LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 11 of 60



That is extraordinary constellation of factors that distinguish Mr. Jones from his siblings.

LAW OFFICES OF

**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 12 of 60

████████████

　　　　2.　　　*The Devastating Impact of a Childhood Like Mr. Jones's*

　　In that context, courts have recognized that one of the factors to be considered in the sentencing context is a lack of a positive parental influence.  That condition existed for Mr. Jones throughout his early life through adolescence and, as in other cases, constitutes convincing mitigation.  *See, e.g.*, *United States v. Armstrong*, 2008 WL 5459177, at *2 (E.D.N.Y. Dec. 22, 2008) (in sentencing defendant to half the Guidelines range, Court observed that "[t]he offense is serious.  The defendant was a member of a gang that disturbed the peace and threatened the safety of a public housing project.  [But the defendant's] childhood was affected by inadequate parental control"); *see also United States v. Petit*, 09 Cr. 455 (JBW), 2010 WL 1727822, at *2 (E.D.N.Y. Apr. 9, 2010) (imposing sentence of probation instead of within Guidelines range of 27-33 months because, *inter alia*, defendant "tried to make the best of a bad childhood.  Defendant had abusive parents, and was raised in various foster homes from the age of six"); *United States v. Serrano*, 08 CR 612 (JBW), 2010 WL 147924, at *2 (E.D.N.Y. Jan. 11, 2010).

　　Mr. Jones's childhood was plagued with poverty & hunger, instability, neglect, and harrowing abuse.  The impact and repercussions of such a dysfunctional and harmful home atmosphere are predictable.  It is well documented that the effects of childhood neglect and abuse are severe and enduring.  *See* Marsha Garrison, J.D., *Reforming Child Protection: A Public Health Perspective*, 12 Va. J. Soc. Pol'y & L. 590, 601-06 (2005).

　　Maltreatment during childhood obviously has myriad physical effects, many of which continue to manifest in adulthood, but childhood abuse is also a well-established risk factor for juvenile and adult offending.  *See* Denise C. Herz, et al., *Challenges Facing Crossover Youth: An Examination of Juvenile-Justice Decision Making and Recidivism*, 48 Fam. Ct. Rev. 305, 305 (April 2010); *see also Child Abuse and Maltreatment: Impact of Child Abuse and Maltreatment on Delinquency, Arrest and Victimization*, National Institute of Justice (updated July 1, 2011), , available at bit.ly/3liv0fd ("[b]eing abused or neglected as a child increases the likelihood of arrest as a juvenile by 59 percent, as an adult by 28 percent").

　　In particular, serious physical abuse during childhood, compounded with low

---

　　[6] The defense has engaged another forensic expert, a neuropsychologist, to examine Mr. Jones as a result of the several head injuries, including one as a child in which he lost consciousness.  *See* PSR, at ¶ 66.  However, due to delays in MDC clearing that expert for a visit, that examination (and report) has not yet been completed.  The report will be provided as a supplement once it is finished.

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 13 of 60

socioeconomic status, like that experienced by Mr. Jones throughout his formative years, greatly increases the likelihood that an individual will come into contact with both the juvenile and adult criminal legal system.  *See* Janet Currie and Erdal Tekin, *Does Child Abuse Cause Crime?*, IZA Discussion Paper No. 2063, at 30-31 (April 2006), available at http://ftp.iza.org/dp2063.pdf.

Indeed, comparison of Mr. Jones's background to the risk factors linked with delinquency demonstrates the extent to which the odds were stacked against him.  A report issued by the United States Department of Justice (hereinafter "DoJ") culled together characteristics and circumstances that predict delinquency, and further correlated certain risk factors and juvenile offending.  *See* Michael Shader, *Risk Factors for Delinquency: An Overview*, U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention Program, at 4 (2004) (hereinafter "*DOJ Delinquency Report*"), available at https://bit.ly/3D9chso.

According to the *DOJ Delinquency Report*, risk factors for juvenile offending during early teen years include "[p]oor parent-child relationship", "[l]ow parental involvement", [a]busive parents", "[h]arsh discipline", "[b]roken home", and "[n]eglect."  *Id.*, at 4.  Here, the dominant tone of Mr. Jones's early life was poverty, neglect, instability, and abuse. Multiple studies cited in the *DOJ Delinquency Report* concluded that later offending was strongly foreshadowed by "poor parenting skills, family size, home discord, child maltreatment, and antisocial parents." *Id.*, at 6.

### 3.   *Mr. Jones Has the Unwavering Support of His Family, Which Is An Important Element for Offender Re-Entry*

His siblings' superior (and in many ways extraordinary) adjustment to their childhood presents an advantage for Mr. Jones:  as demonstrated by the letters from his family members, he has a large and effective support network ready to assist him upon release. In his letter, Mr. Jones acknowledges and appreciates the support provided by his family:

> [t]he type of support that has come from family members and beyond has also been a source of motivation in terms of getting back into society and doing positive things.  They have shown both general love and tough love.  General love in that they never gave up on me, and tough love in that they didn't just welcome me with open arms when I got arrested.

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 14 of 60

Exhibit 1.[7]

    The letters appended hereto as Exhibits 6-11 emphasize Mr. Jones's strong familial bonds, as well as his efforts to contribute positively to those around him. According to Idris Shahid, a friend for 23 years, "Maalik is a serious family man." Letter from Idris Shahid (a copy of which is attached hereto as Exhibit 7). As stated in the PSR, "since his arrest, [Mr. Jones] has reconnected with most of [his siblings]. He added that he and his family currently share a good relationship." PSR, at ¶ 63.

    Also, for children like Mr. Jones, who have experienced childhood neglect and abuse, "siblings can serve as a buffer against the worst effects of harsh circumstances," as well as mitigate the long-term effect of trauma. Wojciak, et. al., "Sibling Relationships of Youth in Foster Care: A Predictor of Resilience," 84 *Children and Youth Services Review* 247, 1072 (January 2018), available at bit.ly/3TdvMIQ.

    As Mr. Jones's brother Tauhid Jones confirms, "[i]n a large family, as you get older, some people grow apart whether they're your siblings or not. That is not the case with Maalik; we have grown closer and closer over the years." Letter from Tauhid Jones (a copy of which is appended hereto as Exhibit 8). Despite Mr. Jones' incarceration, the two siblings have "maintained a close relationship and we are still best of friends." *Id.*

    Likewise, Mr. Jones is his sister Baiyina Jones's "best friend" and has provided her with constant emotional support throughout the years: "He has always been close by in my life to support me when I needed or wanted something. It could be a small thing, like when I needed him to come to SPCA here to adopt my kitten Alphie, or a huge thing, like when he gifted me a car for my college graduation present." Indeed, "so many . . . decisions I've had to make in my life were cushioned by his presence." *Id.*

    As his mother confirmed in her letter to the Court, "Maalik has always been there for any of us who have needed a helping hand. . . . He has always been there for those in the most need." Exhibit 9, at 1. Mr. Jones is deeply loved by his family as confirmed by his brother, Tauhid Jones, in his letter:

> [w]hen I think of Mow, I think of the father figure that I never had.
> . . . Maalik is a great person and a loving father to his children and
> a humble son to his parents. I owe it to him for taking the time to

---

[7] Family photos — captioned to identify those pictured — are attached hereto collectively as Exhibit 12.

groom me into the man, father, son, and husband that I am today.

Exhibit 8.

Mr. Jones's sister, Baiyina Jones, further notes, "Mow is everybody's favorite . . . my mother's favorite son, the favorite brother, the kids' favorite uncle, and so on . . ." Exhibit 10. Indeed, "[h]is family and community benefits from his presence, participation, and earnest effort on a daily basis." Exhibit 7. Tauhid Jones "can't recall a time where he's ever lied to me or tried to be mean to me for any reason." Exhibit 8.

Moreover, Mr. Jones' positive influence has extended beyond his family. As his mother points out, "[a]s an adult, he was charitable, he attend the fundraisers for one of the local homeless shelters for women with children. He volunteered his time to teach at the school he graduated from as a way to give back to his community." Exhibit 9, at 3. As his mother confirms in her letter,

> Maalik is very a very generous person. Since he started making his own money, he has consistently used it to help people in our family and our community even though he is not the richest among us. Not only his wealth, but his time and talents were at our disposal. He would come home from his job as a truck driver for Sysco and fix dinner when I lived with him. When he got paid, we got paid. My daughter Akhira and I lived with his family for a number of years. He moved from his apartment to a house in a suburban neighborhood to accommodate us.

*Id*., at 2.

Because of these close relationships, his mother expresses how much she and her children have missed Mr. Jones: I take pleasure in reflecting on the multiple times Maalik has made me feel special that such a person can be a part of my life. I'd like to have my son back to spend time with him again before the sun sets for me." *Id. See also* Exhibit 7 (Mr. Shahid and others "miss [Mr. Jones] so much and are in pain and suffering until we are reunited with Maalik." *See also* PSR, at ¶71 (Mr. Jones's "brother stated that the family feels the impact of Jones's absence in their lives.")

The element of family support, which is noticeably present for Mr. Jones, is critical for ex-offenders. As reported in a *National Institute of Justice* publication, "[r]esearch shows . . . that strong family support is one of the biggest factors in a successful re-entry experience." Eric Martin, "Hidden Consequences: The Impact of Incarceration on Dependent Children," *National*

LAW OFFICES OF

**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 16 of 60

*Institute of Justice*, May 2017 ("*Hidden Consequences*"), at 4, available at bit.ly/2UuIia0.

As The Sentencing Project concluded in its recent study, "[s]tability is a key component of remaining crime-free after release [from prison]," and much of that stability is predicated on employment, housing, and positive social supports.  Ashley Nellis & Breanna Bishop, "A New Lease on Life," ("*New Lease*"), *The Sentencing Project*, June 2021, at 22, available at bit.ly/30EPyaf.

Creating that stability can be extraordinarily difficult for those newly released after serving long sentences, but Mr. Jones is already situated to obtain it because of his strong familial relationships.  Recent research by the Prison Policy Initiative and The Sentencing Project have highlighted the importance of employment and stable housing in successful reentry, particularly for individuals returning from significant periods of incarceration.

However, those like Mr. Jones    with strong familial support and a family with the capacity and commitment to provide access to employment and stable housing    are well-positioned for successful re-entry.  *See Hidden Consequences*;  *New Lease*;  Mark T. Berg & Beth M. Huebner, *Reentry and the Ties that Bind: An Examination of Social Ties, Employment, and Recidivism*, 28 Just. Q. 382 (Apr. 2011) ("*Reentry*"), at 383, available at bit.ly/3ATRzeU.

Going forward, that support is both instructive and motivational for Mr. Jones, as his family members "continue to encourage me to be and do better, something that I am fully committed to, not just for them, but most importantly for myself."  *Id*.  As a result, he has "been able to be productive and stay out of harms way by involving myself only in matters that concern me while in prison."  *Id*.  *See also id*. ("[i]f [the Court] find it within [itself] to be merciful to me in this instance, I will show gratitude by walking correct and doing what's right and being there for my loved ones as they have been there for me throughout these trying years").

Indeed, Mr. Jones is "positive that had I instituted this same way of thinking, I would not have made the mistake that landed me here."  *Id*.  Again preparing himself for success upon release, he understands that "[f]or sure, concerning myself only in matters that concern me is my guide to doing well once I get out of prison."  *Id*.

LAW OFFICES OF

**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 17 of 60

C.    ***Mr. Jones Has Spent a Harrowing 83 Months in Prison,
Including an Intolerable 24 Months in Solitary Confinement
at MCC, and an Historically Harsh 34 Months at MDC, Both of
Which Have Been Far More Onerous Than Typical Confinement***

It is respectfully submitted that Mr. Jones's 83 months of imprisonment, including 24 months in solitary pretrial confinement at MCC (plus another five months there in general population), and the past 35 months at MDC following remand should be a significant factor in his sentencing pursuant to §§3553(a)(2)(D) and (a)(6).  In that context, courts have routinely imposed sentences that account for the onerous nature of pretrial confinement at MCC and MDC, as well as the ordeal of incarceration during the entire 31 months trajectory (thus far) of the COVID-19 pandemic.

Mr. Jones describes his prison experience *en toto* as follows:  "This experience has been nothing less than trying, horrific, and challenging.  What has given me hope now is the fact that I at least have this opportunity to get a second chance and moreover, a chance to be there for my children who have had no less of a challenge in life."  Exhibit 1.

1.    ***Mr. Jones's Two Years in Solitary Confinement on MCC's 10-South***

Mr. Jones spent his first two years at MCC in solitary confinement on 10-South, which his counsel accurately described at the initial sentencing as "most likely the most horrific and soul-crushing legal environment that our judicial system countenances at this point in this country."  *Sentencing Tr.*, at 9.  During most of that period Mr. Jones was subject to S.A.M.'s, which further aggravated his isolation.  *See, e.g.*, Aviva Stahl, "Prisoners Endure A Nightmare 'Gulag' In Lower Manhattan, Hidden In Plain Sight," *Gothamist*, June 19, 2018, available at: https://bit.ly/337EKm7;  Joseph Goldstein, "Manhattan Jail That Holds El Chapo Is Called Tougher Than Guantánamo Bay," *The New York Times*, Janurary 23, 2017, available at: https://nyti.ms/30gmSEL.[8]

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[8]  The *Gothamist* article noted reports of "filthy conditions, vermin infestations, substandard medical care, and violence and abuse at the hands of guards" on 10-South, and that the six inmates there "are subject to some of the most brutal conditions of solitary confinement in the nation."  Indeed, the conditions are described as "'a punitive measure that is unworthy of the United States as a civilized democracy,'" according to a former United Nations special monitor on torture and punishment who investigated the case of one prisoner held there for three years."  *Id*.

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 18 of 60



LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 19 of 60

Clearly, MCC was not in compliance with the United Nations' "Mandela Rules," which limit solitary confinement to 15 days. *See Minimum Rules on the Treatment of Prisoners* (2015), available at bit.ly/3D3LcL4. Rule 43(a) prohibits "[i]ndefinite solitary confinement[,]" while Rule 43(b) prohibits "[p]rolonged solitary confinement." Rule 44 defines "prolonged solitary confinement" as "in excess of 15 consecutive days."

In *Gallina v. Barr*, 988 F.3d 137 (2d Cir. 2021), Judge Pooler in dissent declared that "[p]rolonged solitary confinement is one of the true horrors of the modern-day penal system." 988 F.3d at 148 (Pooler, J., *dissenting*). *See also id.* ("there is not a single study of solitary confinement wherein nonvoluntary confinement that lasted for longer than 10 days failed to result in negative psychological effects") (internal quotation marks, brackets, and citations omitted), *quoting Williams v. Sec'y Pa Dep't of Corr.*, 848 F.3d 549, 566 (3d Cir. 2017).[10]

### 2.    *The Grossly Inadequate Conditions Generally at MCC*

MCC of course presented problems beyond solitary confinement. No description of the conditions there could be more compelling than the fact that once a senior Department of Justice official (separate from BoP)   Deputy Attorney General Lisa O. Monaco   visited the facility

---

[10]  *See* Paul Hond, "The Trials of Solitary Confinement," *Columbia Magazine*, Spring/Summer 2022, available at bit.ly/3CMCVKV (discussing three papers published by Columbia University's Justice Lab covering different aspects of solitary confinement, "including its physical and mental toll, its relation to prison overcrowding, and its role in the social dynamics of prison life." *Id*.  "'We found strong evidence of psychological distress as well as a lot of material hardship, including hunger, exposure to extreme heat or cold, and sleeplessness,' says [Bruce] Western, who is the co-principal investigator of the study with Jessica Simes, an associate research scholar at the Justice Lab and a sociology professor at Boston University." "'My enduring impression is of an incredible, almost impossible-to-capture experience of deprivation and harm,'" says Kendra Bradner, director of the Justice Lab's project on probation and parole reform, who along with Western and Simes conducted the cellblock interviews"). *See also* Hannah Pullen-Blasnik, Jessica T. Simes, Bruce Western, "The population prevalence of solitary confinement," *Science Advances 7*, 26 November 2021, available at bit.ly/3ywOoLX ("[e]xtended solitary confinement has been found to be especially harmful to mental health, associated with anxiety, depression, impulse control disorder, social withdrawal, lethargy, apathy, self-harming, and suicidal behavior") (footnote omitted); Bruce Western, Jessica T. Simes, and Kendra Bradner, "Solitary confinement and institutional harm," *Incarceration*, March 2022, available at bit.ly/3ywKSkG; Bruce Western, "Inside the Box:  Safety, Health, and Isolation in Prison," *Journal of Economic Perspectives*, Volume 35, Number 4, Fall 2021, 1   27, available at bit.ly/3CIRPlf. *See also Time-In-Cell*.

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 20 of 60

during Summer 2021, it was almost immediately thereafter ordered *closed*.  *See* Benjamin Weiser, "Justice Dept. to Close Troubled Jail Where Jeffrey Epstein Died," *The New York Times*, August 26, 2021, available at nyti.ms/3rm6bTt (""[t]he decision comes just weeks after the deputy attorney general, Lisa O. Monaco, visited the jail in order to get a first hand look at its operations, 'given ongoing concerns,' as the Justice Department said at the time").

Also, Tyrone Covington, the president of the local union that represents employees at the Metropolitan Correctional Center, told *The New York Times* "that the union had not been told of the decision in advance."  *Id*.  Mr. Covington added that "[w]e have called for a long time to have the facility fixed and upgraded for everyone to be safe, staff and inmates alike."  *Id*.

At an April 2021 sentencing, Judge McMahon commented on the woefully inadequate level of care MCC and MDC provide.  For example, she responded to the defendant's attorney's description of conditions his client had endured in pretrial confinement by proclaiming that

> I wish that the Attorney General, whoever, head of the Bureau of Prisons and the leader of the Congress, would have heard that presentation.  The single thing in the five years that I was chief judge of this court that made me the craziest was my complete and utter inability to do anything meaningful about the conditions at the MCC, especially at the MCC and the MDC, two federal correctional facilities located in the City of New York that are run by morons, which wardens cycle repeatedly, never staying for longer than a few months or even a year.  So there is no continuity, there is no leadership, there is no ability to get anything done.

*See* Sentencing Transcript, *United States v. Days*, 19 Cr. 619 (CM) (ECF # 35), (S.D.N.Y., April 29, 2021), at 19.  *See also* Shayna Jacobs, "Judge says 'morons' run New York's federal jails, denounces 'inhuman' conditions," *The Washington Post*, May 7, 2021, available at wapo.st/341MTWy.

Judge McMahon added that "[i]t is the finding of this Court that the conditions to which she was subjected are as disgusting, inhuman as anything I've heard about any Colombian prison, but more so because we're supposed to be better than that."  *Id*.  Judge McMahon also observed that the problems were widespread: "[s]ome of what [the defendant] endured has been endured by prisoners even in well-run facilities, some of it."  *Id*.  As Judge McMahon pointed out, a federal detainee "shouldn't have to suffer for the incompetence of the United States Department of Justice and its subsidiary agency, the Bureau of Prisons."  *Id*., at 20.

Earlier in 2021, Judge McMahon's widely reported remarks during an April 2021

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 21 of 60

sentencing in the Southern District of New York suffice as an accurate characterization of the woefully inadequate level of care those facilities provide.  *See* Sentencing Transcript, *United States v. Days*, 19 Cr. 619 (CM) (ECF # 35), (S.D.N.Y., April 29, 2021), at 18-20.  *See also* Shayna Jacobs, "Judge says 'morons' run New York's federal jails, denounces 'inhuman' conditions," *The Washington Post*, May 7, 2021, available at wapo.st/341MTWy.[11]

### 3.     *The Miserable Conditions Mr. Jones Has Endured at MDC*

During his most recent 35 months of imprisonment, at MDC, Mr. Jones has been subject not only to the full course of the COVID-19 pandemic   he contracted the virus in December 2020  (and has been vaccinated as of May 13, 2021)   and its deleterious impact on confinement, but also to an environment at MDC that was already entirely dysfunctional.[12]

Mr. Jones suffers from a number of medical conditions set forth in painful detail in Dr. Rasmussen's Report, at 8-9, and in the PSR, at ¶¶ 74-75.  MDC has offered only the most rudimentary assistance:  ibuprofen.  Perhaps most disturbing is the description in Dr. Rasmussen's Report of MDC's "treatment" of Mr. Jones's dental cavities:

---

[11]  Judge McMahon added that "[i]t is the finding of this Court that the conditions to which she was subjected are as disgusting, inhuman as anything I've heard about any Colombian prison, but more so because we're supposed to be better than that." *Id.*  Judge McMahon also observed that the problems were widespread:  "[s]ome of what [the defendant] endured has been endured by prisoners even in well-run facilities, some of it." *Id.*  As Judge McMahon pointed out, a federal detainee "shouldn't have to suffer for the incompetence of the United States Department of Justice and its subsidiary agency, the Bureau of Prisons."  *Id.*, at 2

[12] *See, e.g.*, "Review and Inspection of Metropolitan Detention Center Brooklyn Facilities Issues and Related Impacts on Inmates," Office of the Inspector General, Department of Justice, September 2019, available at oig.justice.gov/reports/2019/e1904.pdf;  Office of the Inspector General, Pandemic Response Report 21-002:  Remote Inspection of Metropolitan Detention Center Brooklyn, *Department of Justice*, November 2020, available at bit.ly/3s7tePX;  *Nadler, Velázquez Statement on DOJ IG Report on MDC Brooklyn*, September 26, 2019, available at bit.ly/2u7nNY9 (noting that inmates "subject to inappropriate conditions, lack of adequate medical services, and insufficient access to counsel[]" were "the very conditions we observed when we visited MDC Brooklyn").  *See also*, Complaint (ECF # 1), *Scott v. Quay*, 19 Civ. 1075 (MKB/LB);  Complaint (ECF # 1),  *Federal Defenders of New York v. Federal Bureau of Prisons*, 19 Civ. 660 (MKB/SMG);  Complaint (ECF # 1), *Chunn v. Edge*, 20 Civ. 1590 (RLM) (E.D.N.Y.).

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 22 of 60

> Mr. Jones reported that his complaints of dental pain in four
> cavities have been persistent over the past two and half years, but
> that only one tooth has been pulled, and he has been told by
> medical staff that instead of trying to treat the other three teeth
> "they are waiting for the other teeth to get so bad so that they have
> to pull them."

*Id*. *See also* PSR, at ¶¶ 74-75.

MDC was in crisis even before the COVID-19 pandemic. In May 2020, Judge Richard
M. Berman criticized MDC while imposing a sentence of essentially "time-served" in a $2.5
million fraud case, characterizing the conditions at MDC and MCC as "unfortunate, terrible[,]"
both before and during the coronavirus pandemic, and decrying MDC's "deficient system[.]"  *See*
Stewart Bishop, "NY Judge Rips 'Terrible' Conditions At NYC Federal Jails," *Law360*, May 5,
2020, available at bit.ly/3yVKk8F.

Litigation instituted by the Federal Defenders regarding longstanding problems at MDC
including inadequate medical care, hygiene, and staffing   continues to this day in the Eastern
District. *See* "Review and Inspection of Metropolitan Detention Center Brooklyn Facilities
Issues and Related Impacts on Inmates," Office of the Inspector General, Department of Justice,
September 2019, available at oig.justice.gov/reports/2019/e1904.pdf. *See also,* Complaint (ECF
# 1), *Scott v. Quay*, 19 Civ. 1075 (MKB/LB); Complaint (ECF # 1), *Federal Defenders of New
York v. Federal Bureau of Prisons*, 19 Civ. 660 (MKB/SMG) *See also* Complaint (ECF # 1),
*Chunn v. Edge*, 20 Civ. 1590 (RLM) (E.D.N.Y.).

In addition, conditions at MDC have been adversely affected by the addition of hundreds
of inmates transferred from MCC, which has worsened overcrowding and staff and resource
shortages there. *See, e.g.,* Nina Pullano, "Manhattan jail closure renews concerns over Brooklyn
facility conditions," *Courthouse News*, August 27, 2021, available at bit.ly/3aOCCjT; Noah
Goldberg, "Feds Launch Emergency Search For Gun At Brooklyn Federal Jail," *New York Daily
News*, October 15, 2021 ("*Emergency Search*"), available at bit.ly/3Eqfvcf (noting that MDC is
"dealing with an influx of inmates due to the imminent closure of Manhattan's federal jail" and
that MDC inmates "have sued the Bureau of Prisons over lack of access to their attorneys
through in-person visits and phone calls").

MDC has also suffered multiple crises since Mr. Jones was transferred there, including a
2021 blackout for six days during which he lacked lights, hot water, or hot food, and the toilets
would not flush. As reported in *The New York Daily News*, during that weekend in October 2021
MDC experienced "no water, spotty electricity, no hot food and staff levels so low that one
inmate was told to figure out how to take his own psychiatric medication, defense lawyers

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 23 of 60

charge."  Noah Goldberg and John Annese, "More problems at fed jail in Brooklyn; Inmates report no lights, water or hot food, few staffers," *New York Daily News*, October 10, 2021 ("*More Problems at Fed Jail in Brooklyn*"), available at bit.ly/3CEZ0s4.[13]

    In fact, in August 2021, Eastern District of New York Chief Judge Brodie "ordered that acting U.S. Attorney Jacquelyn Kasulis of the Eastern District of New York visit [MDC] this month alongside the Federal Defenders, after one MDC resident's defense attorney described a lack of basic hygiene and healthcare provided in the facility."  Jane Wester, "Brooklyn Judge Orders US Attorney, Federal Defenders to Tour MDC Amid 'Concern,'" *The New York Law Journal*, August 3, 2021, available at bit.ly/3fVq0KO.

    Judge Kuntz of EDNY has also "railed at the conditions inside the Brooklyn jail after it took several days to fix a 60-year-old bank robbery suspect's toilet."  *More Problems at Fed Jail In Brooklyn*.  Describing the situation at MDC as "an ongoing disgrace," Judge Kuntz explained, he did not "care if the defendant is Jack the Ripper[.] . . .  We treat people under our care with respect and decency because it reflects on the entirety of the criminal justice system."  *Id*.

    Conditions at MDC have only worsened due to the COVID-19 pandemic.  A November 2020 report by the Department of Justice's Inspector General found that staff shortages impeded MDC's ability to respond to inmate "sick calls" in timely fashion, and MDC's erratic and insufficient testing masked the scope of COVID-19 infection inside the facility.  *See Office of the Inspector General, Pandemic Response Report 21-002: Remote Inspection of Metropolitan Detention Center Brooklyn*, Department of Justice, November 2020 ("*2020 DoJ IG Pandemic Report*"), available at bit.ly/3s7tePX.

    Also in October 2021, MDC experienced another lockdown due to discovery of a firearm that had been smuggled into the institution.  *See Emergency Search*.  In 2022, there was a nearly month-long nationwide lockdown due to homicides at a BoP facility in Beaumont, Texas (*see*

---

    [13]  The *Daily News* article quoted an email from Deirdre Von Dornum, Esq., of the Federal Defenders in which she reported that:

> "We understand that electrical work was being done Friday evening and will continue this weekend.  Our clients are reporting being locked in their cells with the water turned off, resulting in unsanitary conditions from flooding toilets. . . .  We have heard multiple reports of no hot food being available.  Some clients report the lights being out.  Many report a lack of officers on the unit."

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 24 of 60

**post**, at 38), and during another four-month period there were least ten separate lockdowns at MDC.  Most lasted two days, although the lockdown associated with the power problems MDC experienced in early October 2021 (reported by *The Daily News* as cited **ante**) lasted six days.[14]

A recent press conference conducted outside MDC August 16, 2022    attended by elected representatives, defense lawyers, and former MDC detainees and their families    protested to call attention to the continuing inhumane conditions at MDC.  *See* Brad Lander, Jumaane Williams and Candidates for Congress (NY-10) Call on Attorney General Merrick Garland and BoP Director Colette Peters to implement Strong Oversight Measures to the Metropolitan Detention Center in Brooklyn, press conference, August 16, 2022 ("*August 16, 2022, Press Conference at MDC*").

The elected officials, including New York City Comptroller Brad Lander and Public Advocate Jumaane Williams, called upon U.S. Attorney General Merrick Garland and BoP Director Colette Peters to implement immediate reforms. They decried the "systematic dysfunction at MDC-Brooklyn [that] has resulted in years of unacceptable conditions of confinement for detainees, denial of basic necessities, and inadequate access to counsel and legal materials."  *Id*.

At that press conference, former MDC inmate Larry Williams provided the account:

> [o]ne of the things they do is continuously lock you down for the smallest reasons.  Sometimes officers do not feel like coming or they do not feel like letting us out so we will be on lockdown.  Or they will do something called the "modified lockdown" but ultimately it is too much. It is excessive.

*Id*.

The Federal Defenders also invited Emmanuel Vasquez, an inmate at MDC until his release earlier this year, to the August 16, 2022 press conference to describe his experience while at MDC:

> [m]y last experience before being released, I was put into a cell that had black mold coming out of the sink drainage.  Me and my

---

[14]  During Mr. Jones's 18 months at FCI McDowell, that institution, too, was subject to constant lockdowns.  Nevertheless, Mr. Jones had a job at McDowell the entire time he was there, and engaged in as much programming as available.

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 25 of 60

cellmate reported it to the steady officer there and he said there is nothing they can do.  We talked to the counselor, we talked to the caseworkers, they said they will put in a maintenance request never.  We were there for about three weeks with black mold coming out of my drainage. [] So my last week at Brooklyn MDC, I had no running water at all in my cell.  I have been in cells in the SHU where I had drainage water coming out of the shower. I have had fungus on my feet and hands because I have had to scoop the water out, in Styrofoam cups, that smells like sewage water and pour it into the sink.

*Id*.[15]

Comptroller Lander along with 10th District Congressional candidates Carlina Rivera, Yuh-Line Niou, Daniel Goldman and Rep. Mondaire Jones all signed a letter urging BoP Director Peters and Attorney General Garland to address the multiple pressing concerns at MDC,[16] including the habit of rotating Wardens too frequently, four inmate suicides within the

---

[15]  Also, MDC inmates' access to counsel has been interrupted repeatedly.  For example, a group of lawyers visiting MDC July 15, 2022, were held against their will for more than two hours during an emergency count of inmates "without access to food, water, communication with family (despite urgent childcare obligations), or contact with MDC Legal or the Warden." *Federal Defenders of New York, Inc. v. Federal Bureau of Prisons and Warden Herman Quay*, 19 Cv. 660 (MKB) (E.D.N.Y. July 19, 2022) (ECF #339).  *See also* Ben Feuerherd, "Lawyers 'detained against their will' by staff at Brooklyn jail: court docs," *New York Post,* August 21, 2022, available at bit.ly/3B6nuwb; John Annese, "Defense lawyers complain they were trapped in Brooklyn federal jail for hours due to lockdown," *NY Daily News*, July 20, 2022, available at bit.ly/3wReZ5D.

A similar incident occurred two days earlier, July 13, 2022, when at least ten attorneys were also detained involuntarily for several hours under similar conditions.  *Id.*  In fact, [l]ong wait times, unexpected lockdowns without explanation, miscommunications among MDC staff and failure of communication to legal visitors have long impeded meaningful in-person legal visiting at MDC.  Despite legal access being the crux of this suit    first filed in 2019 and in mediation since March 2020    conditions have hardly improved and in some ways worsened." *Id.*

[16]  *See* Candidates for Congress NY-10, Letter to Attorney General Garland and Director Peters regarding MDC Brooklyn, August 16, 2022, available at bit.ly/3Qj7hbl.  *See also* "Several NY-10 Candidates call for reform at troubled Metropolitan Detention Center" *NY Daily News*,

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 26 of 60

past two years, and substantially increased corruption by staff, including smuggling weapons, cellphones, and drugs into MDC.  *Id*.  *See United States v. Monk*, 22-MJ-805, (E.D.N.Y. July 29, 2022) (ECF # 1).[17]

The hardships imposed by the pandemic have only exacerbated the inadequate conditions at MDC.  During the pandemic, incarcerated persons have died at a rate three times higher than the U.S. population at large, and have contracted COVID-19 at a rate five times higher.  Mr. Jones reports that the water at MDC simply is not fit for drinking, and makes inmates sick.

The pandemic has subjected inmates like Mr. Jones to unprecedented dangers and unconscionable conditions.  *See* GAO-21-502, "BOP Could Further Enhance its COVID-19 Response by Capturing and Incorporating Lessons Learned," U.S. General Accounting Office (July 2021) ("*2021 GAO Report*"), at 1, available at bit.ly/3fYCxx4.  *See also See* Watson C, Warmbrod L, Vahey R, *et al.*, *COVID-19 and the US Criminal Justice System:  Evidence for Public Health Measures to Reduce Risk*, Johns Hopkins Center for Health Security, Baltimore, Maryland, October 2020, at 11 ("*Johns Hopkins*"), available at bit.ly/3lAk7mo ("COVID-19 has disproportionately affected people who are incarcerated or detained in the United States").

The measures necessary to contain the pandemic in prison have aggravated inmates' isolation, as the nearly continuous lockdown and lack of visitation for extended periods has in many respects created for them the functional equivalent of solitary confinement.  Even upon entry or re-entry to a facility, inmates are subject to 14-day quarantines.  *See, e.g.*, Su Ming Yeh, "Incarcerated or Detained in the COVID Era," *Legal Intelligencer*, September 18, 2020, available at bit.ly/30Be5tW ("many prisons and jails resort to severe lockdowns, calling them 'quarantine'

---

August 15, 2022, available at: bit.ly/3Q9O6Rp;  Courtney Grosss, "Congressional hopefuls call for reform outside Brooklyn federal jail" *NY 1*, August 16, 2022, available at: bit.ly/3B5YBAL; "New York pols rally outside MDC-Brooklyn to demand federal oversight" *ABC 7 News*, August 16, 2022, available at: 7ny.tv/3AEZMph.

[17]   The signatories to the letter also the several Inspector General reports critical of MDC. *See, e.g.,* Office of the Inspector General, "Review of the Federal Bureau of Prisons' Management of Its Female Inmate Population," *U.S. Department of Justice*, September 2018, available at: bit.ly/3Bhovk4; Office of the Inspector General, "Management of the Special Programs Unit at the Federal Bureau of Prisons Metropolitan Detention Center in Brooklyn, New York," *U.S. Department of Justice*, September 2015, available at: bit.ly/3BI9hpn; United States Attorney Eastern District of New York Richard P. Donoghue, "Press Release: Former Federal Bureau of Prisons Lieutenant Sentenced to 25 Years for Sexual Abuse and Violation of Civil Rights Conviction," *U.S. Department of Justice*, July 31, 2019, available at: bit.ly/3BLop5H.

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 27 of 60

when instead the conditions frequently resemble solitary confinement, which can exacerbate mental health issues and people's physical health"). *See also Johns Hopkins*, ("[s]olitary confinement is a punitive measure that severely restricts access to recreation and contact with friends and family, and there is little transparency in the process") (footnote omitted).

### 4.    *The Ordeal of Incarceration at MDC for the 31 Months of the Continuing COVID-19 Pandemic*

The ongoing COVID-19 pandemic has created within the U.S. prison system an unprecedented health and humanitarian crisis. Moreover, the adverse impact on inmates' health has not involved simply exposure to COVID-19, or contracting it (and, even for survivors, enduring its potentially serious and enduring impact),[18] but also the psychological repercussions of more than 31 months in the functional equivalent of solitary confinement.

Predictably, MDC has been beset by serious problems during the COVID-19 pandemic. A November 2020 report by the Department of Justice's ("DoJ") Inspector General found that MDC's erratic and insufficient testing masked the scope of COVID-19 infection inside the facility. *See 2020 DoJ IG Pandemic Report*"). The *2020 DoJ IG Pandemic Report* also concluded that staff shortages impeded MDC's ability to respond to inmate "sick calls" in timely fashion, as the number of ill inmates at MDC during the initial stages of the pandemic increased dramatically over 2019.

As Federal Defenders attorney-in-chief David Patton commented upon release of the *DoJ IG Pandemic Report*, "[a]s we knew at the time, but they refused to admit, last spring the institution was woefully short on protective equipment and testing. To this day, they are not doing testing of asymptomatic people[.]" Stephen Rex Brown and Noah Goldberg, "Audit of Brooklyn federal jail claims lack of COVID-19 tests may have masked size of outbreak," *New York Daily News*, November 10, 2020, available at bit.ly/3RxbbiS.

As part of a pandemic-related lawsuit against MDC, in late April 2020, Dr. Homer Venters, a public health expert with considerable experience with prisons, conducted on behalf of plaintiffs a court-ordered inspection of MDC. He filed a report that concluded that inmate sick call requests were ignored and adequate prevention measures were not being adopted. April 30. 2020, Declaration of Dr. Homer Venters, *Chunn v. Edge*, 20 Civ. 1590 (RLM) (E.D.N.Y.), ECF Dkt #72-1, at ¶¶ 3, 6.

---

[18]   *See* Benjamin Mueller, "Nearly Half of Covid Patients Haven't Fully Recovered Months Later, Study Finds," *The New York Times*, October 12, 20222, available at https://nyti.ms/3SYIlbq.

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 28 of 60

Dr. Venters further reported that when detainees' sick calls were answered, "[a]fter multiple requests, the only response was for a health staffer to come to their cell and take their temperature[.]" *Id*., at ¶ 24. Yet "no thorough symptoms were elicited and no other physical examinations were conducted.  According to the detainees, this was the case even when they reported having shortness of breath." *Id*.

In addition, attention to "ordinary" medical problems, such as those that afflict Mr. Jones (and which are not "ordinary," *see* **ante**, at 21-22), has been reduced not only by the measures designed to limit the spread of COVID-19, but also because of the resources devoted to those who have contracted the virus in prison, or in trying to limit its transmission.  Not only have outside tests and procedures been delayed for many months, but medical care within prisons themselves has diminished considerably during the pandemic.

Also, among the most difficult aspects of the pandemic inside prisons has been the mental toll exacted by more than 31 months of pandemic-generated and security-related lockdowns. The entire federal prison system has been predominantly under some level of lockdown since March 13, 2020.  *See* Federal Bureau of Prisons, "Bureau of Prisons Update on COVID-19," available at bit.ly/3ek5d0z.

Moreover, conditions in pretrial detention (and the BoP system as a whole) have only worsened due to the COVID-19 pandemic, as New York City's local detention centers of course have been among the institutions most adversely affected by COVID-19.  Indeed, the conditions at generated an editorial from *The New York Times* in which reports    which include other deficiencies in hygiene caused in part by the pandemic and its attendant restrictions    were characterized as "disturbing."  *See* Editorial, "Stop the Coronavirus Outbreak at Brooklyn's Federal Jail," *The New York Times*, December 8, 2020, available at nyti.ms/3gtgEVE.

As Dr. Chris Beyrer attested in a March 28, 2022, Declaration in a federal case, "[u]nfortunately, however, the pandemic is not over, and safety precautions are still warranted under certain conditions."  March 28, 2022, Declaration of Dr. Chris Beyrer, Supplement Regarding the Impact of COVID-19 on Capital Defense Practice, *United States v. Burkhalter*, 18 Cr. 36 (BCW) (W.D. Mo.) (ECF #1022-1), at 1.[19]

As Dr. Beyrer explains, the U.S. "is likely to continue to experience fluctuations in levels

---

[19]  Dr. Beyrer is Senior Scientific Liaison to the COVID-19 Vaccine Prevention Network; Professor of Epidemiology at the Bloomberg School of Public Health at Johns Hopkins University;  and Professor of Medicine at the Division of Infectious Diseases at Johns Hopkins University School of Medicine.

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 29 of 60

of COVID-19 transmission, . . ."  *Id*., at 11.  Also, the U.S. "will also likely experience fluctuations in health care system capacity, including availability of hospital beds, medications, and testing."  *Id*.  Thus, while "[t]here may be relative lulls in the pandemic, [] it should not be considered over.  Nor have we reached a point where COVID-19 is endemic, and therefore, predictable and steady-state."  *Id*.

BoP's inability to contain COVID-19 is troubling because, of course, Mr. Jones can contract the virus again, especially since he caught it almost two years ago.  COVID-19's continuing lethality makes his exposure even more ominous.  According to *The New York Times* COVID-19 dashboard there were at least 30,000 deaths from COVID-19 in the U.S. in August and September 2022.  *See* "Coronavirus in the U.S.:  Latest Map and Case Count," *The New York Times*, available at nyti.ms/3CaDI4S.[20]

That two-month total is twice as many deaths as the entire previous flu season.  *See also* Jon Kamp, "Covid-19 Is Still Killing Hundreds ofAmericans Daily," *The Wall Street Journal*, September 11, 2022, available at on.wsj.com/3ExwoVF (COVID-19 is "on pace to remain third-leading cause of death, with older and sicker people among most vulnerable").[21]

In addition, changes in formal guidance from the Centers for Disease Control and Prevention ("CDC") could make it much easier for BoP and prison officials to relax protective measures to the point that the virus threatens prison populations like it did for the first two years of the pandemic.  For example, CDC's new community levels as of September 22, 2022 provide

---

[20]  *See also* Carl Zimmer, "Why Omicron Might Stick Around," *The New York Times*, September 22, 2022, available at nyti.ms/3COBMma ("[i]t's also looking like Omicron has a remarkable capacity for more evolution.  One of the newest subvariants, called BA.2.75.2, can evade immune responses better than all earlier forms of Omicron").

[21]  Nor do the case figures reflect the genuine level of COVID-19 infection in the U.S., as the closing of testing sites and the availability of home testing have obscured accurate totals. *See, e.g.,* Emily Anthes, "Many Virus Cases Go Uncounted. Are There Better Ways to Track the Pandemic?" *The New York Times*, April 14, 2022, available at nyti.ms/3uYszni (Denis Nash, an epidemiologist at the CUNY Graduate School of Public Health & Health Policy who conducted an as yet unpublished New York City analysis, told *The Times*, "'It seems like the blind spots are getting worse with time. . . .  'We are going to be more likely to be surprised'"); Josh Zumbrun, "Why a Massive New Covid Wave Has Escaped the Data," *The Wall Street Journal*, May 27, 2022, available at on.wsj.com/3t4OMPd ("[t]he U.S. has lost count of Covid cases. . . .  Home testing and curbed state tracking efforts hold down closely watched infection totals, making it hard to shape coronavirus strategies").

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 30 of 60

an illustration:  under pre-February 25, 2022, guidance, universal indoor masking would be recommended in 91% of U.S. counties; under the revised (current) guidance, masking is now recommended in only 7% of U.S. counties.  *See CDC, Covid-19 Integrated County View*, available at bit.ly/3ywPA1T.  *See also* Alex Janin, "How to Assess Covid-19 Risks After Easing of CDC Guidelines," *The Wall Street Journal*, August 15, 2022, available at on.wsj.com/3TfBcmR ("easing of federal Covid-19 guidelines places responsibility ever more squarely on individuals to determine their own risk tolerance and behaviors");  Alexander Tin, "CDC ends daily reporting of COVID case and death data, in shift to weekly updates," *CBSNews*, October 6, 2022, available at cbsn.ws/3Vj2daM (new weekly    instead of daily    case and fatality data "also comes as federal health authorities have been bracing for a potential repeat of the past two deadly winter waves of COVID-19, paired with a possibly severe flu season");  Melody Scheiber, "Biden Picked the Worst Possible Moment to Declare the Pandemic 'Over,'" *The New Republic*, October 4, 2022, available at bit.ly/3VhZjD1.

While the new bivalent booster could offer additional protection, recent surveys indicate that not enough of the population is aware of or interested in it.  *See* Jan Hoffman, "Half of Adults Have Heard Little or Nothing About New Covid Boosters, Survey Finds," *The New York Times*, September 30, 2022, available at nyti.ms/3SSWx5I (lack of knowledge of the booster "could have troubling implications[]" because "[t]he Biden administration has been touting the booster as a means of warding off a fresh fall or winter surge of the virus");  Jack Healy, Sharon Otterman and Amy Qin, "Potent New Covid Boosters Are Here. Will Weary Americans Bother?" *The New York Times*, September 18, 2022, available at nyti.ms/3SSjF42 ("[t]he push for a new vaccine    barely noticed so far by some people    will test how the country responds at a time when the sense of crisis over Covid has abated").[22]

---

[22]   The trajectory of the U.S. response to COVID-19 is discouraging when contemplating the threat presented by future pathogens, which inevitably will have their most adverse effect on the incarcerated population.  *See* Apoorva Mandavilli, "New Infectious Threats Are Coming. The U.S. Probably Won't Contain Them," *The New York Times*, September 29, 2022, available at nyti.ms/3ywPOpL ("[i]f it wasn't clear enough during the Covid-19 pandemic, it has become obvious during the monkeypox outbreak:  The United States, among the richest, most advanced nations in the world, remains wholly unprepared to combat new pathogens");  Sharon LaFreniere, "'Very Harmful' Lack of Data Blunts U.S. Response to Outbreaks," *The New York Times*, September 20, 2022, available at nyti.ms/3RQbjbW;  Ed Yong, "The Pandemic's Legacy Is Already Clear," *The Atlantic*, September 30, 2022, available at bit.ly/3ytDq9W.

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 31 of 60

5.      *The Prospect and Dangers of "Long COVID"*

Nor is death or serious initial illness the only danger presented by COVID-19.  Recent studies provide disturbing statistics:  more than 75% of patients suffering from "Long Covid" were *not* hospitalized during their initial illness, and "[o]ne in five adult Covid survivors under the age of 65 in the United States has experienced at least one health condition that could be considered long Covid, according to a large new study by the Centers for Disease Control and Prevention."[23]

According to the studies, "[n]early 35 percent of the patients [suffering from Long COVID] were between the ages of 36 to 50, while nearly one-third were ages 51 to 64, and 17 percent were ages 23 to 35."  *Id*.  Dr. Paddy Ssentongo, an assistant professor of infectious disease epidemiology at Penn State, told *The New York Times*, "Post-Covid syndrome is going to become perhaps one of the most common pre-existing comorbidities going forward."  *Id*.[24]

Compounding the problem, Long COVID is ignored within the prison system (not entirely unlike in the general population).  *See* Zeynep Tufekci, "If You're Suffering After Being Sick With Covid, It's Not Just in Your Head," *The New York Times*, Aug. 25, 2022, available at nyti.ms/3TaS0LD ("[t]o add to their misery    despite centuries of evidence that viral infections can lead later to terrible debilitating conditions    their travails are often dismissed as fantasy or as unworthy of serious concern");  Knvul Sheikh, "What Is Brain Fog and How Can I Treat It?" *The New York Times*, September 13, 2022, available at nyti.ms/3EvZFQx("[r]esearchers are just

_____

[23]   *See* Pam Belluck, "Over 75 Percent of Long Covid Patients Were Not Hospitalized for Initial Illness, Study Finds," *The New York Times*, May 18, 2022, available at nyti.ms/3aEgImN Pam Belluck, "More than 1 in 5 adult Covid survivors in the U.S. may develop long Covid, a C.D.C. study suggests," *The New York Times*, May 24, 2022, available at nyti.ms/3x80zyA.  *See also* Post-COVID Conditions Among Adult COVID-19 Survivors Aged 18-64 and ≥65 Years United States, March 2020  November 2021, *Centers for Disease Control and Prevention*, May 27, 2022, available at bit.ly/395zKSr.

[24]   *See also* "WHO report: 17 million in EU may have suffered long COVID-19," *Associated Press*, September 13, 2022, available at bit.ly/3Vf0G5x;  Fiona Lowenstein and Ryan Prior, "Long Covid is keeping millions out of work    and worsening labor shortage in the US," *The Guardian*, September 15, 2022, available at bit.ly/3yvskl7 ("[a] recent Brookings Institution analysis found that as many as 2 to 4 million people may be out of work as aresult. . . . it's plausible that up to one-third of current labor shortages are due to long Covid"), *citing* Katie Bach, "New data shows long Covid is keeping as many as 4 million people out of work," *Brookings Institution*, August 24, 2022, available at brook.gs/3VaQWcx.

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 32 of 60

beginning to understand the cognitive dysfunction that some people experience with Covid-19 and a range of other health issues").

**6.      *Courts Have Consistently Considered the Conditions
of Confinement at MDC in the Context of Sentencing***

Even prior to *United States v. Booker*, 543 U.S. 220 (2005), courts held that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departure." *See United States v. Carty*, 264 F.3d at 196. *See also United States v. Farouil*, 124 F.3d 838, 847 (7th Cir.1997) (harsh conditions of confinement constitute valid ground for departure); *United States v. Hernandez-Santiago*, 92 F.3d 97, 101 n. 2 (2d Cir. 1996) (remanding for reasons for downward departure due to "harsher incarceration" due to unavailability of programs); *United States v. Mateo*, 299 F. Supp.2d 201 (S.D.N.Y. 2004); *United States v. Francis,* 129 F. Supp.2d 612, 616 (S.D.N.Y. 2001), *citing United States v. Sutton*, 973 F. Supp. 488, 491-495 (D.N.J. 1997).

In *United States v. Behr*, 2006 WL 1586563 (S.D.N.Y. 2006), the Court noted that a judge had "reduced an individual's sentence by one third based upon the harsh conditions in Unit 11-South at MCC[.]" 2006 WL 1586563, at *5. In light of the harsh conditions at MCC, the defendant in *Behr* was sentenced to a non-Guidelines sentence. *Id.*

The same applies to MDC. The difficult conditions there simply make every day at the facility more onerous than ordinary confinement. *See United States v. Spano*, 476 F.3d 476, 479 (7th Cir. 2007) ("in effect [the defendant] is arguing that the severity of a prison sentence has two dimensions:  its length, and the harshness of the conditions, and that the harsher the conditions the shorter the sentence should be. There is enough merit to the argument to allow a sentencing judge to take it into account . . .").

Here, it is respectfully submitted that the §3553(a) provide an avenue for relief for Mr. Jones, who has suffered through confinement at both MCC and MDC for an aggregate of *65 months*, including two years of solitary confinement in the federal system's bleakest environment, and the entirety of now-31-month COVID-19 pandemic, as well as endemic violence, and deficient and still dwindling staff and medical resources.

**7.      *In Fashioning Appropriate Sentences Courts Have
Recognized the Impact of COVID-19 on Incarceration***

The difficulties encountered in pretrial detention, amplified by the contracting, and even fear of contracting, COVID-19 and the increased tensions in many facilities, have been considered by many judges in imposing shorter prison  sentences on defendants who have been in

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 33 of 60

custody during the pandemic, and those who will continue to be incarcerated for the remainder of the pandemic's course.

In the Southern and Eastern Districts of New York, those instances are too numerous to catalogue.  In fact, a *New York Daily News* limited analysis (conducted in early July 2021) of 43 cases involving defendants with court-appointed counsel "shows that judges in Manhattan and Brooklyn federal courts imposed sentences that were on average 58% lower than what federal guidelines recommended[,]" with either the Court or the defendants' submissions explicitly citing COVID-19 conditions in prison.  Stephen Rex Brown and Noah Goldberg, "Brutal conditions in NYC jails during COVID pandemic caused federal judges to impose lighter sentences:  analysis," *New York Daily News*, July 11, 2021, available at bit.ly/2Z8wX63.

However, some reported cases illustrate how courts have incorporated these unprecedented circumstances into their sentencing determinations.  For example, in *United States v. De Jesus*, 20 Cr. 19 (PAE) (S.D.N.Y. July 1, 2020), the Court noted that the defendant had "served most of [his] time in prison so far during the worst pandemic in this country during the past 100 years[.]"  Sentencing Transcript, July 1, 2020, at 36 (ECF # 21).

The Court in *DeJesus* acknowledged that while "[p]rison is supposed to  be punishment, [] it is not supposed to be trauma of that nature or close."  *Id*.  As the Court reasoned, "[m]y colleagues and I commonly informally credit prisoners who have served time awaiting extradition in dreadful prisons overseas with more time served than measured by the calendar.  The same logic applies here, and then some . . ."  *Id*.  As a result, the Court in *De Jesus* recognized that the defendant's pre-sentence detention "was way harder than anyone intended when you were detained following your arrest."  *Id*., at 36, 37.

Similarly, in *United States v. Gonzalez*, 18 Cr. 669 (JPO) (S.D.N.Y. April 2, 2021) (ECF #250), the Court described conditions at MCC as "extraordinarily harsh" during the pandemic. *Id*., at 17.  The Court in *Gonzalez* added that it "believe[d] that because it's been harsher than a usual period that it's more punitive, that it's essentially the equivalent of either time and a half or two times what would ordinarily be served."  *Id*., at 17.

In *United States v. Cerino*, 19 Cr. 323 (JSR) (S.D.N.Y. July 21, 2020), the Court recognized that "[i]n effect, you are serving harder time every day you are in the federal prisons." *See also id*., ("it is fair to say that conditions in the prison system now result in a harshness that is not the norm and that ought to be recognized by the court as a mitigating factor");  *United States v. Ramirez*, 20 Cr. 29 (JPO), Sentencing Transcript, December 4, 2020 (ECF # 51);  *United States v. Morgan*, 19 Cr. 209 (RMB) (S.D.N.Y. May 5, 2020) (ECF # 90) (sentencing defendant to less than half the bottom of the Guidelines range based in part on conditions at MDC during the pandemic, and condemning the conditions at MCC and MDC even prior to the pandemic);

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 34 of 60

*United States v. Pierson*, 14 Cr. 855 (LTS) (S.D.N.Y. May 4, 2020) (ECF # 73);  *United States v. Espinal*, 19 Cr. 622 (DLC) (S.D.N.Y. August 6, 2020) (ECF # 54) (sentencing below the Guidelines due to harsh conditions created by COVID-19).[25]

Likewise, in *United States v. Lizardi*, 11 Cr. 1032 (PAE) (S.D.N.Y. Oct. 9, 2020) (ECF # 2523), in the context of a motion for compassionate release, the Court pointed out that

> [a] day spent in prison under extreme lockdown and in legitimate
> fear of contracting a once-in-a-century deadly virus exacts a price
> on a prisoner beyond that imposed by an ordinary day in prison.
> While such conditions are not intended as punishment,
> incarceration in such circumstances is, unavoidably, experienced as
> more punishing.

*Id*., at 7.

Accordingly, whether in the context of sentencing or compassionate release, courts have considered factors including, "the severe conditions imposed by the concomitant lockdowns and restrictions that are necessary to ensure [the defendant's] safety," that  have resulted in "the actual severity" of a sentence exceeding "what the Court anticipated at the time of sentencing." *United States v. Rodriguez*, 00 Cr. 761 (JSR), 2020 WL 5810161, at *3 (S.D.N.Y. Sept. 30, 2020), *citing United States v. Mel*, No. 18 Cr. 0571 (TDC), 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020).

That is true here for this re-sentencing.  All these factors repudiate any argument that a sentence at the statutory maximum is proportionate or reasonable.  Instead, they constitute compelling factors fully supporting a sentence dramatically lower than the statutory maximum.

---

[25]  *See also United States v. Romero*, No. 15 CR. 445-18 (PAE), 2021 WL 1518622, at *4 (S.D.N.Y. Apr. 16, 2021) ("[a] day spent in prison under extreme lockdown and in fear of contracting a deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison.  Although not intended as punishment, incarceration in such conditions is, unavoidably, more punishing"), *citing United States v. Rodriguez*, No. 00 Cr. 761 (JSR), 2020 WL 5810161, at *3 (S.D.N.Y. Sept. 30, 2020)

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 35 of 60

**D.    *The Deterioration of Conditions Across the Entire***
***BoP System Threatens Mr. Jones's Safety and Health***

**1.    *BoP's Inadequate Response to COVID-19***

The relevance of BoP's inadequate response to the challenges presented by COVID-19 is that neither the pandemic nor its impact on inmates are finished.  *See* Christopher Blackwell, "The Pandemic Isn't over Inside Prisons    and it Might Never be," *The Appeal*, March 11. 2022 ("*Pandemic Isn't Over Inside Prisons*"), available at bit.ly/3JZSYFE ("[a] cycle of hopelessness is taking its toll in prisons across the country, amid continued restrictions on the things that make life more bearable").

Two years of the pandemic have demonstrated that prisons, and U.S. federal prisons in particular, are insufficiently equipped    in terms of medical and logistical resources, funding, policy, and commitment    to address the increased exposure and infection rates that the prison climate presents.  *See, e.g.,* GAO-21-502, "BOP Could Further Enhance its COVID-19 Response by Capturing and Incorporating Lessons Learned," U.S. General Accounting Office (July 2021) ("*2021 GAO Report*"), available at bit.ly/3fYCxx4;  Walter Pavlo, Opinion, "Statistics Show Federal Bureau Of Prisons Unable To Implement Key Policies During Crisis," *Forbes*, February 7, 2022, available at bit.ly/3JdFSoc.  *See also* Glenn Thrush, "Justice Dept. to Seek Stiffer Sentences in Prisoner Abuse Cases," *The New York Times*, September 29, 2022, available at nyti.ms/3CqUZZo (describing BoP as an "underfunded, scandal-plagued . . . sprawling system long plagued by health and safety problems, corruption, staff turnover and physical and sexual abuse that has disproportionately targeted female inmates and prison workers").[26]

Thus, inmates within the BoP system have been living since March 2020 under substantial restrictions on their movement and activities.  During a substantial portion of that time period, they also have been deprived of in-person visits from family members, and, in many cases, attorney visits as well.  *See* Anson Chan, "Prisons Said It Was COVID Isolation. The Incarcerated Describe Torture," *Huffington Post*, October 13, 2021, available at bit.ly/3vVLHRA.  *See also* **ante**, at 26-27.

The continued changes in protocols    varying degrees of lockdowns, visits resumed then

---

[26]  MDC's air quality (and that in prisons generally) may also play a role in Long COVID vulnerability.  *See* Robin McKie, "Severe Covid cases 'more likely in highly polluted areas,'" *The Guardian*, June 4, 2022, available at bit.ly/3Oho8uF ("[p]eople who contract Covid-19 are more likely to suffer severe symptoms if they have been exposed to air pollution for long periods").

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 36 of 60

halted — has also forced inmates to ride an emotional rollercoaster. *See Johns Hopkins*, at 12 ("[m]any detention facilities and prisons have stopped visitations without adequately providing virtual means for prisoners to communicate with loved ones, which may harm the mental and emotional health of inmates and their families") (footnote omitted).[27]

Conversely, rational measures designed to foreclose COVID-19 transmission deprive inmates of otherwise productive endeavors within the institutions. *Id*. ("[t]he interventions implemented to decrease transmission between inmates include canceling activities,[] closing common spaces, and, in juvenile facilities, canceling school[]") (footnotes omitted).

These developments have created psychological turmoil for inmates and immeasurable difficulty for attorneys seeking simply to advocate effectively for clients in any capacity. *See* Editorial, "The Coronavirus Crisis Inside Prisons Won't Stay Behind Bars," *The New York Times*, June 25, 2020, available at nyti.ms/2VkMH0x ("[i]nmates are scared and desperate, and tensions occasionally boil over").

### 2.    *Other Intractable Problems That Beset the BoP System*

COVID-19 presents merely one, albeit overwhelming and persistent, aspect of prison life in the U.S. — and in BoP facilities in particular — among many that constitute threats to inmate health both physically and emotionally. As demonstrated by data as well as experience, unhealthy conditions, inadequate medical care, nearly non-existent effective psychological attention, and violence and other predatory behavior, combine to make U.S. federal prisons dangerous for inmates.

Despite a temporary reduction in the U.S. federal prison population during the initial phases of the COVID-19 pandemic, the federal prison population has increased by more than 20,000 inmates since January 2021. *See* Walter Pavlo, Opinion, "Statistics Show Federal Bureau Of Prisons Unable To Implement Key Policies During Crisis," *Forbes*, February 7, 2022 ("*Statistics Show*"), available at bit.ly/3JdFSoc.

---

[27]   American Bar Association Criminal Justice Section Standards on Treatment of Prisoners (2010) provide, at Standard 23-6.12(b), that "Correctional authorities should not discriminate against a prisoner in housing, programs, or other activities or services . . . unless the best available objective evidence indicates that participation of the prisoner poses a direct threat to the health or safety of others." *See also* Standard 23-3.2(a) ("[c]orrectional agencies and facilities should provide housing options with conditions of confinement appropriate to meet the protection, programming, and treatment needs of special types of prisoners, including female prisoners, prisoners who have physical or mental disabilities or communicable diseases").

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 37 of 60

As Mr. Pavlo reported, "[p]risons are overcrowded, despite efforts undertaken by the CARES Act and, now, First Step Act." *Id*. Mr. Pavlo's article also includes graphic presentations prepared by a former staff attorney at the US Sentencing Commission, showing that "192 BoP facilities [] were at an average of 94.3% of capacity in July 2020 just as the pandemic was kicking in[,]"" but "18 months later, BoP facilities are at an average of 98.8% of their capacity." *Id*. In fact, "93 institutions are over their rated capacity." *Id*.

Between April and September of 2022, the prison population has grown by nearly 3,500 more inmates. *BoP Population Statistics*, updated September 22, 2022, available at https://bit.ly/3DVLCmU. Medium and high level security facilities have experienced a significant increase in population as of the end of Fiscal Year ("FY") 2021 from the year before, and the BoP system "remains crowded in high and medium security facilities." *BoP Program Fact Sheet*, updated March 31, 2022, available at bit.ly/3TN2IJn.

Consistent with the fact that BoP's inmate population, as a whole, is on the rise, and that overcrowding persists at both pretrial facilities and those for sentenced inmates, there were 25% more inmates at medium security level facilities and 17% more inmates at high security level facilities at the end of FY2021 than at the close of the previous year. *Id.*

Compounding that problem, "there is a shortage of workers to tend to these overcrowded facilities, and tensions are high among prisoners who have been living under restricted COVID-19 conditions (lockdowns, limited programming, limited access to family interaction and limited recreation)." *Id. See also* "Bureau of Prisons: Opportunities Exist to Better Analyze Staffing Data and Improve Employee Wellness Programs," U.S. Government Accountability Office (Feb. 2021), available at bit.ly/3rH8ekx (highlighting that insufficient staffing exerts an adverse impact on not only inmate access to programming, medical and dental care, and communications with lawyers and family, but also causes an increase in violence and the concomitant use of solitary confinement). *See also* Letter from Roland C. Arsons, *et al.*, Formerly Incarcerated People and Advocacy Organizations, to Colette Peters, Director, Federal Bureau of Prisons, available at https://bit.ly/3Rg7FYP; Letter from Amy Fettig, Exec. Dir., *The Sentencing Project*, to Merrick Garland, Attorney General of the U.S. (Feb. 14, 2022), available at https://bit.ly/3dLPTik.

For example, following Jeffrey Epstein's suicide   which generated an extraordinary amount of publicity and attention with respect to MCC, ultimately resulting in its closure two years later   a 2019 *New York Times* investigation revealed that during one August 2019 night at MCC, "only 18 workers were guarding a jail with roughly 750 inmates, according to records released by the Bureau of Prisons. Ten of the workers were on overtime. One post was actually vacant." Ali Watkins, Danielle Ivory, and Christina Goldbaum, "Inmate 76318-054: The Last Days of Jeffrey Epstein," *The New York Times*, Aug. 17, 2019, available at nyti.ms/2OXsey1.

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 38 of 60

In fact, *The New York Times* reported that U.S. prisons are becoming increasingly understaffed.  Even those corrections officers on duty are not necessarily trained for the tasks required for their posts.  In 2018, *The Times* disclosed that, "[a]s the Trump administration has curtailed hiring in its quest to reduce the size of the government, some prisons are so pressed for guards that they regularly compel teachers, nurses, secretaries and other support staff to step in." Danielle Ivory and Caitlin Dickerson, "Safety Concerns Grow as Inmates Are Guarded by Teachers and Secretaries," *The New York Times*, June 17, 2018, available at nyti.ms/2lca6Pk. *See also* Associated Press, "Federal prisons forced to use cooks, nurses to guard inmates due to staff shortages," *NBC News*, May 21, 2021, available at https://nbcnews.to/3UIGl8g.

In August 2019 there were only 15,012 correctional officers in the BoP system, which the *Times* pointed out was "the lowest level in at least six years."  While that hiring freeze ended in April 2019, "the hiring freeze, and the retirement of many prison employees who entered during a hiring boom in the 1990s, diminished staff to a point where prison teachers, nurses and chaplains continue to be asked regularly to fill in on guard duties."  Justin George and Weihua Li, "Epstein's Death Highlights a Staffing Crisis in Federal Prisons," *The Marshall Project*, August 14, 2019, available at bit.ly/2QEUd4t.

As a result of that hiring freeze, "[f]rom December 2016 to March 2018, the number of correctional officer vacancies, including supervisory roles, grew by almost 64 percent, to 2,137 from 1,306, according to the bureau    nearly 12 percent of all correctional officer positions."  *Id*. Consequently, prisons have become more dangerous for both inmates and staff:  "[a]ccording to the bureau, assaults on prison staff rose more than 8 percent last year from the previous year." *Id.*

Alongside these major structural issues, or perhaps because of them, BoP has seen a surge in violence and corruption.  For example, BoP instituted a complete nationwide lockdown January 31, 2022, due to gang-related homicides committed in a BoP facility in Beaumont, Texas.  *See* Katie Benner, "Fatal Gang Fight Spurs Nationwide Lockdown of Federal Prison System," *The New York Times*, January 31, 2022, available at nyti.ms/3GKpppZ.  That lockdown lasted nearly a month in some form and came on the heels of a nearly two-month lockdown instituted during the COVID-19 omicron surge during the Winter of 2021-2022.

The strict January 31, 2022, lockdown lasted two weeks (and was modified gradually over time), and limited showers to twice per week, and meals to peanut butter sandwiches (and no hot food).  Computer and phone access, as well as laundry and commissary, were unavailable entirely.  In the months since, intermittent lockdowns    for security purposes and for COVID-19 quarantine purposes    have persisted.

A recent *Associated Press* investigation revealed that in the past two years, of BoP staff

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 39 of 60

that remain, "[m]ore than 100 federal prison workers[, BoP employees,] have been arrested, convicted, or sentenced for crimes," from wardens to correctional officers.  Michael Balsamo and Michael R. Sisak, "Workers at federal prisons are committing some of the crimes," *AP News* (Nov. 14, 2021), available at: https://bit.ly/3nFljsR.  These numbers are deeply distressing.  Equally distressing is the nature of these allegations, which in many instances involve crimes by BoP employees directed at or directly impacting those inmates in their care.  Charges have included murder of an inmate, sexual assault of inmates, smuggling drugs and cell phones into BoP facilities, and extorting inmates.  *Id.*

The AP's investigation has also revealed that senior BoP officials at best neglected to intervene in these issues, and at worst, shielded BoP employees committing these crimes against the people BoP is charged with protecting.  *Id.*  As a result, leaders in Congress called for the resignation of BoP's director in order to address BoP's profound failures.  *See* Michael Balsamo, "Durbin calls for removal of federal prisons director amid 'mounting crises'," *PBS Newshour* (Nov. 16, 2021), available at https://to.pbs.org/3oQnfxX;  Mychael Schnell, "Top Senate Democrat calls on attorney general to fire prisons chief," *The Hill* (Nov. 16, 2021), available at: https://bit.ly/3FCBL3g.

In response, earlier this year, the U.S. Senate announced that it "is launching a bipartisan working group of lawmakers to scrutinize conditions within the Bureau of Prisons following reporting by The Associated Press that uncovered widespread corruption and abuse in federal prisons." Michael Balsamo and Michael R. Sisak, "Senate launches group to examine embattled US prison system," *The Associated Press*, February 17, 2022, available at bit.ly/3EwjUeW.  Senator Jon Ossoff (D.   Ga.), who has introduced legislation that would require that BoP's Director be confirmed by the Senate,[28] commented that "America's prisons and jails are horrifically dysfunctional and too often places where brutality and criminality are prevalent." *Id*.

The Committee conducting a hearing July 26, 2022, addressing the United States Penitentiary Atlanta, a BoP run facility, revealing years of profound neglect and gross misconduct.  *See*, *e.g.*, Akela Lacy, "Federal prison officials knew of misconduct, corruption, and

---

[28]  Notably, Senators Ossoff and Kennedy, after learning about BoP's widespread failures , and particularly its failure to notify families of the incarcerated people in their care of illness or death, felt compelled to introduce prison transparency legislation:  Family Notification of Death, Injury, or Illness in Custody Act of 2022.  The legislation is intended to "ensure family members are notified in a timely and compassionate manner about any health challenges of loved ones while in custody."  Press Release, Office of Senator John Ossoff, Sens. Ossoff, Kennedy Introduce Bipartisan Prison Transparency Legislation (May 20, 2022), available at https://bit.ly/3xJASEo.

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 40 of 60

abuse, Senate investigation finds," *The Intercept*, July 26, 2022, available at https://bit.ly/3R6CUoX; Kevin Johnson, "Atlanta federal prison 'lacked regard for human life'; weapons, drugs trafficked, Senate panel says," *USA Today*, July 26, 2022, available at https://bit.ly/3C6o79J;  Charles P. Pierce, "I Can See Why The Director of the Bureau of Prisons Didn't Want to Talk to Congress," *Esquire*, July 27, 2022, available at https://bit.ly/3LBWUP2; Glenn Thrush, "Prison Personnel Describe Horrific Conditions, and Cover-Up, at Atlanta Prison," *The New York Times*, July 26, 2022, available at https://nyti.ms/3rRIzFd.

At that hearing, Senator Ossoff's opening statement criticized BoP's gross misconduct and "long-term failures of federal prison administration [] likely contributed to loss of life; jeopardized the health and safety of inmates and staff;  and undermined public safety and civil rights in the State of Georgia and the Southeast Region of the United States."  Press Release, The Permanent Subcommittee on Investigations, Chair Ossoff Opening Statement in PSI Hearing Investigating Corruption, Abuse, & Misconduct at U.S. Penitentiary Atlanta (July 26, 2022), available at https://bit.ly/3UDpfsn.  Senator Ossoff continued, "[i]nterviews and records reveal a facility where inmates, including presumptively innocent pre-trial detainees, were denied proper nutrition, access to clean drinking water, and hygiene products; lacked access to medical care; endured months of lockdowns with limited or no access to the outdoors or basic services; and had rats and roaches in their food and cells."  *Id.*

Moreover, NPR and the Marshall Project collaborated to explain how BoP's newest prison, United States Penitentiary Thomson (USP Thomson) in Illinois, became the most deadly prison in the United States.  Christie Thompson, "Five things to know about one of the deadliest federal prisons," *NPR*, May 31, 2022, available at https://n.pr/3BJcP9M;Christie Thompson and Joseph Shapiro, "Lawmakers Call for Probe Into Deadly Federal Prison," *The Marshall Project*, June 14, 2022, available at https://bit.ly/3xN50yQ.

That reporting sparked Senators (from Illinois) Richard Durbin and Tammy Duckworth, along with Representative Cheri Bustos, to write to the Inspector General for the Department of Justice to investigate further.  Letter from Senators Richard Durbin and Tammy Duckworth, and Representative Cheri Bustos, United States Congress, to Michael E. Horowitz, Inspector General, U.S. Department of Justice (June 1, 2022), available at https://bit.ly/3xPfmOu.

That letter outlines the article's most serious allegations as follows:

- Staff purposefully stoking tensions between cellmates and intentionally pairing men whom they knew would attack each other;

- Staff encouraging assaults against sex offenders and informants and falsely telling residents that a particular man was a sex offender, resulting in

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 41 of 60

repeated physical and sexual assaults against him;

- Abusive shackling leaving scars known as "the Thomson tattoo," sometimes in a room known as "the dungeon" or "the torture room," where men would lie shackled to a bed for hours in their own urine and feces without food or water;

- The continuation of abusive behavior towards incarcerated persons after the [Special Management Unit] was transferred to USP Thomson;

- Punishment (often by shackling) of men who refused to be housed with cellmates whom they believed would kill them;

- The highest rate of pepper-spray usage in the Bureau of Prisons (BOP); and

- Staff laughing and joking at the expense of a Jewish man they were guarding as he lay dying in a hospital following an assault that occurred after staff placed him in a recreation cage with known white supremacists.

Letter from Senators Richard Durbin and Tammy Duckworth, and Representative Cheri Bustos, United States Congress, to Michael E. Horowitz, Inspector General, U.S. Department of Justice (June 1, 2022), available at https://bit.ly/3xPfmOu.[29]

    In upcoming months, the Senate Judiciary Committee plans to hold a hearing to address corruption and misconduct in the Bureau of Prisons.  Michael Balsamo and Michael R. Sisak, "Senate to hold hearing on crisis-plagued federal prisons, *AP*, Aug. 5, 2022, available at https://bit.ly/3RaiifF; Press Release, Office of Senator Dick Durbin, Durbin Slams BOP Mismanagement, Allegations Of Abuse At USP Thomson (June 9, 2022), available at https://bit.ly/3dHNPYr.  *See also* C.J. Ciaramella, "Biden's New Bureau of Prisons Director Won't

---

    [29]  Earlier this month, in *United States v. Bardell*, No. 11 Cr. 401 (RBD-DAB) (M.D. Fla. Oct. 4, 2022), the facts of which are astonishing, the Court admonished BoP and a Warden because they "disregarded the Court's directives[,]"  Order, at 9 (ECF # 140) (internal citations omitted), and for "their blatant violation of a Court Order and sheer disregard for human dignity."  *Id.*, at 10.  The Court further recommended that DoJ "undertake an investigation into the circumstances of Mr. Bardell's confinement and treatment, the failure of the BOP to respond to his medical needs, and the BOP's misrepresentations in connection with the compassionate release briefing regarding the seriousness of his condition."  *Id.*, at 12.

LAW OFFICES OF

**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 42 of 60

be Able To Run Away From the Agency's Corruption," *Reason*, August 1, 2022, available at https://bit.ly/3S5aq06 (summarizing various reports of corruption, neglect, and violence in BoP prisons across the country).

These defects in BoP's stewardship are of significant relevance to Mr. Jones because a lengthy sentence, combined with the nature of his offenses, would more than likely result in his designation to a high-security facility at which some of these problems (particularly safety) are most acute.

As if the above did not present sufficiently distressing prospects for a person returning from prison, imprisonment also exerts a compounding effect on health.  Being imprisoned leads to "higher risk of hypertension, asthma, stress-related disease, mental health issues, and general health functioning."[30] In fact, "[e]ach additional year in prison produced a nearly 16% increase in the odds of death and a 2-year decline in life expectancy."[31]

Unsurprisingly, the unemployment rate among the formerly imprisoned population is a dismal 27%.[32]  Ultimately, "[p]eople who have spent time in prison see their subsequent annual earnings reduced by 52%."[33]  In fact, longer prison terms often create insurmountable obstacles for ex-offenders like Mr. Jones,  who are attempting to return to a productive, legitimate role in society.  Indeed, as reported by the Brennan Center for Justice, "each additional year of imprisonment reduces by nearly 4% the likelihood that a person will find post-release employment because time spent incarcerated means time out of the workforce and time not spent accumulating the skills or social connections needed to find or succeed in a job."[34]

---

[30]  Partners for Justice, *Impact of the Criminal Legal System on Health Outcomes*, November 2021, available at bit.ly/3MmuCaH.

[31]  *Id.*

[32]  *Id.*

[33]  *Id.,* at 6.

[34]  Brennan Center for Justice, *Conviction, Imprisonment, and Lost Earnings: How Involvement with the Criminal Justice System Deepens Inequality*, September 15, 2020, at 13, available at bit.ly/3L60YpN.

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 43 of 60

E.    *A Sentence Even In the Range of the Statutory Maximum Would Create an
Unwarranted Disparity Between Mr. Jones's Sentence and That of Others*

In sentencing a defendant a court is required to consider "the need to avoid unwarranted
sentence disparities among defendants with similar records who have been found guilty of
similar conduct." 18 U.S.C. §3553(a)(6). In that context, a sentence for Mr. Jones even in the
vicinity of the statutory maximum would be grossly disproportionate in light of the sentences
imposed on others, as demonstrated by data and example, convicted of    in some instances
similar, and in other instances far more serious    terrorism-related offense conduct.

As set forth below, a sentence for Mr. Jones significantly below the statutory maximum
would be commensurate with the sentences imposed on the average offenders in terrorism cases.
Indeed, it would be consistent even with the sentences imposed in nearly all the sentences
imposed in the Guantanamo Bay military commissions.

Here, the Court noted that with respect to Mr. Jones's specific offense conduct,

> [t]here is, for example, no evidence of Mr. Jones engaged in
> conduct personally that resulted in injury to Americans. Nor is
> there any evidence that he engaged in conduct that presented a risk
> of injury to Americans or that he conspired to do so.

*Sentencing Tr.*, at 45. *See also id*., at 2-6.

Nor, was there any "evidence, in [the Court's] judgment, that Mr. Jones participated in
attacks on civilians of any sort[.]" *Id*. In that context, the Court in *United States v. Babar
Ahmad*, 04 Cr. 301 (JCH) (D. Conn.), in sentencing a defendant (who had already served a
decade contesting extradition from the United Kingdom and in pretrial detention in the U.S.) to a
prison term of 150 months, pointed out that "there were never any plots even discussed by these
defendants. There was never any aid given by these defendants to effectuate a plot. By plot, I
mean a terrorist plot. A plot to go out and purposely harm civilians." *United States v. Babar*, 04
Cr. 301 (JCH) (D. Conn.), Sentencing Transcript, July 16, 2014 (ECF #220), at 33. *See also id*.,
at 136.

The single combat engagement in which Mr. Jones was involved occurred at Afmadow,
Somalia, where he was residing with his wife and children, against Kenyan army units there, *see*
PSR, at ¶¶ 31-34, *Sentencing Tr.*, at 2-3, 6, even though Afmadow is inside Somalia
approximately 150 kilometers (93 miles) from the Kenyan border in *any* direction (west,
southwest, or south). Mr. Jones suffered multiple gunshot and shrapnel wounds during that
battle. *See* PSR, at ¶ 73; *Sentencing Tr.*, at 2.

LAW OFFICES OF

**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 44 of 60

Ultimately, the Court noted that "[e]ven in terrorism cases, the Court has to consider relative culpability, as well as the parsimony principle, which requires that I impose the least possible sentence that serves all the purposes of the sentencing statute." *Sentencing Tr.*, at 46.

In that regard, the Court further concluded "[t]here is no evidence that Mr. Jones occupied a leadership role in al-Shabaab." *Sentencing Tr.*, at 46. However, the Court did "consider, for purposes of sentencing, that Mr. Jones knew about the attack on Kenyan forces in Lamu[,]" *id.*, at 10, although Mr. Jones's counsel clarified that Mr. Jones's knowledge was only *after* the attack had occurred. *Id*.

### 1.    *Sentences In Material Support and Other Terrorism Cases*

####      a.    *The Data from Material Support and Terrorism Sentencing*

In his presentation at Mr. Jones's initial sentencing, his counsel alluded to studies published by "Center on National Security at Fordham, that indicate that the average sentence in so-called jihadist terrorism crimes were at 15 years and one month." *Id.*, at 22. Those studies examined all federal terrorism-related cases prosecuted in the U.S. for the decade after September 11, 2001, and then separately all federal criminal cases involving material support for or other criminal activity related to the Islamic State in the six years that followed.

As a whole, those analyses establish that a sentence of 25 years for Mr. Jones would well exceed the average for terrorism-related charges and cases. Initially, the Center on Law and Security at New York University Law School periodically compiled a "Terrorist Trial Report Card" ("TTRC") that cataloged terrorism-related prosecutions and their results.[35]

The final three versions, published in 2006, 2010, and 2011, each analyzed the data somewhat differently, but provide illuminating data. The September 11, 2008, edition of the TTRC, based on the sentences imposed on the 370 defendants convicted of terrorism offenses (and sentenced) between September 11, 2001, and September 2008 reported that the average sentence for all defendants convicted of terrorism charges was approximately twelve years and

---

[35] In 2011, the creator of NYU Law School's Center on Law and Security, and of the TTRC as well, Dr. Karen Greenberg, left NYU and started the Center on National Security at Fordham University Law School. Thus, subsequent publications and data analyses were issued by the Center at Fordham. In the interest of disclosure, I am a Senior Fellow for Legal Research at the Fordham Center, was the same at the NYU Center, and have served as Senior Fellow for Legal Affairs for the some of the TTRC's, and as Project Advisor for the Fordham publications.

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 45 of 60

eight months (12.67 years),[36] and the average sentence for convictions for material support for terrorism were 14.75 years (18 U.S.C. §2339A) and 11.92 years (§2339B).  Even for violations of 18 U.S.C. §2332 (murder of U.S. nationals outside the U.S., a potential capital offense), the average sentence was 26 years.[37]

The 2010 TTRC covered U.S. federal prosecutions between September 11, 2001, and September 11, 2009, and utilized slightly different nomenclature:  (i)  the "average sentence for persons convicted of terrorism" was 16 years (191.9 months);  (ii)  the "average sentence for persons charged with terrorism" was 19.7 years (236 months);  (iii)  the "average sentence for persons charged with national security violations but not terrorism" was 10.4 years (124.5 months);  and (iv)  the "average sentence for persons convicted of national security violations and not charged with terrorism" was 7.5 years (90.3 months).[38]

The September 2011 edition of the TTRC, covering September 11, 2001, through September 11, 2011, again altered the characterization, and provided the following average sentences graphically (and not in precise numbers):

(i)      for "Terror or National Security Top Charge":  between 10 and 15 years;[39]

(ii)     for "Material Support Top Charge":  also between 10 and 15 years, but less than for "Terror or National Security Top Charge;"

(iii)    for "Material Support Lesser Charge":  slightly less than 15 years;

(iv)    for "National Security Charge Conviction":  slightly more than 15 years;

(v)     for "Terror Charge Conviction":  also slightly more than 15 years, but slightly

---

[36] *Terrorist Trial Report Card, September 11, 2008*, available at http://www.lawandsecurity.org/Portals/0/documents/03_Sept08TTRCFinal1.pdf.

[37] *Id.*

[38] *Terrorism Trial Report Card, September 11, 2001-September 11, 2009* (published January 2010), at 13, available at http://www.lawandsecurity.org/Portals/0/documents/01_TTRC2010Final1.pdf.

[39] The 2011 TTRC did not define "material support" charges as "national security" offenses but rather as "terrorism.  *See* 2011 TTRC, Appendix A, at 31.

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 46 of 60

more than for "National Security Charge Conviction;" and

(vi)     for "Terror and National Security Charge Conviction":  25 years.[40]

In 2013, Fordham Law School's Center on National Security (*see* **ante**, at n. 35) began publishing the updated analyses.  In 2013, the Center also published "By the Numbers    U.S. Prosecutions of Jihadist Terror Crimes, 2001-2013,"[41] digesting 368 cases, 297 convictions (209 by guilty plea and 89 after trial).

The average sentence for all cases was 181 months (15 years, one month), and 201 months (16 years, 9 months) for convictions pursuant to 18 U.S.C. §2339A, and 199 months (16 years, 7 months) for convictions pursuant to 18 U.S.C. §2339B  The Center has continued to publish periodic reports on terrorism prosecutions, particularly those involving persons charged with offenses connected to the Islamic State.  In those reports, the data again demonstrate that the average sentences imposed were significantly lower than the 25-year statutory maximum in this case (particularly in those cases resolved via guilty plea).[42]

### b.     *Sentences at the Guantanamo Bay Military Commissions*

Even persons convicted in the Guantanamo Bay military commissions    described by Secretary of Defense Donald Rumsfeld as "the worst of the worst"    received sentences dramatically below that which the Guidelines prescribe for Mr. Jones.  Salim Hamdan, the driver for Osama bin Laden in Afghanistan, was sentenced to time served (the approximately five years he had already served).  David Hicks, who pleaded guilty to material support to *al Qaeda* in Afghanistan following the September 11, 2001, attacks, received a seven-year sentence (which amounted to an additional seven months served in Australia upon his release after five years at Guantanamo Bay).  Another Guantanamo detainee convicted in the military commissions, Omar

---

[40]  *Terrorism Trial Report Card, September 11, 2001-September 11, 2011*, at 7, available at bit.ly/3TlmIBT.

[41]  That report is available at bit.ly/3g4hVq3.

[42]  *See, e.g., The American Exception:  Terrorism Prosecutions in the United States    The ISIS Cases*, September 13, 2017, available at bit.ly/3g5LpnD;  *Case by Case: ISIS Prosecutions in the United States*, July 6, 2016, available at bit.ly/3CSPNze;  *May 2017 Update: ISIS in the U.S.*, May 8, 2017, available at bit.ly/3CRlXuF;  *Statistical Overview*, February 24, 2017, available at bit.ly/3RXrx3c;  *By the Numbers: ISIS Cases in the United States*, June 22, 2015, available at bit.ly/3MGkR8J.

LAW OFFICES OF

**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 47 of 60

Khadr, a Canadian, pleaded guilty to killing a U.S. service member, and was sentenced to eight years' imprisonment, with the prospect of transfer to Canada after a year (that occurred).

More recently, Hadi al-Iraqi pleaded guilty "to war crimes charges related to his role as a commander of insurgent forces in Afghanistan inthe early 2000s."  Carol Rosenberg, "Iraqi at Guantánamo Bay to Plead Guilty in Afghan War Crimes Case," *The New York Times*, June 10, 2022, available at nyti.ms/3rQF41K.

While "[p]rosecutors had sought at most life in prison in a case that cast Mr. Hadi as Osama bin Laden's liaison to the Taliban and as a commander of insurgents who had attacked and killed American and allied forces as well as medical andhumanitarian relief workers in wartime Afghanistan and Pakistan from about 2003 to 2004[,]" *id*., in the plea agreement "both sides agreed to postpone the prisoner's sentencinghearing until 2024 to give U.S. diplomats time to find a country to take custody of him and provide him with medical carefor a degenerative spine disease that has become acute during his military detention."  *Id.*

Days later it was revealed that the plea agreement provided that while "a military jury will hear the evidence against him and be asked to choose within a range of 25 to 30 years of confinement, starting with his plea[,]" afterward "the senior Pentagon official responsible for overseeing the war court will reduce it to 10 years."  Carol Rosenberg, "Commander of Afghan Insurgency Pleads Guilty at Guantánamo Bay," *The New York Times,* June 13, 2022, available at nyti.ms/3Crhj5u.

> **2.**    ***The Sentencing Commission's Published Sentencing Statistics Demonstrate That a Sentence for Mr. Jones Far Below the Statutory Maximum Would Be Consistent with Current Sentencing Practice***

Data from the Sentencing Commission establishes that a sentence substantially below the statutory maximum would conform with the majority of sentences in this District.  The Sentencing Commission publishes each quarter an abstract of federal sentencing statistics entitled *U.S. Sentencing Commission Preliminary Quarterly Data Report*.

The most recent figures are contained in the *United States Sentencing Commission Quarterly Data Report, 3rd Quarter Release, Preliminary Fiscal Year Data, Through June 30, 2022* ("*Q3 Preliminary Data Report 2022*"), which covers sentences imposed between October 1, 2021 and June 30, 2022 ("3rd Quarter 2022"), and demonstrates that the Guidelines no longer constitute the predominant factor in a decisive majority of sentences nationally or in the Southern

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 48 of 60

District of New York.[43]

Nationally, the *Q3 Preliminary Data Report 2022* reveals that 41.4% of sentences are within the Guidelines range, and only 0.6% of sentences are above the Guidelines. *Id.,* at 14. In the Second Circuit more specifically, only 24.9% of sentences were within the calculated Guidelines range. *Id.* In the Southern District of New York ("S.D.N.Y."), only 18% of sentences were *within* the advisory Guidelines range and there was only a single sentence imposing an upward departure. *Id.*[44] These numbers alone demonstrate that for the overwhelming majority of sentences in S.D.N.Y., following the Guidelines is the rather limited exception, and not the rule.

In 3rd Quarter 2022, 8.6% of S.D.N.Y. sentences were below the advisory Guidelines range as a result of government-sponsored motions,[45] including motions pursuant to §5K1.1 and §5K3.1, while an overwhelming 71.1% of S.D.N.Y. sentences were outside of the Guidelines range due to reliance on §3553(a) factors (denominated "variances" in the *Q3 Preliminary Data Report*). Although the data do not specify how many of the S.D.N.Y. sentences outside the Guidelines range were below that figure, the most conservative estimate by applying to S.D.N.Y. the national percentage[46] would make only 1.6% of the sentences in S.D.N.Y. in 3rd Quarter 2022 above the Guidelines range, while approximately 69.5% of S.D.N.Y. sentences were below the Guidelines based on §3553(a) factors.

These statistics demonstrate the clear and prevalent practice within S.D.N.Y. of sentencing below the Guidelines range. Even nationally, since well over half of sentences nationally are currently *below* the Guidelines range, it is clear that the norm now is for Courts to

---

[43] The *Preliminary Data Report 2022* is available at https://bit.ly/3Csx2AX. Prior *Quarterly Data Reports* are also available on the Sentencing Commission's web site, bit.ly/3aQLRzW.

[44] S.D.N.Y. is among a small group of nine districts in which the within-Guidelines sentences were at or below 18%, spanning between 11.4% in the Southern District of California where government-sponsored "fast track" immigration departures pursuant to §5K3.1 account for 60.8% of the District's sentences to the Middle District of Tennessee and S.D.N.Y.'s 18%. *See Preliminary Data Report 2022*, at 14-16.

[45] The percentages are of *all* sentences within the District, as that is how the figures are presented in the *Data Report*.

[46] Only 2.3% of variances across the country are upward variances and 30.2% were downward variances.

LAW OFFICES OF

**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 49 of 60

consider other §3553(a) factors as more important when fashioning a sentence "sufficient, but not greater than necessary" to achieve the statutory objectives of sentencing.

Also, the advent of the COVID-19 pandemic has only reduced the Guidelines' impact on S.D.N.Y. sentencing even further. For example, in 2021, only 19.8% of S.D.N.Y. defendants were sentenced within the applicable Guidelines range. Among the total sentences imposed in S.D.N.Y. in 2021, only 12.1% involved downward departures pursuant to 5K1.1 motions, while 61.4% were below the Guidelines for other reasons. *See* Sentencing Commission, 2021 Federal Sentencing Statistics for the Southern District of New York ("*2021 SDNY*"), available at https://bit.ly/3MpzSv7, at Table 8.[47]

The Guidelines calculation for Mr. Jones, with an offense level of 37 and a Criminal History score of VI, is 300 months, the statutory maximum. *See* PSR, at ¶¶ 11-13. Yet a sentence of that length would eclipse even those ordinarily imposed for *murder*. For example, the Sentencing Commission's comprehensive data covering sentenced federal defendants, the *2021 Sourcebook of Federal Sentencing Statistics*, (hereinafter "2021 Sourcebook") available at https://bit.ly/3Te7H4F, establishes that nationwide in 2021, defendants in federal court convicted of murder were sentenced to an average of 244 months' imprisonment and a median of 231 months.[48] *See 2020 Sourcebook*, at Table 15.

For a defendant such as Mr. Jones, even allowing for his placement in CHC VI, the mean and median were higher, at 249 and 258 months, respectively, *id.*, at 27   still between 51 and 42 months, respectively, less than Mr. Jones's statutory maximum. Moreover, even those defendants sentenced to within-Guidelines for murder convictions were sentenced to the lower half of the range 52.2% of the time, and sentenced to the range minimum 4.3% of the time. *Id.*, at Table 34.

In S.D.N.Y., in 2021 the mean sentence for murder convictions was 207 months, 37 months fewer than the national average. *Id.*, at Table 7. Similarly, the median S.D.N.Y. sentence for murder was 221 months, 34 months fewer than the national average. *Id.*, at Table 7.

---

[47] To the extent the pandemic generated shorter sentences of imprisonment, it is respectfully submitted that the pandemic's persistence, and how it has highlighted inadequate conditions and medical treatment in the BoP system ordinarily, as well as (through compassionate release motions) provided a opportunity for retrospection regarding the efficacy and/or justification for long sentences, should continue to influence sentencing decisions.

[48] That cohort of course includes defendants who did not cooperate or have §5K1.1 motions filed on their behalf, or, conversely, who proceeded to trial (and conviction).

<table>
<tr><td>LAW OFFICES OF<br>**DRATEL & LEWIS**</td><td>Hon. Paul G. Gardephe<br>United States District Judge<br>Southern District of New York<br>October 13, 2022<br>Page 50 of 60</td></tr>
</table>

Likewise, the median S.D.N.Y. sentence for murder was 192 months, 39 months shorter than the national average. *Id.*

This sentencing data demonstrates that a sentence for Mr. Jones remotely close to the statutory maximum would represent an unwarranted disparity contrary to §3553(a)(6)'s mandate.

> **3.**  ***Comparing Mr. Jones's Sentencing Exposure to Sentences Imposed on Those Convicted for Offenses Related to the Events of January 6, 2021***

As the Court noted at the initial sentencing, Mr. Jones did not engage in conduct that threatened or targeted Americans. *See* **ante**, at 43. Yet his sentencing exposure (and the PSR's recommendation, and likely the government's position) is exponentially greater than the sentences meted out to hundreds of Americans who attacked the U.S. Capitol in a deliberate, often violent, unlawful effort to overturn a Presidential election and essentially overthrow the duly constituted U.S. government.[49]

A canvass of those cases is instructive, not only regarding the distribution of sentences thus far, but also with respect the particular facts of certain cases that merit mention to provide a portrayal of the conduct committed in these cases generally. In addition, the potential sentences faced by many of the defendants involved in the January 6, 2021, attack on the U.S. Capitol were limited significantly by plea agreements that reduced the charges from far more serious offenses.

Based on the data in George Washington University's Program on Extremism, has compiled   the *Capitol Hill Siege Cases Database* (hereinafter "*Siege Database*")   414 people have pleaded guilty to crimes that occurred in connection with the January 6, 2021, assault on the Capitol, and 276 of them have already been sentenced. *Siege Database*, available at https://bit.ly/3MoKUAS.

Of those who pleaded guilty, the vast majority of defendants received sentences ranging between a few days' incarceration and twelve months and one day of incarceration. *Siege Database*. Sentences of house arrest, intermittent incarceration, 14 to 90 days' incarceration, and/or relatively significant probation periods were most common among the 276 sentences. *Id.* None, including those who were charged with the most serious of crimes, has thus far been

---

[49] During Mr. Jones's initial sentencing, his counsel did point to the sentences imposed in a few cases involving white supremacists. *See Sentencing Tr.*, at 21-23. Of course, the events of January 6, 2021, were not available then for comparison.

LAW OFFICES OF

**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 51 of 60

assessed the Guidelines terrorism enhancement in §3A1.4[50] despite their participation in an insurrection at best, and an attempted coup at worst. *Id. See also* **ante**, at n. 50;  PSR, at ¶¶ 5 & 8.[51]

Moreover, even those defendants charged with (and who pleaded guilty to) more serious crimes were not sentenced to incarceration for longer than 86 months, in large part because none

---

[50] *See*, *e.g.* Josh Gerstein, "Texas militia member gets most serious Jan. 6 sentence yet: Just over 7 years," *Politico* (Aug. 1, 2022), available at https://politi.co/3EACkgx ("U.S. District Court Judge Dabney Friedrich declined the Justice Department's request to treat [the defendant]'s crimes as terrorism, which would have substantially increased the recommended sentence under federal guidelines");  Spencer S. Hsu, "Alabama man pleads guilty to bringing molotov cocktails, five loaded firearms to Capitol on Jan. 6," *The Washington Post* (Nov. 12, 2021), available at https://wapo.st/3TfVNY1 (noting that Judge Colleen Kollar-Kotelly found that the defendant's offense qualified for a terrorism enhancement, intending to intimidate or retaliate the government," but that the terrorism enhancement was not sought).

[51] In contrast, the conflict in Somalia has lasted more than 30 years, and presents complex issues of sovereignty, insurgency, drought, and cyclical famine that beg for a negotiated solution. *See, e.g.,* International Crisis Group, *Considering Political Engagement with Al-Shabaab in Somalia*, Africa Report N°309, 21 June 2022, at 3 ("*ICG Report*"), available at bit.ly/3EyPpHi ("Al-Shabaab's lethal insurgency continues with no end in sight. . . .  Combined with dysfunction and division among their adversaries, the militants' agility has allowed them to embed themselves in Somali society.  It also makes them hard to defeat. . . .  The protracted war has cost countless lives and derailed Somalia's state building project.  There is growing domestic and international consensus that Al-Shabaab cannot be beaten by military means alone.  Yet there is little appetite among Somali elites or the country's international partners for exploring alternatives, notably talks with militant leaders").  The *ICG Report* recommends that "[t]he government should seek discreet channels to Al-Shabaab leaders to test whether political negotiations and confidence building steps might be feasible[]" because "[p]utting off efforts to engage militants in the hope of gaining the upper hand militarily or forging greater unity among elites will prolong the conflict indefinitely").  *See also* Jonathan Guyer, "Biden sought to end endless wars.  So what's the military doing in Somalia?" *Vox*, July 18, 2022, available at bit.ly/3CsrYNg ("'There's no purely military solution,' a State Department official, speaking on the condition of anonymity, told me. 'It's really political factors that are driving this, and the governance challenges that are at the root of this").  *See also id*. ("[p]ushing toward political reconciliation will be difficult, as many Somalis see the government as corrupt;  they 'seek justice and an equitable way of resolving these things,' Samira Gaid, the director of the Hiraal Institute in Mogadishu, told me. 'That's what's absent.  And that's what al-Shabaab offers'").

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 52 of 60

were assessed §3A1.4's terrorism enhancement.   For example, Lonnie Coffman parked his truck within a few blocks of the U.S. Capitol January 6, 2021.  After reports of bombs near the Capitol and an intensive police search, Mr. Coffman's truck was found "filled with 11 Mason jars filled with gasoline and Styrofoam, several unregistered firearms, hundreds of rounds of ammo, a stun gun, machetes and a crossbow with bolts."  Holmes Lybrand, "Man who brought Molotov cocktails near Capitol on January 6 sentenced to nearly 4 years," *CNN* (Apr. 1, 2022), available at https://cnn.it/3EBhm18.  Despite also possessing a small armory in his truck, and another at his home in Alabama, and participating in the attack on the Capitol, Mr. Coffman received a sentence of 46 months' incarceration.  *See Siege Database*, "Coffman, Lonnie Leroy.".

Kyle Young, who was responsible for the assault on District of Columbia Police Officer Michael Fanone, the officer who suffered a heart attack while being assaulted and tased by the rioters, received the longest sentence received of any defendant who pleaded guilty.  *See Siege Database*, "Young, Kyle."  *See also* Rachel Weiner, "'I hope you suffer': Ex-D.C. officer confronts Jan. 6 attacker in court," *Washington Post* (Sept. 27, 2022), available at https://wapo.st/3Twq991.

Pursuant to his plea agreement, Mr. Young's offense level was between 22 and 24, with a CHC of IV, corresponding to a Guidelines range of either 63-78 or 77-96 months, respectively. *See* Plea Agreement at 3-5, *United States v. Kyle Young*, No. 21-CR-291-3 (ABJ) (D.D.C. Apr. 21, 2022), ECF No. 119, available at https://bit.ly/3MESQyl.  At sentencing, the Court found the offense level to be 24 (finding "physical restraint" pursuant to §3A1.3), and Mr. Young was sentenced to 86 months' incarceration   the midpoint of the applicable Guidelines range.  *See Siege Database,* "Young, Kyle."

In another case resolved by guilty plea, Joshua Pruitt "wore a tactical glove and an ankle monitor from a recent offense and climbed a makeshift ladder into the building, according to prosecutors, 'seeking to overturn the election.'"  Livia Albeck-Ripka, "Aspiring Proud Boy Who Encountered Schumer on Jan. 6 Gets 55 Months in Prison," *The New York Times*, August 29, 2022, available at nyti.ms/3yY8Ohpä.  Prosecutors also explained that, "Mr. Pruitt, now 40, . . . advertised his desire to participate in the violence;  took part in standoffs between the mob and the police and at one point, came face to face with Senator Chuck Schumer's group after they fled theSenate chamber."  *Id.*[52]

---

[52]  A newly elected West Virginia legislator, Derrick Evans, was sentenced to 90 days in prison after pleading guilty to felony disorder for his role in the January 6, 2021, attack. Prosecutors described Mr. Evans as a "leader" of the riot who "lent credibility" to it, and his role as "play[ing] a role in escalating things on the East Side [of the Capitol] before it was breached." Andrew Millman, "West Virginia lawmaker sentenced for role in January 6 riot," *CNN*, June 22,

LAW OFFICES OF

**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 53 of 60

Thus far, 26 people have proceeded to trial, 25 have been convicted, and five have been sentenced.  Of those who proceeded to trial, the most severe sentence    120 months' incarceration    was imposed upon Thomas Webster, a former New York City police officer.  Sentencing Transcript, *United States v. Webster*, CR No. 21-208 (D. D.C. Sept. 1, 2022), at 63; Press Release, U.S. Department of Justice, Retired NYPD Officer Sentenced to 10 Years in Prison For Actions Related to Capitol Breach (Sept. 1, 2022), available at https://bit.ly/3SRkQRo.

Mr. Webster was convicted of conduct that included assaulting a police officer with a flag pole and tackling and choking a police officer, as well as carrying a dangerous weapon into a restricted building.  SentencingTranscript at 57-60.  In addition, the Court applied a body armor enhancement and considered Mr. Webster's lack of remorse in imposing the ten-year prison term.  *Id.* at 62-63.  However, Mr. Webster's sentence represented a *43% reduction* from the *bottom* of his Guidelines range (as his offense level was 37, *id.*, at 19-23, with a CHC of I, yielding a guidelines range of 210 to 240 months).  *Id*. at 23.[53]

Another defendant who proceeded to trial, Guy Reffitt, was convicted on "five felony charges in March, including obstructing Congress's certification of the 2020 presidential election, carrying a .40-caliber pistol during the riot and two counts of civil disorder[,]" was sentenced to an 84-month prison term.  Zach Montague, "First Capitol Rioter to Face Trial Gets 7 Years, Longest Sentence So Far," *The New York Times*, August 1, 2022, available at nyti.ms/3ECf1mL.  *See also Siege Database*, "Reffitt, Guy."

###     4.     *The Government's Reliance on a Small Sample of Cherry-Picked Cases Is Misleading and Unavailing*

These discrete but comprehensive data sets    from the TTRC's, the Sentencing Commission, and the January 6, 2021, cases    reveal that the government's attempt to justify the statutory maximum based on a small selection of cases would be an inappropriate guide for sentencing in this case.  Indeed, a case cited by the government at the initial sentencing, *United*

---

2022, available at https://cnn.it/3Voo1BR.  *See also Siege Database*, "Evans, Derrick."

[53]  Prosecutors said another ex-police officer, Thomas Robertson, 49, who was sentenced to an 84 month prison term after conviction at trial, "had wielded a large stick and donned a gas mask during the riot, and that he confronted police officers who were trying to stop the increasingly violent crowd."  Vimal Patel, "Ex-Police Officer Gets 7 Years in Prison for Role in Jan. 6 Attack," *The New York Times*, August 11, 2022, available at nyti.ms/3yAcQME.  *See also Siege Database*, "Robertson, Thomas."

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 54 of 60

*States v. Pugh*, 15 Cr. 116 (NGG) (E.D.N.Y.), involved a defendant *who proceeded to trial*. *Id.*, at ECF # 124. *See Sentencing Tr.*, at 32. *See also id.*, at 21-22 (Mr. Jones's counsel pointing out that "If you look at any of those cases, almost all of them involve specific planned attacks against vital interests of the United States[,]" and "importantly, what it misses is a whole range of cases over the last 20 years that just can't be captured by a handful of sentences").

The flaw in citing isolated cases is illustrated by contrasting *Pugh* with another E.D.N.Y. resolved in the same general time frame.  In *United States v. Mohamed*, 13 Cr. 527 (WFK) (E.D.N.Y.), Mr. Mohamed was charged in 2013 with the murder and attempted murder of U.S. Embassy personnel in Niger in December 2000.  *See* Indictment, at ¶¶ 20-22 (ECF Docket #1). However, the defendant's plea agreement limited him to a 25-year prison sentence, which he received.  *See* ECF Docket #155 (Judgment).

### 5.   *Mr. Jones Is Ineligible for RDAP or FSA Credits*

Another disparity would deprive Mr. Jones of opportunities available to other inmates to reduce the custodial portions of their sentences through specific programming.  Ordinarily, Mr. Jones would request that the Court recommend to BoP that he participate in BoP's substance abuse programs for which he may be eligible, including RDAP, which, if completely successfully, could shorten a sentence by as much as twelve months (plus earlier transfer to home confinement).  However, Mr. Jones is ineligible for RDAP due to the nature of his offense.

Mr. Jones is also ineligible for FSA credits because 18 U.S.C. §3632(d)(4)(D)(xlvii) provides that a "prisoner is ineligible to receive time credits under this paragraph if the prisoner is serving a sentence for a conviction under any of the following provisions of law: . . . (xlvii) Any section of chapter 113B, relating to terrorism."  In turn, the material support offenses of conviction herein, §2339B and §2339D, are listed under chapter 113B.

### F.   *Increasing Mr. Jones's Criminal History Category From Category I to Category VI Grossly Overstates His Criminal History*

Notwithstanding application of the enhancement in §3A1.4 to Mr. Jones, the Court should apply other §3553(a) factors to ameliorate its impact because the prong of the enhancement that assigns Mr. Jones to Criminal History Category VI, §3A1.4(b), constitutes a gross overstatement of his criminal history, which otherwise would be Category I (with one prior conviction for which he was sentenced to probation, resulting in one criminal history point).  *See* PSR, at ¶ 56.

Also, as discussed below, the enhancement undermines the structure of the Guidelines, and the role and purpose of the Criminal History Category ("CHC") in maintaining

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 55 of 60

individualized sentencing determinations.  As a result, the Court should correct the inequity created by §3A1.4(b) via those §3553(a) factors other than the Guidelines.[54]

As one District Court has recognized, "[a]fter applying § 3A1.4, Defendant's criminal history is maximized at category VI.  For an individual with no criminal record and no evidence of ever having committed an illegal act in his life outside of the conduct for which he is convicted, this clearly over-represents the seriousness of his criminal history."  *United States v. Benkahla*, 501 F.Supp.2d 748, 759 (E.D.VA 2007) (granting a departure pursuant to USSG §4A1.3, and reducing the defendant's criminal history category from VI to I), *affirmed*, 530 F.3d 300 (4ᵗʰ Cir. 2008).  *See also United States v. Alhaggagi*, 372 F. Supp. 3d 1005, 1015 (N.D. Cal. 2019), *vacated and remanded on other grounds*, 978 F.3d 693 (9th Cir. 2020) (collecting cases where judges refused to "automatically increas[e] a defendant's criminal history to reflect an untested concern about recidivism").

Encouraging flexibility in addressing the impact of §3A1.4 on a defendant's Criminal History, the Second Circuit has instructed that "[a] judge determining that §3A1.4(b) over-represents 'the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes' always has the discretion under §4A1.3 to depart

--------------------------------

[54]  Even in the more rigid context of departures, the Guidelines instruct that a Court may depart downward if:

> reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes[.]

U.S.S.G. §4A1.3(b)(1).  *See also United States v. Alhaggagi*, 372 F. Supp. 3d 1005, 1017 (N.D. Cal. 2019), vacated and remanded on other grounds, 978 F.3d 693 (9th Cir. 2020) *(*issuing a downward departure and "declin[ing] to apply the terrorism enhancement's automatic criminal history category of VI, which is deeply flawed and at the very least does not fit this defendant."); *United States v. Muhtorov*, 329 F. Supp. 3d 1289, 1301 (D. Colo. 2018) (finding that a downward departure CHC II was necessary because CHC VI "substantially overrepresents Muhtorov's criminal history and the likelihood he will commit other crimes"); *United States v. Landa*, 281 F.Supp.2d 1139, 1141 (N.D.Cal. 2003) (downward departure granted upon a finding that the CHC had overstated the defendant's criminal history);  *Czernicki v. United States*, 270 F.Supp.2d 391, 393 (S.D.N.Y. 2003) (downward departure granted upon a finding that the CHC had overstated the defendant's criminal history).  Here, Mr. Jones is not seeking a formal downward departure, but rather relief via §3553(a).

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 56 of 60

downward in sentencing." *United States v. Meskini*, 319 F. 3d 88, 92 (2d Cir. 2003).

Moreover, as the Introductory Commentary to Chapter Four of the Sentencing Guidelines (entitled "Criminal History and Criminal Livelihood") states, "[t]he Comprehensive Crime Control Act sets forth four purposes of sentencing. (*See* 18 U.S.C. § 3553(a)(2).) *A defendant's record of past criminal conduct is directly relevant to those purposes.* A defendant with a record of prior criminal behavior is more culpable than a first offender and thus deserving of greater punishment." (Emphasis added).

In addition, such individualized attention assures that the "draconian" nature of §3A1.4(b) does not cause a sentence that "over-represents the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes." *United States v. Jumaev*, No. 12-CR-00033-JLK, 2018 WL 3490886, at *9 (D. Colo. July 18, 2018), *aff'd*, 20 F.4th 518 (10th Cir. 2021).

Contrary to many legal and legislative statements, "[t]here is no published statistical data demonstrating that defendants convicted of violating 18 U.S.C. §§ 2339B, 2339C, or other anti-terrorism statutes . . . are any more likely to be recidivists than any other first offenders." James P. McLoughlin, Jr., *Deconstructing United States Sentencing Guidelines Section 3a1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations*, 28 *Law & Ineq*. 51, 114  15 (2010).[55]

Indeed, in *United States v. Doe*, 323 F. Supp. 3d 368 (E.D.N.Y. 2018), Judge Weinstein noted that "the experts stressed that any prediction of a former extremist's likelihood for recidivism is highly individualized and should be assessed on a case-by-case basis." *Id*., at 390.[56] Similarly, "[r]epetition of that assertion might give it the ring of truth, but does not make it true."

---

[55]  Stephen Floyd, *Irredeemably Violent and Undeterrable: How Flawed Assumptions Justify a Broad Application of the Terrorism Enhancement, Contradict Sentencing Policy, and Diminish U.S. National Security*, 109 Geo. L.J. 142, 158 (2022), available at https://bit.ly/3SVmW2E ("[e]mpirical data about recidivism and current research into radicalization cast doubt on this assumption and suggests a greater emphasis on rehabilitation and proportionality."). *But see United States v. Mumuni Saleh*, 946 F.3d 97, 113 (2d Cir. 2019) ("when it comes to sentencing terrorism, Congress and the United States Sentencing Commission 'plainly intended for the punishment of crimes of terrorism to be significantly enhanced without regard to' specific facts of the case") (quoting *United States v. Stewart*, 590 F.3d 93, 175 (2d Cir. 2009) (Walker, J., *concurring in part and dissenting in part*).

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 57 of 60

*United States v. Alhaggagi*, 372 F. Supp. 3d at 1015.

Here, the balance between the offense and the offender has been irremediably disrupted by the PSR's reflexive placement of Mr. Jones in CHC VI.  In addition to ignoring the mandate of §3553(a)(1), and overstating Mr. Jones's CHC as much as possible under the Guidelines (from the lowest to the maximum), the enhancement precludes any retention of individualized sentencing of Mr. Jones because it effectively removes from advisory Guidelines consideration the only axis that integrates a defendant's background and history into the advisory Guidelines equation.[57]

---

[57]  Former Justice Breyer, who chaired the Sentencing Commission, recounted the "trade-offs" that were part of the initial Sentencing Commission's compromises in formulating the Guidelines and their framework, including how the Criminal History Category was designed as the sole element that considered *offender* characteristics:

> [o]ne important area of such compromise concerns "offender" characteristics.  The Commission extensively debated which offender characteristics should make a difference in sentencing; that is, which characteristics were important enough to warrant formal reflection within the Guidelines and which should constitute possible grounds for departure.  Some argued in favor of taking past arrest records into account as an aggravating factor, on the ground that they generally were accurate predictors of recidivism.[] Others argued that factors such as age, employment history, and family ties should be treated as mitigating factors.[] Eventually, in light of the arguments based in part on considerations of fairness and in part on the uncertainty as to how a sentencing judge would actually account for the aggravating and/or mitigating factors, the Commission decided to write its offender characteristics rules with an eye towards the Parole Commission's previous work in the area.[]  As a result, the current offender characteristics rules look primarily to past records of convictions. They examine the frequency, recency, and seriousness of past crimes, as well as age, treating youth as a mitigating factor. The rules do not take formal account of past arrest records or drug use, or the other offender characteristics which Congress suggested that the Commission should, but was not required to, consider.[] In a word, the offender characteristics rules reflect traditional compromise.

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 58 of 60

Ordinarily, the exclusion of consideration of the defendant's background and history in the ordinary advisory Guidelines calculation is offset by the CHC. Here, though, assigning Mr. Jones to CHC VI has created a severe *im*balance, negating by itself the other §3553(a) factors that greatly outweigh the arbitrary application of the absolute and extreme horizontal Guidelines enhancement applied via §3A1.4(b). *See* United States Sentencing Commission March 2006 *Final Report on the Impact of* United States v. Booker *on Federal  Sentencing*, at 78 (excessive CHC constitutes one of the four most common reasons post-*Booker* for non-Guidelines sentences imposed below the calculated range).

The distortion created by §3A1.4(b) provides further compelling justification for a sentence based on the other factors set forth in 18 U.S.C. §3553(a). It is respectfully submitted that the only means of restoring any equilibrium to Mr. Jones's sentencing, and complying with the dictates of §3553(a)(2), is by recognizing that his prior criminal record would place him in CHC I, and/or imposing a sentence grounded in those §3553(a) sentencing factors.

### G.    *The Remand Returns to the Court Its Traditional Discretion at Sentencing*

As a result of the vacatur of Count Three of the original Indictment, the Court is no longer constrained by any mandatory minimum term of imprisonment. Thus, it is vested with the full discretion afforded it to impose a reasonable sentenced "sufficient, but not greater than necessary" to accomplish the objectives of sentences enumerated in §3553(a)(2)(A)-(D).

However, the initial sentence, as well as the Guidelines generally, can exert an "anchoring bias" effect on sentencing, explained by U.S. District Judge Mark W. Bennett (Northern District of Iowa) in a law review article as follows:

> judges' sentences are subconsciously anchored by the calculated Guidelines range. This Article offers a simple, modest, and practical solution that requires no change in existing law by the Supreme Court or Congress. It simply requires rearranging the numerical anchoring information in the presentence report and adding additional  relevant numerical information to counteract the anchoring effect of the Guidelines. If federal district court judges are educated about the effect of cognitive anchoring and their own bias-based blind spots to it    their improved awareness can only enhance the fairness of sentencing.

---

*See* Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1 (Fall 1988), at 19-20 (footnotes omitted).

LAW OFFICES OF

**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 59 of 60

Hon. Mark W. Bennett (United States District Judge, Northern District of Iowa), "Confronting Cognitive 'Anchoring Effect' and 'Blind Spot' Biases In Federal Sentencing: a Modest Solution For Reforming a Fundamental Flaw," *Journal of Criminal Law and Criminology*, Volume 104, Issue 3 (Fall 2014) (hereinafter "*Anchoring Effect*"), available at bit.ly/3CtqhPt. *See also* Nancy Gertner, "Judicial Discretion in Federal Sentencing   Real or Imagined?" *Federal Sentencing Reporter*, Vol. 28, No. 3, February 2016), available at bit.ly/3RWNLCp.

Judge Bennett, relying on studies in a number of disciplines, concludes that "[t]he gravitational pull of the Guidelines appears to be so strong that the change from mandatory to advisory Guidelines has had little to no impact on the average length of federal sentences." *Anchoring Effect*, at 521.

However, he also offers mechanisms for overcoming that "anchoring effect," including measures also utilized in self-recognizing implicit bias generally, *i.e.*, (1)  "[p]eople must be aware that bias has occurred";  (2)  "be motivated to correct the bias";  (3)  "know the direction and magnitude of the bias";  and (4)  "have sufficient control over their responses to be able to correct for the bias."  *Id.*, at 529 (footnote omitted).

The broad discretion afforded district courts to determine a sentence also conforms with 18 U.S.C. §3661, which provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  *See also United States v. Murillo*, 902 F.2d 1169, 1172 (5th Cir. 1990);  *United States v. Jones*, 531 F.3d 163, 172 n. 6 (2d Cir. 2008).

In fact, in *Pepper*, the Court cited §3661 as an important means of achieving just sentences:  "[p]ermitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.'"  562 U.S. at 488, *quoting Wasman v. United States,* 468 U.S. 559, 564 (1984).

It is respectfully submitted that considering the new and subsequent information and materials discussed above, the Court's initial sentence should not impede the Court's discretion in imposing a reasonable sentence substantially lower   even of time served   than the statutory maximum.

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
October 13, 2022
Page 60 of 60

### Conclusion

Accordingly, it is respectfully submitted that for all the reasons set forth above, as well as in connection with Mr. Jones's initial sentencing, a sentence substantially below the statutory maximum   even time served   for Mr. Jones would be reasonable, and be "sufficient, but not greater than necessary," to vindicate the goals of sentencing set forth in §3553(a)(2).

Respectfully submitted,

Joshua L. Dratel

Peter E. Brill

JLD/
Encls.

cc:   Andrew J. DeFilippis
      David W. Denton, Jr.
      Assistant United States Attorneys