UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

MAALIK ALIM JONES,

                Defendant.

S3 16 Cr. 19 (PGG)

# THE GOVERNMENT'S SENTENCING MEMORANDUM

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
*Attorney for the United States*
*of America*

David W. Denton, Jr.
Assistant United States Attorney
    *Of Counsel*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

MAALIK ALIM JONES,

Defendant.

S3 16 Cr. 19 (PGG)

## I. PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in advance of the resentencing of Maalik Alim Jones, which is scheduled for November 3, 2022.  As the Court is aware from Jones's prior sentencing in this case, Jones is an American citizen who left his Maryland home in 2011, traveled to Somalia, and joined the terrorist organization al Shabaab.  For more than four years, Jones received training from, fought with, and assisted al Shabaab's specialized fighting force, Jaysh Ayman.  During that time, Jaysh Ayman perpetrated countless attacks against members of the Kenyan military and innocent civilians, including an attack on a shopping mall in Nairobi, Kenya, that killed more than 67 people and injured five Americans; an attack in June 2014 that killed more than 50 men, women, and children in a village in Mpeketoni, Kenya; and an attack on a Kenyan military base in June 2015.  In December 2015, after four years with al Shabaab, Jones left the group and attempted to travel to Yemen to join yet another terrorist organization, the Islamic State of Iraq and al-Sham ("ISIS").  He was arrested by Somali officials while in transit.

The Court previously determined, after careful consideration of the factors set forth in 18 U.S.C. § 3553(a), that a sentence of "35 years' imprisonment is sufficient to serve all of the

purposes of sentencing." (Sent'g Tr. at 46).[1]  That sentence was vacated, however, following the

Supreme Court's decision in *United States v. Davis*, 139 S. Ct. 2319 (2019).  The change in law

that occasions this resentencing brought no change in the defendant's history and characteristics,

no change in the seriousness of his offenses or the specific conduct in which he engaged, and no

change in the need for a significant sentence to meet the purposes of sentencing.  Nevertheless, by

virtue of the statutory maximum penalties for the crimes to which the defendant has now re-

pleaded guilty, his sentence can be no more than the stipulated Guidelines sentence of 25 years'

imprisonment.  That sentence is the only appropriate sentence in this case in light of the newly

applicable statutory maximum.  A Guidelines sentence of 25 years is necessary to adequately

reflect the seriousness and depravity of the defendant's conduct, provide justice to the victims of

Jaysh Ayman's brutality, and deter Jones, and others who might consider following his deadly

path, from engaging in similar acts of terror.  No further windfall is warranted in this case.

## II. FACTUAL BACKGROUND

The facts of Jones's conduct are set forth at length in the PSR, and in the Government's

original sentencing submission in this matter.  They bear repeating, however, because the need for

---

[1] As used in this submission, "Sent'g Tr." refers to the transcript of the previous May 29, 2018 sentencing in this case.  "Def. Sub." refers to the defense's October 13, 2022 sentencing submission, "Rasmussen Rep." refers to the report of Dr. Andrew Rasmussen submitted as Exhibit 2 to that submission, and "Krellman Rep." refers to the report of Dr. Jason Krellman submitted as Exhibit 1 to the defense's October 21, 2022 letter.  "PSR" refers to the Probation Department Final Presentence Investigative Report, filed August 25, 2022.  "2018 Sent'g Sub." refers to the Government's original sentencing submission in this case.  "U.S.S.G." or "Guidelines" refers to the United States Sentencing Guidelines.

a Guidelines sentence in this case is demonstrated most powerfully by the actual facts of Jones's conduct, for which he has pleaded guilty to serious crimes of terrorism.

### A.   The Defendant's Support of al Shabaab

Maalik Jones abandoned his family and betrayed his country when he traveled to Somalia to join and fight with al Shabaab, a violent terrorist group aligned with al Qaeda that has killed countless innocents and called for attacks against the United States.  Specifically, in July 2011, Jones, a United States citizen, traveled via commercial airplane from New York to Kenya, and then by land to Somalia.  PSR ¶ 22.  As described in further detail below, Jones trained with al Shabaab, became a member of its violent and specialized fighting force, Jaysh Ayman, and fought with and provided assistance to al Shabaab.  *Id*. ¶ 20.

#### 1.   Background on al Shabaab

Al Shabaab is a jihadist terrorist group based in Somalia that has pledged allegiance to al Qaeda.  In February 2008, the United States Department of State designated al Shabaab a Foreign Terrorist Organization ("FTO").  PSR ¶ 15.  Among other things, al Shabaab has used violent means, including the ruthless slaughter of innocent civilians, to destabilize the government of Somalia, to quell the Somali population, and to force the withdrawal of foreign troops in Somalia.  *Id.* ¶ 12.  As a result of al Shabaab's recruitment efforts, men from other countries—including the United States and the United Kingdom—have traveled to Somalia to engage in violent jihad.  *See id.* ¶¶ 14, 33.  Since al Shabaab's designation as an FTO, it has made several public statements demonstrating its intent to harm the United States and its citizens and interests.  For example, in or about April 2009, al Shabaab claimed responsibility for mortar attacks targeting a United States Congressman who had been visiting Somalia.  *Id.* ¶ 15.  Similarly, after an al Shabaab member

was killed in or about May 2008, al Shabaab leaders declared that the mujahedeen would "hunt the U.S. government" and that governments supporting the United States and Ethiopia should keep their citizens out of Somalia.  *Id.*  In or about February 2012, the then-emir of al Shabaab publicly swore allegiance to Ayman al-Zawahiri, the then-emir of al Qaeda, stating that al Shabaab "will hereby merge into al Qa'ida."  *Id.* ¶ 18.

Al Shabaab maintains a unit known as Jaysh Ayman, which functions as a specialized fighting force within the terrorist group.  PSR ¶ 19.  Jaysh Ayman is responsible for carrying out commando attacks and cross-border raids in which fighters, among other things, cross the border into Kenya to target individuals and carry out terrorist attacks outside Somalia.  *Id.*

### 2.   The Defendant's Decision to Join al Shabaab

In July 2011, Jones left his wife and children at their residence in the Baltimore, Maryland area and flew from New York to Kenya.  According to interviews with Jones's wife and other family members conducted by law enforcement after Jones's arrest, Jones had attended a mosque in the Baltimore area and had become increasingly religious and radicalized in the period before his departure, including by watching radical Islamic videos.

After arriving in Kenya, Jones traveled by land to Somalia.  Once in Somalia, he trained, worked, and fought with al Shabaab.  PSR ¶ 11.  Among other things, Jones received military training at an al Shabaab training camp, during which he learned to operate an AK-47 assault rifle, a PK machine gun, and rocket-propelled grenades.  *Id.* ¶ 30.  Following his training, Jones became a member of Jaysh Ayman.  Among other things, Jones fought alongside other Western al Shabaab recruits in a battle against Kenyan soldiers in Afmadow, Somalia.  *Id.*  ¶¶ 30-31.

4

### 3. Al Shabaab's Attacks on Innocent Civilians

Al Shabaab, and Jaysh Ayman in particular, has been especially brutal in its willingness to target civilians, and the group has committed numerous attacks against innocent people during the time period in which Jones was a member. For example, on September 21, 2013, other members of al Shabaab entered the Westgate Mall in Nairobi, Kenya and held those inside hostage for over 48 hours. The masked gunmen killed 67 innocent civilians and injured 175 others, including five Americans. On April 2, 2015, al Shabaab members—not including Jones—stormed the Garissa University College in Garissa, Kenya, killing 148 people and injuring 79 others. Those gunmen held over 700 students hostage until members of the Kenyan Defense Force ended the siege and killed the attackers. Al Shabaab claimed responsibility for both of these massacres.

The attacks on the Westgate Mall and Garissa University were not the only times al Shabaab targeted innocent civilians. On June 15, 2014, Jaysh Ayman carried out an attack on the village of Mpeketoni, Keyna. PSR ¶ 20. During the attack, Jaysh Ayman fighters hijacked a van, raided a police station, and killed approximately 53 men, women, and children by shooting them and slitting their throats. *Id.* The attackers burned hotels, restaurants, and government offices. Two days later, on June 17, 2014, members of the unit set fire to houses in the vicinity of Mpeketoni. *Id.* The attackers pulled victims from their homes and killed at least 15 people during the overnight attacks. *Id.* An al Shabaab propaganda video that claimed responsibility for and featured images of the Mpeketoni attacks was subsequently recovered from a Jaysh Ayman fighter. The video shows the attackers, including an individual with his face covered who appears to be Jones, preparing for the attack and walking toward the village of Mpeketoni. It later depicts the fighters laying their victims in the streets and slitting their throats.

Attached to the Government's original sentencing submission as Exhibit A were transcripts of interviews of some victims of the June 2014 Mpeketoni attack.[2]  Their accounts demonstrate the extreme and wanton violence in which Jaysh Ayman engaged.  For example, David Mbukiza, a victim of the attack who was shot in the leg explained:

> I recall very well that day, June 14, 2014 on a Sunday.  We were watching a soccer match at the video shop.  It was during the second half at halftime when we went outside to take a break while the match was going on.  When we got outside there were gunshots and a house on fire.  Everyone started running for his safety.  My neighbor Anthony Kahindi who has a motorbike told me that we should go home quickly because it was unsafe.  We got on the motorbike and at a distance of 200 meters, we came across a Nissan vehicle stopped on the road.  . . . . The [people in the Nissan] pursued us for about 500 meters and that is when they hit my leg . . . . When they hit my leg, the motorbike lost control because the whole back tire was hit, and then they began shooting at the individual who was driving the motorbike on the right shoulder.  He was unable to control the motorbike and we fell down. . . . I slept there until the following day at 8:00 am.  Lo and behold as I slept there the blood was flowing to the road.  When the neighbors came to see what was happening there, they followed the blood flow and found me sleeping in the bushes.

2018 Sent'g Sub. Ex. A at 1-2.  Mbukiza explained that his injuries left him unable to work, and he could no longer afford private school for his child.  *Id.*  Esther Mungai, whose husband was burned to death in the Mpeketoni attack, described Jaysh Ayman's advance on her village:

> I lived there in Mpeketoni town. . . . I heard the gunshots go off really loudly.  I now waited for it because I had never heard a gunshot sound like that one.  I waited, and waited, and waited.  As I was waiting—I live by the road . . . there was a guest house close to where I [was] renting a house.  Now I saw guns firing at that guest house.  It looked like stars shooting out—ah!—I went back to the house.  When I got in the house I locked the door and looked through the window since the moon was bright.  On looking, I saw a group of about thirty people approaching carrying guns and they were covered up [gesturing to her face].  Their clothing resembled that of the people in the forest.  I saw one had a flag—he was holding it up like this [holds right hand up] leading.  When they got closer—there was a car by the

---

[2]  FBI agents showed several of these victims a photograph depicting Jones.  Although the victims did not recognize Jones as one of the attackers, his face was covered in the video that appears to depict his appearance prior to the Mpeketoni attack.

roadside, and about three other cars—they set it on fire.  They put something in the car that released fire.  As it released the fire they laughed—they were laughing out loud.

They came closer.  There is a guest house that is close by me now.  There were about—about six tractors and about two lories.  One was close by me—at the place I was renting.  They came very close.  They now came as—as close as here outside.  I was just peeking at them—they set it on fire.  They spoke a language that sounded like Somali—and they laughed a lot.  Once they had burned those vehicles, they then went to the road.  Now there, about ten steps forward was the firing of gunshots—twa-twa-twa-twa—they were moving along—as they moved along they fired shots.  When they found a guest house they fired at it.  They went around the road—they went on—they got to a house that was-that was called Monica Guest House.  Now that is where they killed 12 people.  They were laid down—and shot at while lying there.

*Id.* at 4-5 (second and third brackets in original).  Lucy Wanjuku, who was also widowed in the attack, recounted that the loss of her husband has devastated her family.  She explained, "As a result of the attack that took place in Mpeketoni on June 15, 2014, I was left a widow.  I had a husband and two children.  My husband was everything.  I was a house wife—he was the breadwinner—everything; he is the one who provided everything; the children's tuition, food and clothing for the children."  *Id.* at 19.

### 4.  The Lamu, Kenya Attack and Recovery of Electronic Media

Many of the attacks carried out by the Jaysh Ayman unit during the period of Jones's membership in al Shabaab targeted the Kenyan government and defense forces.  For example, on June 14, 2015, a contingent of Jaysh Ayman fighters, not including Jones, ambushed a Kenyan Defense Force base in Lamu County, Kenya, using various weapons, including AK-47 rifles and rocket-propelled grenades.  PSR ¶ 17.  Two Kenyan Defense Force soldiers and all of the al Shabaab fighters who participated in the attack were killed.  *Id.*

Attached as Exhibits B, C, and D to the Government's original sentencing submission were

7

interviews of Kenyan officers who were present for al Shabaab's June 2015 Lamu attack. Their accounts demonstrate the brutality of the tactics used by al Shabaab, and the effects its brutality had on the Kenyan soldiers and their families. For example, a Kenyan Army Captain who was injured in the attack explained:

> This . . . was one of the most . . . traumatizing days that I've experienced. One, apart from me being injured, there is the issue of my soldiers, [who were] fully traumatized, others, they lost their life. . . . [I]t's very sad to know some were very young, newly married, they had spouses who were looking upon them, others— they had very young kids. The kids will no longer have a father. They will forever remember they lost their father and through means that were never justified.
>
> * * *
>
> This—this not a thing that will fade away [from] my life. I know the families of my soldiers—who lost their life—who were injured. I and the rest of the Company, the soldiers we were with, our lives will never be the same again. . . . It was unwarranted. We were in line of duty doing what we are supposed to do, and I think such people need extensive counselling and be guided. Terrorism helps no one.

2018 Sent'g Sub. Ex. B at 1, 2.

Following the battle, Kenyan authorities recovered electronic media from the body of a deceased al Shabaab fighter who had been killed in the attack, and provided the media to the FBI. *See* PSR ¶ 23. The FBI's review of the media revealed numerous videos in which Jones is depicted with other prominent al Shabaab fighters, including members of Jaysh Ayman who were killed in the June 2015 Lamu attack, two of which are described in the PSR. For example, in the video the PSR identifies as the "Shirwa Sermon" video, Jones is seen sitting behind Luqman Osman Issa, an al Shabaab commander, as Issa gave a sermon to a crowd of male fighters and exhorted the fighters

to carry out attacks on Kenyans.[3]  *See* PSR ¶¶ 24-25.  In another video, Jones is seen with other al Shabaab fighters while Jones is holding an AK-47 assault rifle.  *See id.* ¶ 26.

Hours after the attack in Lamu, Jones called the mother of one his fellow Jaysh Ayman fighters, a British citizen named Thomas Evans who was killed in the attack, to inform her of Evans's death.  PSR ¶ 33.  The video and phone call make clear that, even if Jones did not himself participate in the attack, he was certainly aware of it before and after.[4]

### 5.  The Defendant's Arrest

On December 7, 2015, a battalion of Somali National Army ("SNA") soldiers apprehended Jones in Baraawe, Somalia.  PSR ¶ 27.  The soldiers were on patrol when they came upon Jones attempting to procure a boat in the Baraawe harbor.[5]  The soldiers took Jones into custody and brought him to the SNA headquarters in Baraawe.  SNA personnel questioned Jones over the course of approximately two days.  An English-speaking SNA officer ("Officer-1") was present

---

[3] A cooperating defendant in this District (the "CW") who is a former al Shabaab commander, viewed several screenshots of the aforementioned videos.  Upon reviewing the screenshots, the CW identified Issa in the videos as an individual who fought under the CW's command in numerous battles for al Shabaab.  *See* PSR ¶ 40.

[4] At Jones's original sentencing, the Court concluded that it "will not rely for purposes of sentencing that Mr. Jones called the mother of Thomas Evans. Setting that aside, I will consider, for purposes of sentencing, that Mr. Jones knew about the attack on Kenyan forces in Lamu." (Sent'g Tr. at 10).  Contrary to the defense submission's suggestion (*see* Def. Sub. at 4), the Court's conclusion that it need not resolve that issue for purposes of sentencing does not have any preclusive effect.  To the extent that the Court believes that additional factual presentation on this issue would be dispositive at Jones's resentencing, the Government is prepared to make a supplemental submission of the phone record exhibits that support the factual conclusions in the PSR.

[5] Baraawe is a common point of departure for individuals traveling by boat to Yemen or other Somali ports.

for each of those interviews.  Jones told Officer-1, in sum and substance, that he had lived in Somalia for five or six years, during which time he had been a member of a fighting group within al Shabaab.  Jones further stated that prior to his arrest, he had left al Shabaab due to a clash within the group.  Jones explained that he was transiting through Baraawe, where he and his co-conspirators had planned to board a boat and travel to northern Somalia where they would join Daesh, or ISIS, in Somalia.  Jones told Officer-1 that al Shabaab had been hunting Jones and other individuals who had defected from the group to join ISIS in Somalia.

Following Jones's arrest, Somali authorities permitted the FBI to interview Jones outside the presence of Somali authorities.  After being advised of his *Miranda* rights, Jones admitted that in July 2011, he had left Baltimore intending to join al Shabaab.  PSR ¶¶ 28-29.  He further stated that he had traveled to New York City and flown from there to Morocco.  *Id.* ¶ 29.  He added that approximately one week later, he had traveled to Kenya, and then to Somalia by taxi.  *Id.*  Jones stated that once in Somalia, he had traveled to territory controlled by al Shabaab and attended a training camp where he had received religious instruction and training in how to shoot firearms, including AK-47s and rocket-propelled grenades.  *Id.* ¶ 30.

According to Jones, upon completion of his training, he was assigned to the Jaysh Ayman fighting force.  PSR ¶ 30.  Thereafter, he participated in the aforementioned battle against Kenyan forces in Afmadow, where, according to Jones, he was injured by a missile.  *Id.* ¶ 31.  Jones stated that after receiving medical treatment for his injuries, he had returned to service with his Jaysh Ayman unit.  After several years, he attempted to travel to Yemen.  *Id.*  Jones also identified himself in several screenshots of the above-referenced videos.  *Id.* ¶¶ 24, 26.

The FBI subsequently took custody of Jones in Somalia and transported him to this District,

where he arrived on December 18, 2015.

### B.  Procedural History

On September 8, 2017, the defendant originally pled guilty pursuant to a plea agreement to all three counts of a superseding information, S1 16 Cr. 19, charging him with (1) participating in a conspiracy, from at least in or about July 2011 up to and including in or about May 2015, to provide material support and resources to al Shabaab, in violation of 18 U.S.C. § 2339B; (2) participating in a conspiracy, from at least in or about July 2011 up to and including in or about May 2015, to receive military-type training from, and on behalf of, al Shabaab, in violation of 18 U.S.C. §§ 371 and 2339D; and (3) from at least in or about July 2011 up to and including in or about May 2015, knowingly carrying and using an AK-47 assault rifle, rocket-propelled grenades, and other weapons in furtherance of crimes of violence, specifically the crimes alleged in Counts One and Two of the S1 Information, in violation of 18 U.S.C. §§ 924(c)(1)(A) and (c)(1)(B)(ii).

On May 29, 2018, the Court sentenced the defendant to 35 years' imprisonment, in excess of the 30-year mandatory minimum required by Count Three of the S1 Information.  At that proceeding, the Court considered all of the factors set forth in 18 U.S.C. § 3553(a) at length, noting that although the defendant had a "horrific childhood" (Sent'g Tr. at 43), he "is a danger to  the community, and that a lengthy term of imprisonment is necessary to protect the community" (*id.* at 45).  Although the Court found that it was not "necessary that Mr. Jones die in jail in order to protect the community or to deter him or others from joining terrorist organizations" (*id.*), and that therefore a variance from the then-applicable Guidelines sentence of 50 years' imprisonment was appropriate, a "total sentence of 35 years' imprisonment is sufficient to serve all of the purposes of sentencing" (*id.* at 46).

11

The defendant subsequently appealed his conviction to the Second Circuit Court of Appeals. On March 6, 2020, the Court of Appeals vacated the defendant's conviction on Count Three of the S1 Information and remanded to the Court for resentencing in light of *Davis*, 139 S. Ct. at 2319. The Government moved to reinstate the counts of the original indictment in this case that had previously been dismissed in connection with the defendant's plea. (*See* Dkt. 113). The Court denied that motion, but noted that the Government could nevertheless "pursue in a superseding indictment the charges in the original indictment that were dismissed at sentencing." (Dkt. 138 at 8). A superseding indictment was returned on August 24, 2021. (Dkt. 148). The defendant subsequently pleaded guilty to a superseding information, S3 16 Cr. 19, on June 15, 2022, charging the defendant with (1) conspiring to provide material support to an FTO, al Shabaab, in violation of 18 U.S.C. § 2339B, and (2) receiving military-type training from an FTO, al Shabaab, in violation of 18 U.S.C. § 2339D.

### C.   The PSR and United States Sentencing Guidelines

The Government agrees with the calculation of the Guidelines set forth in the defendant's plea agreement and the PSR. Pursuant to U.S.S.G. § 3D1.2(b), because Counts One and Two involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan, they are grouped together into a single Group, although in this case both counts result in the same applicable Guidelines range. PSR ¶ 42. Pursuant to U.S.S.G. § 2M5.3(a), the base offense level for Count One is 26. PSR ¶ 43. Because Count One involved the provision of firearms or other material support or resources with the intent, knowledge, or reason to believe they were to be used to commit a violent act, two levels are added. *See* PSR ¶ 44; U.S.S.G. § 2M5.3(b)(l). Finally, because Count One is a felony that involved a

federal crime of terrorism, 12 levels are added.  *See* PSR ¶ 45; U.S.S.G. § 3Al.4(a).  Because the defendant accepted responsibility by pleading guilty in a timely manner, his offense level is reduced by three levels, PSR ¶¶ 50-51.  Accordingly, his Guidelines offense level is 37].

Further, because Counts One and Two are felonies that involved a federal crime of terrorism, pursuant to U.S.S.G. § 3A1.4(b), the defendant's Criminal History Category is VI.

Based upon the offense level of 37 and Criminal History Category of VI, the defendant's stipulated Guidelines range for Counts One and Two is 360 months' to life imprisonment. However, the statutorily authorized maximum term of imprisonment for Counts One is 180 months, and Count Two carries a fixed term of 120 months, resulting in a statutory maximum of 25 years' imprisonment.  Accordingly, the Guidelines sentence for Counts One and Two is 25 years' imprisonment.  *See* U.S.S.G. § 5G1.1(a) (noting, when sentencing on single counts of conviction, that "the statutorily authorized maximum sentence shall be the guideline sentence" where the statutory maximum "is less than the minimum of the applicable guidelines range"). Therefore, pursuant to U.S.S.G. § 5G1.2(d), because the sentences the Court can impose on those Counts individually is less than the total punishment prescribed by the Guidelines, the Court should order that they run consecutively in order to impose the Guidelines sentence.[6]

### III. DISCUSSION

#### A.   Applicable Law

The United States Sentencing Guidelines still provide strong guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d

---

[6] In addition, after determining the defendant's ability to pay, the Court may impose a fine pursuant to U.S.S.G. § 5E1.2.  At Guidelines level 37, the applicable fine range is $40,000 to $400,000.

103 (2d Cir. 2005).  Although *Booker* held that the Guidelines are no longer mandatory, it held also that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing.  543 U.S. at 264.  As the Supreme Court explained, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," and that "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).  After calculating the Guidelines, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3); the Guidelines range itself, *id.* § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7). *See Gall*, 552 U.S. at 49-50 & n.6.  In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

- to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

- to afford adequate deterrence to criminal conduct;

- to protect the public from further crimes of the defendant; and

- to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

14

Courts may not presume that the appropriate sentence necessarily lies within the Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50, n.6.  Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita v. United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46.  To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* at 50.

## B.   The Nature and Seriousness of Jones's Crimes and the Need for Just Punishment Necessitate a Guidelines Sentence

For this defendant—who abandoned his life and family in Baltimore in order to join and fight with a terrorist group that murders innocents and poses a serious, ongoing threat to the lives of American citizens at home and abroad—the nature and seriousness of the offense could hardly be more serious and, consistent with the Probation Department's recommendation, strongly counsel in favor of a Guidelines sentence.  Jones was not a misguided youth who naively embraced a radical or violent ideology.  He did not merely "study the Koran and contribute to the running of [a Somali] village through menial labor and farming." (Krellman Rep. at 4).  He went far beyond merely joining and swearing allegiance to al Shabaab, engaging in isolated or relatively minor acts of support.  Rather, over the course of more than four years, after traveling halfway around the

15

world, he fully committed himself to "one of al-Qa'ida's most dangerous affiliates, which has killed thousands of people, including Americans, in Somalia and across East Africa." Antony J. Blinken, Press Statement, Terrorist Designation of al Shabaab Leaders, Oct. 17, 2022, available at https://www.state.gov/terrorist-designation-of-al-shabaab-leaders. Jones abandoned his family to join and train with Jaysh Ayman, one of its most specialized and violent units. And, by his own admission, the defendant took up arms and engaged in battle in furtherance of the organization's murderous goals. Jones's involvement in al Shabaab was not short-lived or fleeting; instead, it lasted for years, during which time the group carried out at least four brutal, deadly attacks, killing hundreds of people. Nor was Jones merely an innocent bystander to the group's atrocities. He trained with Jaysh Ayman, learned how to use AK-47s and other deadly weapons, and then deployed them on the battlefield. He actively fought in combat on behalf of an enemy that he knew posed a danger to the national security of the United States (*see* July 11, 2022 Plea Tr. at 22-23 ("I knew that al Shabaab was a designated foreign terrorist organization.")). Jaysh Ayman's indiscriminate attacks on civilian and military targets were not only something the defendant was aware of, "it is a fair inference . . . that he approved of them." (Sent'g Tr. at 41). The crimes to which Jones has twice pled guilty are among the most serious, and a Guidelines sentence is necessary to provide just punishment for his conduct—whatever *post hoc* justifications he may seek to offer for them.

The need for a lengthy sentence is confirmed by the structure of the Guidelines' terrorism enhancement. In 1994, Congress mandated that the U.S. Sentencing Commission establish a Guidelines enhancement for terrorism offenses to ensure that defendants convicted of such crimes receive punishment commensurate with the extraordinary nature of their conduct. *See United*

*States v. Mumuni*, 946 F.3d 97, 112 & n.64 (2d Cir. 2019) (citing Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 120004, 108 Stat. 1796, 2022).  The resulting enhancement set forth in Section 3A1.4(a) specifies a minimum base offense level and criminal history category to apply to any crime of terrorism, even if the calculations under an individual Guideline would be lower.

> The import of this enhancement "could not be clearer": It reflects Congress' and the Commission's policy judgment "that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time."

*United States v. Stewart*, 590 F.3d 93, 172-73 (2d Cir. 2009) (Walker, J., concurring in part) (quoting *United States v. Meskini*, 319 F.3d 88, 91-92 (2d Cir. 2003)); *accord United States v. Ceasar*, 10 F.4th 66, 79 (2d Cir. 2021).

Notably, the defense does not even address this first factor set forth in Section 3553(a)(2), focusing exclusively on the other factors (which the Government addresses further *infra*) to suggest that a below-Guidelines sentence is appropriate.  But the Second Circuit has repeatedly warned against undercounting the severity of conduct supporting foreign terrorist organizations in sentencing defendants in other terrorism cases.  Recently, in *United States v. Ceasar*, 10 F.4th 66 (2d Cir. 2021), the defendant "expressed her support for ISIS, encouraged others to join ISIS abroad, and helped individuals in the United States contact ISIS members overseas," who "then facilitated U.S.-based ISIS supporters' travel to ISIS controlled territory."  *Id.* at 68.  The defendant "herself intended to travel to ISIS territory by way of Sweden, where she planned to marry another ISIS supporter."  *Id*.  Ceasar was, however, unlike Jones, stopped by law enforcement at JFK Airport before she could achieve her goal.  *See id.*  In that respect, her offense was substantially

less serious than Jones's conduct, in which he successfully traveled, took up arms with al Shabaab, fought for years with Jaysh Ayman, and trained in the use of particularly deadly weaponry he then deployed on behalf of that terrorist organization.  The Second Circuit reversed Ceasar's sentence of 48 months' imprisonment, finding the sentence "shockingly low and unsupportable as a matter of law."  *Id.* at 70.  Among the errors committed by the district court, the Second Circuit highlighted the district court's inadequate consideration of the Section 3553(a) factors concerned principally with the defendant's crime, rather than the defendant's life story:

> While Ceasar's need for rehabilitation from years of trauma and abuse was one factor that the district court could have properly taken into consideration at sentencing—perhaps it may indeed merit, in the court's discretion, a below-Guidelines sentence—the district court's assigning it overwhelming weight while failing to give adequate consideration to the competing goals of sentencing—including the need for the sentence to protect the public, deter criminal conduct of the defendant specifically and others generally, promote respect for the law, and reflect the seriousness of the offense committed—was an abuse of discretion.

*Id.* at 81; *see also generally Mumuni*, 946 F.3d at 97; *United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009).

In this case, as the Probation Department correctly advises, "the seriousness of the instant offense trumps any mitigating factors and a lengthy prison term is warranted."  PSR at 27.  Jones's conduct was far more serious than Ceasar's, and so it would be an even greater error than in that case to ignore the severity of his crimes.  The Court reached that same conclusion at Jones's original sentencing in imposing a sentence of 35 years' imprisonment.  And that same conclusion mandates a Guidelines sentence of 25 years' now.

## C.   A Guidelines Sentence Will Serve the Purpose of Deterrence, Protect the Public, and Promote Respect for the Law

A Guidelines sentence is also necessary in this case in order to "afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B), and "promote respect for the law," *id.* § 3553(a)(2)(A). Indeed, the need for general deterrence here is especially paramount. For groups such as al Shabaab, recruits like Jones are the lifeblood of their operations. Such organizations aggressively seek to attract young recruits—typically young men in their 20s and 30s—so that they can train and employ those men to carry out vicious attacks around the globe. For example, in 2019, al Shabaab released a recording of its chief spokesman, Ali Dheere, exhorting Muslims in western nations to join in fighting with terrorist organizations, stating:

> The time of retribution will come, no matter how long it takes, and we quench our faith with the blood of our martyrs . . . .

> [W]e say to the Muslims in the West, wake up from your slumber, and know that you are in the den of wolves who surround you from every direction and lie around you. You are not safe from their gaze, even when you are inside the mosques. And those who are steadfast on their religion and obey its teachings are accused with charges and thrown into the darkness of prison. . . .

> O Muslims, you must realize that there is no future for you in the West, and that you must return to your countries, to participate in liberating them from the enemies and to live afterwards as Muslims, free under the shade of the Shariah and the governance of Islam. This is the great goal pursued by your brothers the mujahideen, opposed in that by the Crusaders and their supporters, who fight them on air, land, and sea with all kinds of weapons and trickery.

Similarly, in November 2019, al Shabaab released a recording of its emir, Ahmed Umar, exhorting followers to attack Americans, following an unsuccessful attack by al Shabaab on an American military base in Baledogle, Somalia:

> I hereby call upon all Muslims and the Mujaahideen to make the targeting of American interests worldwide their first priority.

> I call upon them to kill the Americans wherever they find them. Restrict their movement and besiege them, for it is through such acts that you will obtain the lofty levels of paradise. Ask Allah to grant you success and steadfastness.

Indeed, the threat posed by al Shabaab to the United States has only increased in recent years since the defendant's arrest.  Between January 15 and 16, 2019, five al Shabaab members attacked the DusitD2 hotel in Nairobi, killing approximately 21 people, including Jason Spindler, a U.S. citizen. On or about January 5, 2020, a group of al Shabaab terrorists attacked a U.S. military installation and airfield located in Manda Bay, near Lamu, Kenya, killing three U.S. nationals serving there. And al Shabaab coordinated a long-running international plot to conduct a suicide attack inspired by the attacks of September 11, 2001, using a hijacked airplane to crash into a building in the United States.  *See United States v. Abdullah*, 20 Cr. 677 (AT) (S.D.N.Y. 2020).  While Jones himself is obviously not responsible for conduct that post-dates his arrest, the need to afford adequate deterrence to individuals contemplating joining al Shabaab at the present time demands the most serious penalties.

As for individual deterrence, a Guidelines sentence of 25 years' imprisonment, as recommended by Probation, is necessary to deter Jones from returning to his criminal conduct. Terrorism is a crime with high recidivism rates and rehabilitation is notoriously difficult for those convicted of it.  *See Meskini*, 319 F.3d at 91-92 (noting the link between "the difficulty of deterring and rehabilitating" terrorists and the conclusion that "terrorists and their supporters should be incapacitated for a longer period of time").  As Judge John M. Walker has stated, "[i]n no area can the need for adequate deterrence be greater than in terrorism cases, with their potential for devastating loss of innocent life."  *United States v. Stewart*, 590 F.3d 93, 181 (2d Cir. 2009) (Walker, J., concurring).

The defense submission and its accompanying expert reports focus principally on the defendant's upbringing and family circumstances when arguing for a substantial downward

variance from the Guidelines sentence. While the Court should appropriately consider Jones's history and characteristics, as was true at Jones's original sentencing, his troubled childhood does not explain, much less justify, his decision to leave his home to join a terrorist organization, and does not offer any reason for the Court to deviate from the balance it struck at his original sentencing. Notably, the defendant's letter and the reports of Drs. Rasmussen and Krellman are entirely devoid of any mention whatsoever of the conduct the defendant in fact engaged in and to which he has twice pleaded guilty. It beggars belief to characterize the defendant's remorse as "deep and genuine" (Def. Sub. at 6), when he fails to even confront in the most basic way the conduct in which he engaged. For similar reasons, the expert reports submitted by the defense are of at best dubious value. The Court should not rely on analysis that utterly fails to engage whatsoever with the conduct for which the Court is charged with sentencing Jones. *See* Rasmussen Rep. at 7 (describing defendant's conduct in Somalia as that he "pursued religious study, engaged in combat, got married and fathered a child"); Krellman Rep. at 4 (noting that the evaluation did not include any "discuss[ion of] his association with or activities within that organization [al Shabaab"). While asserting a variety of clinical diagnoses, they offer no explanation as to any supposed nexus between those diagnoses and the defendant's conduct—which occurred over the course of years, required substantial planning and thought, and during which he himself told his family that he was happy.

Indeed, the defense submission itself highlights the problem with relying on these diagnoses. As it asserts, "childhood abuse is . . . a well-established risk factor for juvenile and adult offending" (Def. Sub. at 12), and the Government certainly does not dispute that the defendant faced difficult circumstances as a child. But the defense then relies heavily on Dr.

Rasmussen's conclusion that "Mr. Jones has a notable lack of antisocial behavior in his history for someone with so many adverse childhood experiences."  (Def. Sub. at 12, *see also id.* at 6).  Put more plainly, Dr. Rasmussen's clinical conclusion was that the defendant's childhood experiences, while horrible, *do not* explain the conduct of which he has been convicted, because his behavior is atypical of someone with his history, and that he is an "outlier" (*id.* at 8) from the inference that his childhood experiences would predispose him to the violent conduct that he chose to engage in with Jaysh Ayman.

Moreover, even if these diagnoses were in some way (unexplained by the defense submission or the reports themselves) causally related to the defendant's decision to travel halfway around the world to fight for years on behalf of a violent terrorist organization, that would not be a basis to reduce his sentence, particularly in light of the array of countervailing factors discussed herein and recognized by the Court at the initial sentencing.  As the Second Circuit recognized in *United States v. Lutchman*, 910 F.3d 33 (2d Cir. 2018), in affirming a district court's imposition of the maximum sentence on a terrorism defendant with mental illness, the defendant's "mental health thus cut 'both ways,'" in that it "impaired his ability to appreciate the severity of his conduct and thereby 'created a real danger in the community,'" and the district court reasonably "concluded that the only way 'to protect the public from further crimes' was to impose the maximum sentence of imprisonment."  *Id*. at 40.  Similarly, in *United States v. Encarnacion*, 19 Cr. 118 (RA) (S.D.N.Y. 2020), in sentencing a defendant with a significant history of actual psychological diagnoses who sought to travel overseas to join the terrorist organization Lashkar e-Tayyiba, Judge Abrams recognized that "someone who is borderline intellectually disabled, as his lawyer asserts he is, along with supporting documentation, is less morally culpable in a traditional sense.  But

22

that doesn't make them, and doesn't make Mr. Encarnacion, less dangerous . . . . [M]ental health issues can cut both ways, when they impair the ability of someone to appreciate the severity of his conduct, thereby creating a real danger to the community." *Id.*, Aug. 11, 2020 Sent'g Tr. at 30-31.   In this case, the Court previously recognized correctly that the defendant "is a danger to the community, and that a lengthy term of imprisonment is necessary to protect the community." (Sent'g Tr. at 45).   Nothing in the defense submission suggests that Jones acted anything other than fully voluntarily in choosing to make common cause with an organization that has pronounced this country to be its principal target, and to join a particularly violent arm of al Shabaab responsible for horrific attacks.   The defendant's choices and actions paint a clear picture: Maalik Jones, an American citizen, knowingly abandoned his life as a father, husband, and resident of Baltimore and chose instead to train and fight as a battle-hardened terrorist.   Few crimes could be more serious.

The defense also relies on its experts' reports to assert that Jones is a good candidate for rehabilitation, but that assessment is belied by the reports' failure to engage with the conduct that has him before this Court.   It is impossible to credit claims that Jones is a good candidate for rehabilitation who does not need appreciable individual deterrence when the experts presenting that assessment make no mention whatsoever of the conduct for which he needs rehabilitation.   If anything, the generic, self-centered nature of Jones's letter suggests that he has not, in fact, appreciated the scope or wrongfulness of his conduct.   Jones acknowledges that to the extent his worldview has changed, it is *because of* the deterrent effect of the sentence previously imposed by

the Court: "The most important thing that has happened to me is seeing the reality of prison life and realizing that nothing in the world is worth ending up here." (Def. Sub. Exh. 1).[7]

The principal evidence that the defense submission and those expert reports rely upon is Jones's minimal disciplinary record and completion of six courses while incarcerated. As a legal matter, the first factor bears no weight. The Second Circuit has held that "no substantially mitigating weight can be borne . . . by the fact that [a defendant] did what was plainly required of him—that is, behaving himself in prison. . . . [H]is compliance with institutional regulations has no bearing on the sentencing factors a district court must consider under 18 U.S.C. § 3553(a)." *Mumuni*, 946 F.3d at 112. Nor is it particularly impressive that, over the course of six years of incarceration, the defendant has participated in a limited number of courses available to him. While what he has done is positive, it hardly makes him exceptional, and certainly provides no basis for a downward variance from the Guidelines sentence.

### D.  A Guidelines Sentence Will Avoid Creating Unwarranted Nationwide Disparities

Finally, a Guidelines sentence will avoid creating unwarranted nationwide sentencing disparities because it will fairly punish the defendant for his serious crimes. As an initial matter, the uncontested Guidelines sentencing range here is 25 years. As the Court of Appeals has explained, "the guidelines cannot be called just another factor in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors." *Rattoballi*, 452 F.3d at 131 (cleaned up); *cf. United States v. Fernandez*, 443 F.3d 19, 28 (2d Cir. 2006) (stating that "the

---

[7] Indeed, it is hard to imagine a more powerful rebuttal to the defense submission's exposition of academic theorizing that deterrence—a statutorily mandated consideration for the Court—is ineffective (*see* Def. Sub. at 8-9).

Guidelines range should serve as 'a benchmark or a point of reference or departure' for the review of sentences" (quoting *United States v. Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005))), *abrogated on other grounds by Rita*, 551 U.S. 338. "[T]o secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall*, 552 U.S. at 50. As the Second Circuit has recognized, "the mandate to take into account nationwide disparities under § 3553(a)(6), as distinct from the need to give due weight to the Guidelines under § 3553(a)(4), is modest." *United States v. Goberdhan*, 499 F. App'x 63, 66–67 (2d Cir. 2012) (quoting *United States v. Wills*, 476 F.3d 103, 110 (2d Cir. 2007)). It is precisely because the Guidelines function as a national "benchmark" that a Guidelines sentence here will advance "the need to avoid unwarranted sentence disparities." 18 U.S.C. § 3553(a)(6). The Second Circuit has been explicit that "concern about unwarranted disparities is at a minimum when a sentence is within the Guidelines range." *United States v. Irving*, 554 F.3d 64, 76 (2d Cir. 2009).

Here, Jones's culpability is significantly greater than defendants in prior "traveler" cases who have conspired or attempted—unsuccessfully—to travel to conflict zones or to join forces with terrorist groups. For example, in *United States v. Raishani*, 17 Cr. 241 (RA) (S.D.N.Y. 2019), the defendant pleaded guilty to one count of attempting and one count of conspiring to provide material support to ISIS, in violation of 18 U.S.C. §§ 2339B and 371. Raishani had attempted to leave the United States to join ISIS but had been stopped by law enforcement before he was able to do so. Raishani's Guidelines range was 300 months' imprisonment, the statutory maximum. Judge Abrams sentenced him to concurrent sentences of 240 and 60 months' imprisonment, the statutory maximum penalty on each count. Similarly, in *United States v. Pugh*, 15 Cr. 116 (NGG) (E.D.N.Y. 2017), a former member of the United States military was apprehended in Turkey en

25

route to join ISIS in Syria.  Pugh was arrested before he had an opportunity to follow through with his apparent goals of meeting with ISIS members; receiving military training; and engaging in combat or other terrorist acts.  Nevertheless, Pugh received a sentence of 35 years' imprisonment.[8] By contrast, Jones successfully completed all of those goals by training, fighting in battle, and supporting a brutal terrorist organization that massacred innocents during the very time period in which he was a member.

Indeed, in a variety of cases, courts have routinely sentenced defendants charged with similar crimes to the statutory maximum, in recognition that the penalty prescribed by Congress and the Sentencing Commission is the only appropriate sanction for such severe conduct.  *See, e.g.*, *United States v. Augustine*, No. 18 Cr. 393 (SJ) (E.D.N.Y. 2022) (defendant sentenced to statutory maximum of 20 years' imprisonment for attempting to provide material support to ISIS after being arrested in Tunisia while attempting to join ISIS in Libya); *United States v. Matthews*, No. 20 Cr. 488 (OLG) (W.D. Tex. 2022) (defendant sentenced to statutory maximum of 20 years' imprisonment for providing material support to ISIS by running an online ISIS chat group and disseminating ISIS materials); *United States v. Langhorne*, No. 19 Cr. 218 (HES) (M.D. Fla. 2022) (defendant sentenced to statutory maximum of 20 years' imprisonment for providing material support to ISIS in online chat rooms); *United States v. Clark*, No. 20 Cr. 76 (NRB) (S.D.N.Y. 2021) (defendant sentenced to statutory maximum of 20 years' imprisonment for disseminating

---

[8] The defense asserts that *Pugh* is an inappropriate comparator because he "proceeded to trial." (Def. Sub. at 54 (emphasis omitted)).  While that fact is informative as to why Pugh did not receive a reduction for acceptance of responsibility, the substance of Pugh's conduct provides a useful comparison, particularly given that it was materially less severe than that of Jones, who actually engaged in combat on behalf of al Shabaab.

large quantities of pro-ISIS propaganda and terrorist-attack training manuals in online chatrooms, participating and administering chatrooms, and exhorting other participants in chatrooms to commit "lone wolf" attacks in United States); *United States v. Sewell*, No. 19 Cr. 137 (O) (N.D. Tex. 2019) (defendant sentenced to statutory maximum of 20 years' imprisonment for attempting to recruit individuals online to join Lashkar e-Tayyiba); *United States v. Rahim*, No. 17 Cr. 169 (B) (N.D. Tex. 2019) (defendant sentenced to statutory maximum of 20 years' imprisonment on count of providing material support to ISIS after being arrested while attempting to board a flight to Jordan to join ISIS); *United States v. Alaa Sadeh*, No. 15 Cr. 558 (SDW) (D.N.J. 2016) (defendant sentenced to statutory maximum of 15 years' imprisonment for assisting another individual to travel to join ISIS overseas); *United States v. Zea*, No. 13 Cr. 72 (SJF) (E.D.N.Y. 2015) (defendant sentenced to statutory maximum of 15 years' imprisonment for attempting to travel to Yemen to join al Qaeda in the Arabian Peninsula); *United States v. Aswat*, No. 04 Cr. 356 (KBF) (S.D.N.Y. 2015) (stacking 18 U.S.C. § 2339B and 18 U.S.C. § 371 in order to sentence defendant to statutory maximum 20 years' imprisonment); *United States v. Sherifi*, No. 09 Cr. 00216 (FL) (E.D.N.C. 2012) (sentencing defendant to statutory maximum 15 years' imprisonment on material support count, followed by consecutive mandatory minimum five-year and 25-year sentences, as part of a total 45-year sentence); *United States v. Bujol*, No. 10 Cr. 0368 (DH) (S.D. Tex. 2012) (sentencing defendant to a total of 240 months' imprisonment by stacking statutory maximum penalties for 18 U.S.C. § 2339B and 18 U.S.C. § 1028A); *United States v. Hassan*, No. 09 Cr. 216 (FL) (E.D.N.C. 2011) (statutory maximum 15 years' imprisonment for violation of 18 U.S.C. § 2339A); *United States v. Shah, et al.*, No. 05 Cr. 673 (LAP) (S.D.N.Y.) (Shah, statutory-maximum 15 years; Sabir, 25 years; Brent, statutory-maximum 15 years); *United States v. Hashmi*,

No. 06 Cr. 442 (LAP) (S.D.N.Y. 2007) (statutory maximum 15-year sentence for violation of 18 U.S.C. § 2339B); *see also United States v. Kourani*, 6 F.4th 345, 357–59 (2d Cir. 2021) (affirming district court's sentence of 40 years' imprisonment for defendant's conviction of various offenses, including providing and conspiring to provide material support to Hizballah, in part because sentence "simply reflects Congress' judgment as to the appropriate national policy for such crimes" (alterations and internal quotation marks omitted)).

Section 3553(a)(6) limits the Court's consideration of comparable sentences to "the need to avoid unwarranted sentence disparities among defendants *with similar records who have been found guilty of similar conduct*." (emphasis added). The defense's arguments that a Guidelines sentence would create such a disparity seek to avoid the specific analysis of comparable cases that the statute demands (and which is set forth above) and substitute instead generic statistics and naked appeals to emotional comparison.

As to the former, the defense's resort to statistics is simply unpersuasive. Not only are the terrorism-specific statistics on which the defense relies in many cases more than a decade old, (Def. Sub. at 44-46), they also  defense submission makes no discussion of the conduct at issue in those cases (or even what particular offenses were at issue), while also failing to note that (as described above), in a large number of cases, courts have imposed statutory maximum sentences for the conduct at issue. Contrary to the defense's blithe suggestion that the Government's comparisons reflect only "a small selection of cases" (Def. Sub. at 53), courts have routinely found that the statutory maximum sentence prescribed by Congress for terrorism offenses reflects the only appropriate balancing of the Section 3553(a) factors in light of the serious threat that terrorists pose to the national security of the United States. Nor do general statistics regarding sentencing

generally (*see, e.g.*, Def. Sub at 48-49 (discussing general sentencing trends in this District)), or other offenses different from those of which the defendant was convicted (*see id.* at 49-50), provide any insight into the appropriate sentence for Jones.  Any number of crimes, including murder, which the defense submission cites, are extremely serious and warrant lengthy sentences.  And other defendants may be worthy of below-Guidelines sentences in cases that do not implicate either conduct of the severity at issue in this case or the statutory maximum that defines the Guidelines sentence recommended for Jones.  As the Second Circuit has recognized, "'[a]verages of sentences that provide no details underlying the sentences are unreliable to determine unwarranted disparity because they do not reflect the enhancements or adjustments for the aggravating or mitigating factors that distinguish individual cases.'" *United States v. Irving*, 554 F.3d 64, 76 (2d Cir. 2009) (quoting *United States v. Willingham*, 497 F.3d 541, 544 (5th Cir.2007)).

Equally unpersuasive is the defense's lengthy disquisition on the sentences received by defendants involved in the riots at the U.S. Capitol on January 6, 2021.  None of those cases involved the same offenses to which Jones has pleaded guilty, and as the defendant acknowledges, many of those cases involved plea agreements to lesser offenses.  While the appropriate sentences for defendants in those cases may be the subject of debate, the charging decisions of a different office in those entirely inapposite cases, under different circumstances, for different crimes, do not provide either an appropriate point of comparison under Section 3553(a)(6) much less any conceivable basis for a below-Guidelines sentence in Jones's case.  *Cf. United States v. Stanley*, 928 F.2d 575, 583 (2d Cir. 1991) (rejecting unwarranted disparity claim based on charging decisions and holding that "[w]e do not believe that substituting the judge's view of the proper general prosecutorial policy for that of the prosecutor constitutes a valid ground for departure from

the guideline range"); *United States v. Mitchell*, 358 F.3d 216, 219–20 (2d Cir. 2004) (rejecting

unwarranted disparity claim "where the only mitigating circumstance identified was the fact that

defendants who engaged in similar conduct but agreed to plead guilty to lesser charges received

less punishment" absent evidence of "misconduct by the prosecutor or coercion of the defendant,"

citing *Stanley*, 928 F.2d at 582-83 (cleaned up)).  Simply put, the defense's reliance on the Capitol

riot cases is far afield and utterly misplaced, and those cases have no bearing whatsoever on the

appropriate sentence in this case.

### E.  The Defense's Arguments About Conditions of Confinement Do Not Warrant a Below-Guidelines Sentence

The vast majority of the defense submission is devoted to a discussion of generally

applicable conditions in BOP facilities, virtually devoid of any discussion of Jones or the case-

specific factors that the Court must consider under Section 3553(a) in determining his sentence.

(*See* Def. Sub. at 19-42).  While the Court has the discretion to consider these factors, they do not

bear the weight the defense assigns to them.  With respect to the COVID-19 pandemic, the

measures applicable to the defendant's experience—quarantine at the MDC, for example—were

challenging, but equally necessary to the BOP's mandate of mitigating the virus's spread and

limiting the defendant's exposure to others.[9]  Moreover, COVID-19 tests and vaccines are now

widely available at BOP facilities.  The BOP has administered approximately 376,145 vaccine

doses, including booster shots offered in accordance with CDC guidance.   These and other steps

---

[9] The defense submission also cites extensively to the ongoing risks presented by COVID-19, including the prospect of "Long COVID."  (*See* Def. Sub. at 29-32).  But the defense's citation to concerns applicable to the public at large merely highlight why this is an inappropriate consideration in determining the length of Jones's sentence—the risks he faces are not unique to his incarceration, but are merely an unfortunate fact of life.  (*See, e.g.*, *id.* at 31 (noting that treatment of "Long COVID" in BOP facilities is "not entirely unlike in the general population")).

show that the BOP is meaningfully addressing the risk posed by COVID-19 to inmates, and that it has taken the threat seriously, has mitigated it, and continues to update policies and procedures in accord with the facts and recommendations, as well as directives from the Attorney General.

The Government recognizes that the pandemic has in some circumstances made inmates' incarceration "harsher and more punitive than would otherwise have been the case . . . because the federal prisons . . . have had to impose onerous lockdowns and restrictions that have made the incarceration of prisoners far harsher than normal." *United States v. Rodriguez*, No. 00 Cr. 761 (JSR), 2020 WL 5810161, at *3 (S.D.N.Y. Sept. 30, 2020) (internal quotation marks and citation omitted). These effects are an amplification of the effects that COVID-19 and responsive measures have had throughout society, including long periods of isolation and quarantining, social distancing, remote work and schooling, and other measures. The defendant, like other inmates, has been subject to lockdowns at the MDC in an effort to prevent the spread of COVID-19 within that facility. *See United States v. Pinto-Thomas*, 454 F. Supp. 3d 327, 331 (S.D.N.Y. 2020) ("[A]s stated by the Court during oral argument on the instant motions, lockdowns are a routine fact of life for incarcerated defendants and are hardly extraordinary."). In the face of the other sentencing considerations discussed above, the defendant has not demonstrated that conditions resulting from COVID-19 warrant any variance below the Guidelines sentence that his conduct demands.

Indeed, in assessing the appropriateness of any variance from the Guidelines sentence for these considerations, it is appropriate to consider the context of the defendant's resentencing. Were it not for the windfall he received by virtue of *Davis*, any reduction in Jones's previous sentence based on these subsequent considerations would be governed by 18 U.S.C. § 3582(a), and courts have uniformly recognized that, notwithstanding the broad discretion afforded to reduce sentences

under that provision, the generally-applicable conditions occasioned by the pandemic do not warrant a change in defendants' sentences. *See, e.g.*, *United States v. Espinal*, No. 10 Cr. 74 (JFB), 2021 WL 3566579, at *2 (E.D.N.Y. Aug. 12, 2021) (Bianco, J.) (Defendant claims "he now suffers from depression and anxiety because he is confined to his cell with little opportunity to communicate with his family, to go outside, and has not been able to receive mental health services," but the "defendant's depression and anxiety do not meet Section 3582(c)(1)(A)'s 'extraordinary and compelling' requirement based upon this record."); *United States v. McCullum*, No. 15 Cr. 491 (LTS), 2021 WL 1550322, at *3 (S.D.N.Y. Apr. 20, 2021) ("[E]very federal inmate sentenced prior to the pandemic has been subject to the same unexpected increase in severity of the conditions of their confinement and a greater separation from their loved ones. The changes in Mr. McCullum's confinement conditions therefore are [not] extraordinary . . . ."); *United States v. Hudson*, No. 10 Cr. 329, 2021 WL 2912012, at *4 (E.D. La. July 12, 2021) ("Hudson's reliance on pandemic-related prison lockdowns, even if it is compelling, is not extraordinary . . . to the extent this hardship confronts Hudson, it confronts . . . every prisoner in any other prison taking steps to curb the spread of the virus within its walls. It is more ordinary than it is extraordinary."); *United States v. Mitchell*, No. 15 Cr. 20609, 2021 WL 1827202, at *2 (E.D. Mich. May 7, 2021) ("[T]he conditions that affect all inmates at FCI Aliceville, regardless of their health, age, and family circumstances, do not warrant the extraordinary remedy of compassionate release for Defendant individually."); *United States v. Polnitz*, No. 17 Cr. 201, 2020 WL 1139836, at *2 (E.D. Wis. Mar. 9, 2020) ("The court understands that the defendant has a history of mental health issues . . . [b]ut those are not the kinds of extraordinary and compelling circumstances contemplated by the First Step Act. Many inmates suffer from pain and mental illness."); *United States v. Adkins*,

No. 19 Cr. 651, 2020 WL 3058097, at *2 (S.D. Cal. June 9, 2020) ("[T]he fact that [defendant] . . . has mental health problems exacerbated by anxiety over COVID-19 is insufficient to rise to the level of 'extraordinary and compelling' circumstances warranting compassionate release.").  Jones would not be entitled to any compassionate reduction in his prior sentence for these reasons, and they provide no basis for a variance from the Guidelines sentence merely because he happens to be before the Court for resentencing rather than petitioning for such a reduction.

## IV. CONCLUSION

For these reasons, the Government respectfully submits that the Court should impose a Guidelines sentence of 25 years' imprisonment.


Dated:  New York, New York
         October 27, 2022

                                         Respectfully submitted,

                                         DAMIAN WILLIAMS
                                         United States Attorney
                                         Southern District of New York

                              By:     /s/
                                         David W. Denton, Jr.
                                         Assistant United States Attorney

Cc:     Defense Counsel
        (Via Email)